UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, <br><br>         **Plaintiff,** <br><br>  -against- <br><br> **IAN BALINA,** <br><br>         **Defendant.** | Civil Action No. 1:22-CV-950 <br><br> ECF CASE <br><br> (Jury Trial Demanded) |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission" or "SEC"), for its Complaint, alleges as follows:

### SUMMARY OF THE ACTION

1. This action concerns Ian Balina's unregistered offering and promotion in 2018 of crypto asset securities called SPRK Tokens. Balina, a self-described crypto asset investor, promoter, and influencer, who claimed he could help people "make millions with initial coin offerings," failed to disclose the compensation he received from the issuer while he publicly promoted the tokens. He also failed to file a registration statement with the SEC for the tokens that he re-sold using an investing pool that he organized.

2. Sparkster, Ltd. ("Sparkster"), a software development company incorporated in the Cayman Islands, and its Chief Executive Officer ("CEO"), conducted an unregistered securities offering ("Sparkster Offering") of crypto asset securities called SPRK Tokens. This unregistered offering took place between April and July 2018, raising approximately $30 million from nearly 4,000 investors located abroad and in the United States.

3.      Balina signed a contract to invest approximately $5 million in the Sparkster Offering and promoted the offered SPRK tokens on YouTube, Telegram, and other social media platforms.  Although he agreed to receive a 30% bonus from Sparkster on the tokens he purchased in the Sparkster Offering, Balina never publicly disclosed the consideration he received for his promotion.

4.      Balina also organized on Telegram an investing pool of about fifty individuals. After he agreed to purchase the SPRK tokens from Sparkster, Balina offered members of the investing pool the opportunity to purchase SPRK tokens from him upon their release, and at least fifty members of the pool, including U.S. residents, contracted with Balina to purchase tokens that Balina had purchased from Sparkster.  Balina did not file a registration statement with the Commission for his offering and sale of SPRK tokens, and no exemption from registration was applicable.  As a result, Balina conducted his own unregistered offering of SPRK Tokens.

5.      By engaging in this conduct, as set forth more fully herein, Balina violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c)], and Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].  Balina will continue to violate the federal securities laws unless restrained or enjoined by this Court.

6.      The SEC seeks injunctive relief, disgorgement, civil penalties, and other appropriate and necessary equitable relief.

## JURISDICTION AND VENUE

7.      The SEC brings this action, and this Court has jurisdiction, pursuant to 28 U.S.C. § 1331 and Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)].

8.     Defendant Balina, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation and communication in interstate commerce, or of the mails, in connection with the acts, transactions, practices, and courses of business alleged in this Complaint.

9.     Venue is proper in the Western District of Texas pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] because Balina currently resides in the district.

## DEFENDANT

10.     **Ian Balina**, age 33, is currently a resident of Austin, Texas, where he works as CEO of a company that provides crypto investment research.  At all relevant times for the allegations in this complaint, Balina was a resident of Potomac, Maryland.  Balina's YouTube page describes him as "an influential Blockchain and Cryptocurrency Investor, Advisor, and Evangelist."  Balina, a self-described "crypto millionaire," offered his advice to investors regarding how to make money investing in crypto asset offerings based on his experience.  Balina organized an investing pool through which he distributed SPRK tokens he had promoted and purchased from Sparkster.

## RELEVANT ENTITY

11.     **Sparkster, Ltd.,** is a corporation organized under the laws in the Cayman Islands with activities in multiple countries, including the United States.  In 2018, Sparkster described itself as a developer of software to allow users to write their own software applications in "plain English" using a "drag and drop" graphical interface instead of writing code.

## BACKGROUND ON CRYPTO ASSETS

12.     An "Initial Coin Offering" or "ICO" is a fundraising event in which an entity offers participants a unique crypto asset – often described as a "coin" or "token" – in exchange for

consideration, often in the form of a crypto asset such as Bitcoin or Ether ("ETH"), and sometimes in fiat currency. The tokens are issued and distributed on a "blockchain," a cryptographically secured ledger that is spread across a decentralized computer network.

13.     The Sparkster Offering was conducted on the Ethereum blockchain ("Ethereum"). Ethereum, which is second to only the Bitcoin blockchain in terms of market capitalization, uses ETH as its crypto asset and allows the use of "smart" contracts, which are, essentially, computer programs designed to automatically execute the terms of a contract when certain triggering conditions are met, without the involvement of an intermediary.

14.     ICOs are generally announced and promoted through public internet channels or other marketing methods. An ICO issuer usually releases a "whitepaper" describing the project and promoting the ICO, often in technical terms, and promotes the ICO elsewhere, including on its website, social media, and other internet sites. To participate in the ICO, investors are generally required to transfer consideration, often in the form of crypto assets, to the issuer's blockchain address, online "wallet," or other account.

15.     At some point after the completion of the ICO, the issuer distributes the tokens to each participant's unique "wallet" address on the blockchain. Tokens can be transferred between users and are often listed on online crypto asset trading platforms to allow investors to trade the tokens for other crypto assets or fiat currency in a secondary market.

16.     ICO issuers often pay social media influencers with large online followings to promote their ICOs by endorsing them on social media. These influencers or promoters can include celebrities from unrelated industries like sports, music, and entertainment or individuals who have active followings specifically related to technology, crypto assets, and/or ICOs.

17.     As described more fully herein, Sparkster's offer and sale of SPRK tokens from April 2018 to July 2018 constituted an unregistered offering of crypto securities.

## REGULATORY FRAMEWORK

18.     Congress passed the Securities Act in order to regulate the offer and sale of securities, and in doing so, enacted a regulatory regime of full and fair disclosure, requiring issuers who offer and sell securities to provide certain important information to potential investors to enable them to make informed decisions before investing.

19.     The definition of a "security" includes a broad range of investment vehicles and instruments, including "investment contracts."   Investment contracts are investments by individuals of money in a common enterprise, with a reasonable expectation of profits or returns derived from the entrepreneurial or managerial efforts of others.  Congress defined "security" broadly to encompass a "flexible rather than a static principle" that is capable of adapting to various schemes where the money of others is collected on the promise of future profits.

20.     Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)] prohibit the unregistered offer or sale of securities in interstate commerce.  Specifically, Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)] provides that, unless a registration statement is in effect as to a security, it is unlawful for any person, directly or indirectly, to sell the security in interstate commerce.  Section 5(c) of the Securities Act [15 U.S.C. § 77e(c)] provides a similar prohibition against offers to sell or offers to buy securities, unless a registration statement has been filed as to that security.

21.     The registration statements contemplated by the Securities Act are filed with the Commission and require disclosures of essential facts that provide potential investors with information necessary to make informed investment decisions.   These required disclosures

include:  a description of the issuer's properties and business, a description of the securities to be offered for sale, information about the management of the company, financial statements audited by independent accountants, and a description and analysis of the risks and material trends that would affect the enterprise.

22.      On July 25, 2017, well before the Sparkster Offering, the Commission issued the DAO Report of Investigation (the "DAO Report"), regarding the 2016 sale of DAO Tokens on the Ethereum blockchain.  The DAO Report expressed the SEC's view that, depending upon their particulars, digital tokens or coins may be securities for purposes of the federal securities laws.

23.      Unless an exemption is applicable, Section 5 [15 U.S.C. § 77e] creates liability for any offer or sale of securities where a registration statement is not in effect and does *not* limit liability to the initial distribution.  As demonstrated below, Balina purchased SPRK tokens from Sparkster in an unregistered offering, with a view to distributing the tokens in his own offering. He offered the purchased tokens in a general solicitation, and at the time he paid for the tokens, he had already contracted for their resale.  He then distributed the tokens to members of the investing pool he had organized.  No exemption from Section 5 [15 U.S.C. § 77e] was applicable to Balina's offers or resales, and scienter is not an element for this claim.

24.      Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)] prohibits the publication or circulation via interstate commerce of a notice or communication describing a security, for a consideration received from an issuer, underwriter, or securities dealer, without full disclosure of the consideration received or to be received, and the amount thereof.  Scienter is not an element of a Section 17(b) [15 U.S.C. § 77q(b)] claim.

## FACTS

### A.    Balina's Career as a Crypto Asset Promoter

25.     After receiving bachelor's and master's degrees in computer engineering from George Washington University in 2010 and 2012, Balina began his career at various technology companies in the Washington, D.C. area.  He left his job as a "Sales Evangelist" at a Fortune 500 technology company in 2017 to focus on crypto assets and blockchain-related issues full time. Balina subsequently claimed that his initial motivation to get involved with crypto assets was to make enough money with his ICO investments to "quit his corporate job and have financial freedom."  Balina, who was born in Uganda, became a United States citizen in 2017.

26.     Around the time he left his job at the Fortune 500 technology company, Balina created a Delaware limited liability company called *Diary of a Made Man LLC*, a vehicle for Balina's social media and publishing activities with its principal place of business in Washington, D.C.  He then began documenting his investment process and ICO research on YouTube, Instagram, and other social media through an online diary entitled "Diary of a Made Man."  As part of this process, Balina became an ICO promoter.  A press release for his 2021 book described Balina as having a "data-driven moneyball style approach to investing in crypto assets" and stated that he used this approach to "turn $20,000 into over $5 million by investing in cryptocurrencies."

27.     During 2017 and 2018, as the market for ICOs exploded, Balina regularly posted videos about ICOs on his YouTube channel, including a 2017 post entitled "How to Make Millions with Initial Coin Offerings (ICOs)" that has garnered over 350,000 views to date.  He currently has approximately 110,000 Twitter subscribers, and his videos have cumulatively attracted over 2,300,000 views to date on YouTube.  Balina has previously claimed that he built a following on social media based on the value that he was providing to people.

28.     Balina also began operating a public website, *ianbalina.com*, in 2017, using a hosting provider in Dallas, Texas.  At all relevant times for the allegations in this complaint, Balina published a free "ICO spreadsheet" containing rankings of what he considered the top ICOs of the year, which he linked on the front page of his website and regularly promoted through social media. According to a press release issued for Balina's 2021 book, his ICO spreadsheet "was accessed by more than one million investors per month."   The ICOs on the spreadsheet reflected Balina's alleged personal investment strategy and were the subject of many of his YouTube videos and social media posts.

29.     In 2018, Balina launched the "Ian Balina Crypto World Tour," which would eventually lead to him meeting Sparkster's CEO.  During the tour, he hosted live "pitch contests" in different cities around the world, where technology startups pitched their ideas to live crowds, competing for an opportunity to be interviewed by Balina on his YouTube channel.  Balina described his goal to audiences as wanting to "evangelize and share with other people out there who have their own dreams and goals of having financial freedom."

30.     Because of Balina's influence as an ICO promoter, Sparkster's CEO understood that if the Sparkster Offering was included in Balina's ICO spreadsheet and promoted through his social media channels, it would reach his large audience of crypto asset investors and enthusiasts, drawing attention and investors to the Sparkster Offering.

**B.     Creation of the SPRK Tokens That Balina Promoted, Purchased, and Sold**

31.     In late 2016 and 2017, Sparkster and its CEO began development of a "no code" software development platform (the "no code platform") inspired by an idea developed at the Massachusetts Institute of Technology that allowed children to code more easily using a "drag and drop" interface.

32.     In April 2018, Sparkster began publishing on its website a whitepaper containing details about the Sparkster Offering ("the Whitepaper") and began promoting it on its Telegram channel.  The Whitepaper stated that the purpose of the Sparkster Offering was to raise funds for the development and marketing of the no code platform that would allow users to develop software applications using a "drag and drop" graphical interface instead of writing code.

33.     According to the Whitepaper, this no code platform would run on "the world's fastest Decentralized Cloud for Smart Software" (the "decentralized cloud") using a network of cell phones, notebooks, laptops, and other personal devices held by "miners," who would be rewarded with SPRK tokens for contributing their spare computing capacity to the network.

34.     The Whitepaper proposed a marketplace for software created using the no code platform (the "marketplace") where contributors could sell software created on the platform to other users, with SPRK tokens constituting the exclusive form of payment.

35.     The Whitepaper stated that SPRK tokens "may be placed on third-party exchanges" and that any users seeking to buy SPRK tokens after the Sparkster Offering would have to buy them on these exchanges.  The Whitepaper provided details regarding the token sale and distribution, including Sparkster's retention of 2% of tokens to "facilitate liquidity for an exchange listing."

36.     The Whitepaper stated that the no code platform would launch in April 2018, the marketplace would launch in May 2018, and the decentralized cloud would launch a public alpha release in the fourth quarter of 2018.

37.     According to Sparkster, the no code platform was finished and available for users to begin testing as of May 10, 2018.

38.     Although Sparkster stated in the Whitepaper and the associated *Simple Agreement for Future Tokens* ("SAFT") contract that U.S. residents were not eligible to purchase SPRK tokens, U.S. residents, including Balina, did in fact participate in the Sparkster Offering and purchased SPRK tokens.

C.     **Balina's Promotion of Sparkter's Offering of SPRK Tokens**

39.     The Sparkster Offering included both a "presale" phase and a "crowdsale" phase. Sparkster conducted the Sparkster Offering on the Ethereum blockchain, selling SPRK Tokens directly to participants in exchange for ETH, using ERC-20 smart contracts.  ERC-20 smart contracts are used by ICOs on the Ethereum blockchain and allow the offering party to create and sell fungible tokens.  Sparkster stated that it would proceed with the Sparkster Offering until it reached an aggregate cap of $30 million.

40.     At the direction of the Sparkster CEO, during the "presale" phase, Sparkster sought out investment and endorsement by various ICO promoters or influencers, including Balina. Sparkster's CEO told colleagues that he viewed obtaining Balina's endorsement as a way to draw participants to the Sparkster Offering and strategized on how to earn that endorsement.

41.     In an internal chat dated April 4, 2018, Sparkster's CEO stated, "Ian Belina [sic] took an ICO from 12 million tokens sold to 36 million sold in 1 day . . . Because it came up high on his spreadsheet . . . Getting Ian is gonna be easy."

42.     On April 30, 2018, Sparkster published on its website a "presale whitelist" application form that would allow potential "presale" phase participants to request a desired allocation of SPRK tokens in U.S. dollars.  The site specified that the "presale" phase minimum investment in SPRK Tokens was $25,000.

43.    After an unsuccessful attempt to enter Balina's pitch contest in London during the "World Tour," Sparkster's CEO secured a spot at Balina's pitch contest in Amsterdam on May 11, 2018, and won that contest, earning him an interview on Balina's YouTube channel.

44.    Over the next few weeks after Sparkster won Balina's contest, Balina promoted the Sparkster Offering in YouTube videos and on other social media, and he specifically included Sparkster in his ICO rankings spreadsheet—publicly available at *ianbalina.com*—as his "Hall of Fame" or top ICO pick for 2018.  An image of Balina's ICO rankings spreadsheet is included below:

| IAN INVESTED | IAN'S OPINION | Ranking | ICO | Rating |
|---|---|---|---|---|
| YES | HALL OF FAME | 1 | Sparkster | 90.00% |
| YES | ALL-STAR | 2 | Phantasma | 83.87% |
| YES | ALL-STAR | 3 | Quarkchain | 83.08% |
| YES | ALL-STAR | 4 | Edenchain | 82.76% |
| YES | ALL-STAR | 5 | Mainframe | 80.32% |
| | STARTER | 6 | Virtue Poker | 79.13% |
| | STARTER | 7 | Sovrin (Evernym) | 78.98% |
| | STARTER | 8 | Home Run (Code Name) | 76.92% |
| | STARTER | 9 | FarmaTrust | 76.64% |
| | STARTER | 10 | NEX | 76.07% |
| | STARTER | 11 | Atonomi | 76.01% |
| | STARTER | 12 | Belarus (Code Name) | 75.77% |
| | STARTER | 13 | Metronome | 75.42% |
| | SUBSTITUTE | 14 | TON (Telegram) | 74.00% |
| | SUBSTITUTE | 15 | Akropolis | 73.40% |

45.    On May 16, 2018, Sparkster announced on its Telegram channel that the first email invitations to "presale" phase participants were being sent and that the maximum participation for each "presale" phase participant would be 35 ETH.

46.    Each participant in the "presale" phase entered into a purchase agreement or contract referred to as the SAFT.  Pursuant to the SAFT, the "presale" investors purchased SPRK Tokens at a price of $.15 per token.

47.    On May 17, 2018, Sparkster gave Balina a private demonstration of its software.

48.     On May 18, 2018, Sparkster posted on its public Telegram channel that "[b]onus tokens would be eliminated to deter anyone from dumping."  However, on June 23, 2018, well after Balina's promotion, Sparkster announced that "strategic partners" were given bonus tokens that were locked.  Sparkster did not provide the names of those strategic partners at that time.

49.     On May 19, 2018, Balina began promoting the Sparkster Offering on his Telegram channel.  For example, Balina posted: "After Sparkster won my Amsterdam Crypto World Tour ICO Pitch event, word is getting out that attending my Crypto World Tour was more fruitful than attending #Consensus2018 ☺☺. I respect their hustle to fly all the way from London to pitch. The crowd voted and I agree 🚀☺💯."

50.     On June 5, 2018, during a live *Ask Me Anything* ("AMA") session on YouTube, when asked if he was "still bullish on Sparkster," Balina said, "Yes. Very bullish, guys. They crushed it. … I think Sparkster has definitely overachieved in publicly showing what they have more than any ICO.  That's why I still believe in Sparkster. … Sparkster, I am personally very bullish on."

51.     During the "presale" phase, Sparkster raised $24.3 million from approximately 900 investors, including investors residing in multiple U.S. states.  Approximately 350 additional persons, again including U.S. investors, purchased tokens through third-party investing pools.

52.     The investing pools, including the pool organized by Balina as described below, used their own smart contracts, which provided that pool participants would receive their SPRK tokens by sharing in the allotment of SPRK tokens purchased directly from Sparkster by the individual directing the distribution to that pool.

53.     On July 7 and July 8, 2018, during the "crowdsale" phase, Sparkster additionally raised approximately $5.7 million from approximately 3,000 individuals, including investors

residing in multiple states in the U.S., bringing the total sale proceeds from SPRK tokens to $30 million.

54.     In June 2019, SPRK tokens were unlocked and briefly listed on a crypto asset-trading platform, but the listing was removed shortly thereafter.  Beginning on September 6, 2019, SPRK tokens were listed on another crypto asset-trading platform.  As soon as trading began on that platform, the value of SPRK tokens dropped dramatically.

### D.     Balina Failed to Disclose That Sparkster Had Given Him Consideration for Promoting SPRK Tokens.

55.     On May 13, 2018, two days after Sparkster won Balina's contest in Amsterdam and before his promotion of the Sparkster Offering began, Balina asked Sparkster's CEO to provide him with a "5000+ ETH," or approximately a $3,500,000, allocation for the Sparkster ICO—well above what Sparkster was allowing other investors to purchase individually.

56.     On May 20, 2018, after further discussions between Balina and Sparkster's CEO, Balina signed a SAFT with Sparkster, agreeing to purchase 7,143 ETH, or approximately $5,000,000, worth of SPRK tokens.  The SAFT also stated that Balina would receive a 30 percent bonus in SPRK tokens.  Sparkster's CEO informed Balina at the time that he was "the only one that's been allowed to invest more than the [minimum]."

57.     The same day that he signed the SAFT—May 20, 2018—Balina named the Sparkster Offering as his "Hall of Fame" or top ICO of the year in his ICO rankings.  While Balina disclosed that he was an investor in Sparkster when he promoted the Sparkster Offering, he did not disclose that he had received bonus tokens from Sparkster for his endorsement of the Sparkster Offering.

58.     The SAFT that Balina signed with Sparkster expressly stated that U.S. residents, like Balina, were *not* eligible for and "must not buy" SPRK tokens.  Balina nevertheless proceeded

with the SPRK token purchase, but instead of submitting a U.S. passport for the registration process, he submitted a Ugandan passport and utility bill as proof of citizenship and residence during the SPRK token purchase registration process.  At that time, Balina was a United States resident, living in Potomac, Maryland, where he had lived for a number of years.

59.     On May 21, 2018, Sparkster's CEO privately messaged Balina and told him that the Sparkster Telegram group had voted to eliminate bonuses for all presale participants, but he said that a few strategic partners, including Balina, would receive bonuses of up to 30 percent. Balina responded, "I think [the Sparkster website] should be changed to document that the highest bonus given out was 30%. I have to publicly disclose it to my audience due to SEC regulations. So I suggest to do this."

60.     On May 25, 2018, during a live AMA session on YouTube, where he hosted a demonstration by Sparkster's CEO, Balina said that after Sparkster's previous pitch in Amsterdam: "I … and my team ended up doing more homework on the project and after two demos ... our team basically came to a conclusion that this was a project that we wanted to be a part of.  Disclosure: I have invested. I was part of their token sale.  That being said, this is not a paid endorsement."

61.     On May 26, 2018, Balina transferred 7,143 ETH to the Ethereum wallet address provided by Sparkster's CEO.

62.     Contrary to his acknowledgement and statement on May 21, 2018 that he needed to disclose the compensation Sparkster provided him, Balina never publicly disclosed that Sparkster had agreed to provide him with bonus tokens as a consideration for his promotion of SPRK tokens.  The federal securities laws require that a person who receives or is to receive from an issuer of securities a consideration for the person's use of interstate transportation,

communication, or commerce to publicize a security must fully disclose the past or prospective receipt of the consideration, as well as the amount thereof.

63.     Almost six months later, on November 16, 2018, during a live YouTube AMA and in response to a direct question about the price at which Balina received SPRK Tokens, Sparkster's CEO disclosed that the company had provided a 30% bonus to Balina and that he was one of only three strategic partners to receive a bonus.

### E.     Balina Also Conducted an Unregistered Offering of SPRK Tokens

64.     On May 21, 2018, the day after he signed the SAFT, Balina announced on Telegram that he was forming an investing pool for members of that group.  Balina directed potential investors to a third-party website used for hosting investing pools, posting a link to the site and stating "get whitelisted for my Sparkster pool."  Balina's pool used a smart contract to allow pool participants to contribute ETH and share in Balina's allocation of SPRK tokens he would receive pursuant to the SAFT he signed with Sparkster.

65.     The link that Balina posted on Telegram included an online form that the members of his investing pool would have to complete in order be potentially included in the whitelist for the SPRK token investing pool.  In addition to providing the details of Balina's offering for his investing pool, the form requested potential investors to provide information about themselves, how much money they were willing to invest, and to identify the Ethereum wallet address that they intended to use for Balina's offering.  The form also contained a disclaimer from *Diary of a Made Man LLC*, which identified Balina's company as being responsible for the investing pool.

66.     Approximately fifty individuals, including 12 U.S. residents, ultimately contributed approximately $3.8 million worth of ETH to participate in Balina's investing pool.  Balina controlled who was allowed to participate in the pool and provided regular updates to the Telegram group about the status of the pool.  Through the information provided by the pool participants to

the investing pool provider, Balina—himself a U.S. resident—was also aware that U.S. residents were participating in the pool, but he did not take steps to restrict their participation.

67.    The members of the Telegram group repeatedly thanked Balina for the opportunity to invest in his pool.  When members had problems with their contributions being approved or "whitelisted," Balina addressed the problems and told the group when the issue was resolved.  He also removed members from the Telegram group who had not been invited by him to participate.

68.    On May 26, 2018, Balina announced on Telegram:  "Sending funds soon.  Those that want to pull out please do so asap.  We won't wait long."  Balina's pool participants submitted ETH to the address provided by Balina, and, when Sparkster distributed its tokens to Balina, a portion of those tokens was automatically distributed to the pool participants via a smart contract. Balina agreed to share with the participants in his investing pool the bonus tokens that he would receive from Sparkster, in accordance with the amount of the investment by each participant. Sparkster ultimately distributed the bonus tokens on or about August 26, 2019.

69.    The U.S.-based investors in Balina's pool irrevocably committed to the transaction when, from within the United States, they sent their ETH contributions to Balina's pool.  At that point, their ETH contributions were validated by a network of nodes on the Ethereum blockchain, which are clustered more densely in the United States than in any other country.  As a result, those transactions took place in the United States.

70.    As alleged below, the SPRK tokens that Balina distributed to the pool were securities under federal law.  Balina included a disclaimer in the online form that his investing pool participants were required to complete, stating that the offering may constitute an "unregistered securities offering."   Balina received the SPRK tokens from Sparkster with the

intention to distribute them, and he did in fact distribute the SPRK tokens. Balina's distribution of SPRK tokens through his investing pool was therefore a separate offering of securities.

71.     Balina's offering of securities was done without any filing or registration with the SEC, and no exemption from registration was applicable.

72.     In setting up, communicating the particulars of, and conducting the distribution to his investing pool, Balina offered to sell, and sold, unregistered securities through the use of interstate communication or commerce, in violation of the offering registration provisions of the federal securities laws.

**F.     The SPRK Tokens in the Sparkster Offering Were Securities, but the Offering Was Not Registered with the SEC**

73.     The SPRK Tokens offered and sold in the Sparkster Offering were securities under the federal securities laws, the Offering was not registered with the SEC, and no exemption from registration was applicable.

74.     *First*, the Sparkster offering involved an investment of money. Purchasers paid using a crypto asset – ETH – in exchange for SPRK Tokens.

75.     *Second*, investors in SPRK Tokens had an expectation of profits from their investment in a common enterprise. Sparkster and its CEO led investors to expect that they would receive profits because of their SPRK Token purchases.

76.     Sparkster's promotion of the offering to investors and its representations regarding the value of SPRK tokens pitched the tokens as a way for investors to make money.

77.     During and after the Sparkster Offering, Sparkster's CEO repeatedly stated on social media that SPRK tokens would increase in value and that his goal was to preserve the value of the tokens and eventually list them on crypto asset trading platforms.

78.     Sparkster decided to postpone the planned "crowdsale" phase of the Offering based on the value of the tokens.  On June 29, 2018, Sparkster's CEO posted on Sparkster's Telegram channel:  "Hey guys, I have been listening to your concerns, and from seeing the deteriorating market conditions, I have decided to postpone the crowdsale."

79.     Moreover, in a Telegram comment posted on July 4, 2018, Sparkster's CEO stated, "Stick with us, and we'll deliver 300x.  Our platform is truly life changing."  A screenshot of this statement was widely shared and discussed among SPRK investors.

80.     Also in July 2018, Sparkster distributed all SPRK tokens in locked format, prohibiting their use and transfer, and Sparkster did not list them on crypto asset trading platforms for almost a year.  Sparkster told token holders that it was taking those actions because it did not want SPRK tokens to decrease in value as a result of a general decline in the ICO market. Sparkster's CEO repeatedly told investors that the reason for the lengthy lockup of SPRK tokens, and the consequent delay in listing the tokens on a crypto asset trading platform or "exchange," was fear of the tokens losing value if they were unlocked in the context of a soft ICO market.

81.     On July 26, 2018, Sparkster's CEO posted on Telegram:

It's important that we list in fertile conditions. Nobody here wants our token to drop in value, and we are very conscious of this. We're lining up everything we can on our end to have a successful listing, but market conditions play a big role. We're keeping an eye on what's going on in the industry. Some of you may know that an ICO launched today and dropped below ICO price. We do not want this to happen to SPRK, so we're actively waiting for good conditions. . . . We need to ensure that the market supports an exchange listing, we are monitoring other ICOs and their listing to determine an appropriate time. I think you will agree, nobody wants to lose money because of a poorly executing listing strategy.

82.     Sparkster's CEO made similar statements on social media and in YouTube AMAs through April 2019, including that other ICOs who had unlocked in the current ICO market had lost 80-90% of their value.

83.     The status of Sparkster's products also undermined statements in the Whitepaper that SPRK tokens constituted "utility tokens."  The decentralized cloud did not launch until January 2019, almost six months after the offering, and the marketplace did not launch until more than a year after the Sparkster Offering, eliminating for many months the purported utilities for SPRK tokens as proposed in the Whitepaper.

84.     Moreover, Sparkster's promotional efforts for the Sparkster Offering were broadly aimed at crypto asset investors and enthusiasts and were not limited to potential users of the Sparkster platform.  To assist their promotional efforts, Sparkster and its CEO recruited ICO promoters, like Balina, who, according to Sparkster's CEO, would "make a lot of noise about the project," and who had an audience primarily consisting of crypto asset investors and enthusiasts.

85.     *Third*, any profits that would have come to Sparkster investors would have had to come from the efforts of others.  The SPRK tokens were to be listed on a crypto asset trading platform, with a view to their increasing in value.  Any such resulting profit would not come from the efforts of those investing in the Sparkster Offering, but from the efforts of Sparkster management in creating an enterprise that would cause SPRK tokens to increase in market value.

86.     Representations by Sparkster and its CEO further led investors to believe that these profits would be derived from managerial efforts.  Sparkster's CEO repeatedly made statements on YouTube and other social media about the efforts of Sparkster management to grow Sparkster and the growth of the company generally.  In the Whitepaper and on social media, Sparkster's CEO repeatedly emphasized his success in previous business ventures, stating that he had founded multiple businesses over the past 15 years with total revenue of $50 million.

87.     Moreover, before and after the "crowdsale" phase, Sparkster repeatedly highlighted the company's and its employees' partnerships or affiliations with well-known technology companies and research institutions.

## FIRST CLAIM FOR RELIEF
### Violation of Sections 5(a) and 5(c) of the Securities Act

88.     The Commission realleges and incorporates by reference paragraphs 1 through 87 as though fully set forth herein.

89.     By virtue of the foregoing, Defendant Balina, directly or indirectly, (a) without a registration statement being in effect as to those securities, made use of the means and instruments of transportation or communication in interstate commerce and of the mails to sell securities through the use or means of a prospectus or otherwise, and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus or otherwise, securities as to which no registration statement had been filed.

90.     By engaging in the conduct described above, Defendant Balina directly violated, and unless enjoined will continue to violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

## SECOND CLAIM FOR RELIEF
### Violation of Section 17(b) of the Securities Act

91.     The Commission realleges and incorporates by reference paragraphs 1 through 87 as though fully set forth herein.

92.     By virtue of the foregoing, Defendant Balina made use of the means and instruments of transportation or communication in interstate commerce or of the mails to publish, give publicity to, or circulate a notice, circular, advertisement, newspaper, article, letter,

investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

93.     As described herein, Defendant Balina promoted the Sparkster Offering without disclosing that he had received or would receive from Sparkster consideration for that promotion, in the form of bonus SPRK tokens and without disclosing the amount of that consideration.

94.     By reason of the conduct described above, Defendant Balina violated and, unless enjoined will again violate, Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court grant the following relief:

## I.

A Final Judgment permanently restraining and enjoining Defendant Balina and his agents, servants, employees, attorneys, and other persons in active concert or participation with any of them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), 77e(c)];

## II.

A Final Judgment permanently restraining and enjoining Defendant Balina and his agents, servants, employees, attorneys, and other persons in active concert or participation with any of him, who receive actual notice of the injunction by personal service or otherwise, and each of

them, from violating, directly or indirectly, Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)];

**III.**

A Final Judgment permanently restraining and enjoining Defendant Balina from participating, directly or indirectly, in the offer or sale of any securities, including but not limited to any crypto asset securities, provided, however, that such injunction shall not prevent him from purchasing or selling crypto asset securities for his personal account;

**IV.**

A Final Judgment permanently restraining and enjoining Defendant Balina from receiving or agreeing to receive any form of compensation or consideration, from any issuer, underwriter, or dealer, for directly or indirectly publishing, giving publicity to, or circulating any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security, crypto or otherwise, for sale, describes such security;

**V.**

A Final Judgment directing Defendant Balina to disgorge all ill-gotten gains from his illegal conduct as set forth in this Complaint, including prejudgment interest thereon;

**VI.**

A Final Judgment directing Defendant Balina to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)];

**VII.**

Such further relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Securities and Exchange Commission demands that this case be tried to a jury.

Dated: September 19, 2022          Respectfully submitted,


/s/  Melissa Armstrong
Melissa Armstrong, State Bar No. 24050234
Fernando Campoamor Sánchez*
Ivan J. Snyder*
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC  20549
(202) 551-8523 (Telephone: Campoamor Sánchez)
(202) 772-9286 (Facsimile)
Email:  campoamorsanchezf@sec.gov
*Counsel for Plaintiff Securities and Exchange Commission*


Of Counsel:
Carolyn M. Welshhans
David Frohlich

*Pro Hac Vice* motions forthcoming