**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | |
|                                **Plaintiff,** | **Civil Action No. 1:22-CV-950** |
|      -against- | **ECF CASE** |
| **IAN BALINA,** | **(Jury Trial Demanded)** |
|                                **Defendant.** | |

<u>**IAN BALINA'S ANSWER TO PLAINTIFF'S COMPLAINT**</u>

Defendant Ian Balina ("Balina" or "Defendant"), by and through his undersigned attorneys, hereby submits his Answer to the Complaint ("Complaint") of Plaintiff U.S. Securities and Exchange Commission ("SEC" or "Plaintiff") as follows:

**I.  BACKGROUND**

1.     This lawsuit by the Securities and Exchange Commission ("SEC") against Ian Balina is contrary to the facts, established law, and past SEC pronouncements. Balina did nothing wrong. On the contrary, Balina has spent an enormous amount of his time, energy, and career trying to educate consumers as to the merits or possible fraud of projects that have been offered.

2.     The SEC's demand for disgorgement of all "ill-gotten gains" is an example of how the SEC's claims are contrary to the facts. The fact is that Balina, like other purchasers of Sparkster tokens, has no gains. Instead, he lost money. In fact, in the SEC's Cease-and-Desist Order against Sparkster, the SEC determined that Sparkster and its CEO violated Sections 5(a) and 5(c) of the Securities Act and detailed Sparkster's numerous representations that turned out

1

to be false. The SEC required Sparkster to disgorge $30,000,000, imposed civil penalties, and set up a Fair Fund for the benefit of persons harmed by the violations. In this lawsuit, the SEC is now going after one of the people who the SEC determined was harmed by Sparkster. Even a quick review of the SEC's lawsuit against Balina shows that most of the allegations are targeted against statements, activities, and conduct of Sparkster.

3.       In a time when some people attempt to conceal their financial transactions, Balina has been transparent. Balina even went so far as to post and disclose all of his crypto transactions. In 2018, Balina went on a "World Tour" to try and assist the general public in identifying the good projects from the fraudulent projects in the burgeoning token world. Meanwhile, at that time, the SEC was not close to putting pen to paper to even identify what factors would make a token a security that the SEC might regulate.

4.       The SEC also mistakenly claims that Balina received compensation from Sparkster. The SEC is wrong. On May 11, 2018, Balina was the master of ceremonies in Amsterdam, Netherlands for a "Shark Tank" like event. Balina was not paid for his appearance by Sparkster or any of the contestants. There is no allegation that Balina received any payment or inducement to favor Sparkster. None of the other participants or organizers of the event have been charged with any wrongdoing but only Balina has been singled out. Balina has been singled out even though he disclosed during the presentation that he had participated with a group of other angel investors.

5.       Balina, like other early purchasers, simply received a volume discount for the purchase of Sparkster tokens. Balina paid the same price as the other angel investors and received a 30% discount from the then-planned future public sale price of the Sparkster tokens. When Balina and the other angel investors invested, there was no market value for these tokens

2

against which to compare the discount price. The Sparkster tokens are now worthless (as the SEC has admitted). Balina never profited from his purchase or the volume discount, instead he lost money. Of course, discounts in private or pre-sale offerings and volume discounts are common and well known in the industry. To Balina's knowledge, this is the first time that a private pre-sale purchase of a digital asset token, with a discount/bonus typical for such purchases, has been accused of being "compensation."

6.      On November 23, 2021, Balina provided the SEC with his Wells submission. Balina presented the SEC with the facts and law that indicated that the SEC should not file this lawsuit. Ten months later, with no further communication from the SEC, the SEC filed this lawsuit against Balina for "ill-gotten gains" that never existed, based on false allegations, and premised on an unprecedented extension of the SEC's authority. Balina did nothing wrong.

## II.  IAN BALINA'S ANSWER TO PLAINTIFF'S ALLEGATIONS[1]

1.      This action concerns Ian Balina's unregistered offering and promotion in 2018 of crypto asset securities called SPRK Tokens. Balina, a self-described crypto asset investor, promoter, and influencer, who claimed he could help people "make millions with initial coin offerings," failed to disclose the compensation he received from the issuer while he publicly promoted the tokens. He also failed to file a registration statement with the SEC for the tokens that he re-sold using an investing pool that he organized.

**ANSWER:**

The allegations in the first sentence contain characterizations and legal conclusions to which no response is required. To the extent any response is necessary, Balina denies the allegations. The allegations in the first sentence contain characterizations and legal conclusions to which no response is required. To the extent any response is necessary, Balina admits that he is a crypto asset investor and that he previously made a spreadsheet of his investments publicly available to

---

[1] Balina denies all titles, subheadings, and any other material not contained in numbered paragraphs.

others and denies the remaining allegations. The allegations in the third sentence contain characterizations and legal conclusions to which no response is required. To the extent any response is necessary, Balina denies the allegations.

2.      Sparkster, Ltd. ("Sparkster"), a software development company incorporated in the Cayman Islands, and its Chief Executive Officer ("CEO"), conducted an unregistered securities offering ("Sparkster Offering") of crypto asset securities called SPRK Tokens. This unregistered offering took place between April and July 2018, raising approximately $30 million from nearly 4,000 investors located abroad and in the United States.

**ANSWER:**

Balina admits that Sparkster is a company that conducted a sale of Sparkster tokens. Balina is without knowledge or information sufficient to form a belief about the remaining allegations and therefore denies them.

3.      Balina signed a contract to invest approximately $5 million in the Sparkster Offering and promoted the offered SPRK tokens on YouTube, Telegram, and other social media platforms. Although he agreed to receive a 30% bonus from Sparkster on the tokens he purchased in the Sparkster Offering, Balina never publicly disclosed the consideration he received for his promotion.

**ANSWER:**

Balina admits that he invested in a sale of Sparkster tokens at a 30% volume-based discount from the public price, as did other purchasers. Balina denies the remaining allegations.

4.      Balina also organized on Telegram an investing pool of about fifty individuals. After he agreed to purchase the SPRK tokens from Sparkster, Balina offered members of the investing pool the opportunity to purchase SPRK tokens from him upon their release, and at least fifty members of the pool, including U.S. residents, contracted with Balina to purchase tokens that Balina had purchased from Sparkster. Balina did not file a registration statement with the Commission for his offering and sale of SPRK tokens, and no exemption from registration was applicable. As a result, Balina conducted his own unregistered offering of SPRK Tokens.

**ANSWER:**

Balina admits that he invested in a sale of Sparkster tokens and that he was part of a group of investors who invested in Sparkster tokens. Balina further admits that he did not file a

registration statement with the SEC because none was required. Balina denies the remaining allegations.

5.     By engaging in this conduct, as set forth more fully herein, Balina violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c)], and Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].  Balina will continue to violate the federal securities laws unless restrained or enjoined by this Court.

**ANSWER:**

This paragraph contains characterizations and legal conclusions to which no response is required.

To the extent any response is necessary, Balina denies the allegations.

6.     The SEC seeks injunctive relief, disgorgement, civil penalties, and other appropriate and necessary equitable relief.

**ANSWER:**

Plaintiff's request for relief does not require a response. To the extent any response is necessary,

Balina denies the allegations and denies that Plaintiff is entitled to the requested relief.

7.     The SEC brings this action, and this Court has jurisdiction, pursuant to 28 U.S.C. § 1331 and Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)].

**ANSWER:**

This paragraph contains legal conclusions to which no response is required. To the extent any

response is necessary, Balina admits that the Court has jurisdiction.

8.     Defendant Balina, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation and communication in interstate commerce, or of the mails, in connection with the acts, transactions, practices, and courses of business alleged in this Complaint.

**ANSWER:**

This paragraph contains characterizations and legal conclusions to which no response is required.

To the extent any response is necessary, Balina admits that the Court has jurisdiction and denies

that Plaintiff is entitled to the requested relief.

9.     Venue is proper in the Western District of Texas pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] because Balina currently resides in the district.

**ANSWER:**     Admit.

10.     **Ian Balina**, age 33, is currently a resident of Austin, Texas, where he works as CEO of a company that provides crypto investment research.  At all relevant times for the allegations in this complaint, Balina was a resident of Potomac, Maryland.  Balina's YouTube page describes him as "an influential Blockchain and Cryptocurrency Investor, Advisor, and Evangelist."  Balina, a self-described "crypto millionaire," offered his advice to investors regarding how to make money investing in crypto asset offerings based on his experience.  Balina organized an investing pool through which he distributed SPRK tokens he had promoted and purchased from Sparkster.

**ANSWER:**

Balina admits the first and third sentences. Balina lacks sufficient information to either admit or

deny the allegations in the second sentence as to "[a]t all relevant times" and therefore denies

them. Balina admits that he has offered his advice to investors regarding how to make money

investing in crypto assets based on his experience and that he has been described as a "crypto

millionaire." Balina admits that he invested in a sale of Sparkster tokens and that he was part of a

group of investors who invested in Sparkster tokens. Balina denies the remaining allegations.

11.     **Sparkster, Ltd.,** is a corporation organized under the laws in the Cayman Islands with activities in multiple countries, including the United States.  In 2018, Sparkster described itself as a developer of software to allow users to write their own software applications in "plain English" using a "drag and drop" graphical interface instead of writing code.

**ANSWER:**     Balina admits that Sparkster is a company that claimed that it had developed a

usable product, service, and network and that its product enabled users to develop code using

natural language. To the extent that the second sentence purports to quote, characterize or

summarize a document, the document speaks for itself and Balina respectfully refers to the full

text of the document. Balina denies the remaining allegations.

12.     An "Initial Coin Offering" or "ICO" is a fundraising event in which an entity offers participants a unique crypto asset – often described as a "coin" or "token" – in exchange for consideration, often in the form of a crypto asset such as Bitcoin or Ether ("ETH"), and sometimes

in fiat currency. The tokens are issued and distributed on a "blockchain," a cryptographically secured ledger that is spread across a decentralized computer network.

**ANSWER:**

This paragraph contains general characterizations to which no response is required. To the extent that any response is necessary, Balina admits that the term "initial coin offering" is abbreviated as "ICO" and can be a fundraising event in which an entity may offer an asset in exchange for consideration, sometimes in the form of a crypto asset and admits that a "blockchain" can refer to a cryptographically secured ledger that is spread across a decentralized computer network. Balina denies all of the remaining allegations.

13.     The Sparkster Offering was conducted on the Ethereum blockchain ("Ethereum"). Ethereum, which is second to only the Bitcoin blockchain in terms of market capitalization, uses ETH as its crypto asset and allows the use of "smart" contracts, which are, essentially, computer programs designed to automatically execute the terms of a contract when certain triggering conditions are met, without the involvement of an intermediary.

**ANSWER:**

Balina admits that the sale by Sparkster was conducted on the Ethereum blockchain. Balina admits the allegation in the second sentence. Balina denies all of the remaining allegations.

14.     ICOs are generally announced and promoted through public internet channels or other marketing methods. An ICO issuer usually releases a "whitepaper" describing the project and promoting the ICO, often in technical terms, and promotes the ICO elsewhere, including on its website, social media, and other internet sites.  To participate in the ICO, investors are generally required to transfer consideration, often in the form of crypto assets, to the issuer's blockchain address, online "wallet," or other account.

**ANSWER:**

This paragraph contains general characterizations to which no response is required. To the extent that any response is necessary, Balina admits that (1) ICOs can be announced and promoted through public internet channels or other marketing methods; (2) an entity issuing ICOs may release a "whitepaper" describing the project and promoting the ICO and may promote the ICO

elsewhere, including on its website, social media, and other internet sites; and (3) to make a purchase in an ICO, a person may be required to make a payment, which may include a crypto asset to the issuer's wallet or other account. Balina denies all of the remaining allegations.

15.     At some point after the completion of the ICO, the issuer distributes the tokens to each participant's unique "wallet" address on the blockchain. Tokens can be transferred between users and are often listed on online crypto asset trading platforms to allow investors to trade the tokens for other crypto assets or fiat currency in a secondary market.

**ANSWER:**

This paragraph contains general characterizations to which no response is required. To the extent that any response is necessary, Balina admits that (1) the issuer may distribute the tokens to each participant's unique "wallet" address on the blockchain and (2) tokens may be transferred between users and may be listed on online crypto asset trading platforms to allow investors to trade the tokens for other crypto assets or fiat currency in a secondary market. Balina denies all of the remaining allegations.

16.     ICO issuers often pay social media influencers with large online followings to promote their ICOs by endorsing them on social media. These influencers or promoters can include celebrities from unrelated industries like sports, music, and entertainment or individuals who have active followings specifically related to technology, crypto assets, and/or ICOs.

**ANSWER:**

This paragraph contains general characterizations to which no response is required. To the extent that any response is necessary, Balina admits that some persons have promoted ICOs and he is without knowledge or information sufficient to form a belief about the allegations and therefore denies them.

17.     As described more fully herein, Sparkster's offer and sale of SPRK tokens from April 2018 to July 2018 constituted an unregistered offering of crypto securities.

**ANSWER:**

The allegations consist of characterizations and legal conclusions to which no response is

8

required. To the extent any response is necessary, Balina denies the allegations.

18. Congress passed the Securities Act in order to regulate the offer and sale of securities, and in doing so, enacted a regulatory regime of full and fair disclosure, requiring issuers who offer and sell securities to provide certain important information to potential investors to enable them to make informed decisions before investing.

**ANSWER:**

The allegations consist of legal conclusions to which no response is required. To the extent any

response is necessary, Balina refers to the provisions of the Securities Act, codified at 15 U.S.C.

§ 77a et seq.

19. The definition of a "security" includes a broad range of investment vehicles and instruments, including "investment contracts." Investment contracts are investments by individuals of money in a common enterprise, with a reasonable expectation of profits or returns derived from the entrepreneurial or managerial efforts of others. Congress defined "security" broadly to encompass a "flexible rather than a static principle" that is capable of adapting to various schemes where the money of others is collected on the promise of future profits.

**ANSWER:**

The allegations consist of legal conclusions to which no response is required. To the extent any

response is necessary, Balina refers to the provisions of the Securities Act, codified at 15 U.S.C.

§ 77a et seq.

20. Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)] prohibit the unregistered offer or sale of securities in interstate commerce. Specifically, Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)] provides that, unless a registration statement is in effect as to a security, it is unlawful for any person, directly or indirectly, to sell the security in interstate commerce. Section 5(c) of the Securities Act [15 U.S.C. § 77e(c)] provides a similar prohibition against offers to sell or offers to buy securities, unless a registration statement has been filed as to that security.

**ANSWER:**

The allegations consist of legal conclusions to which no response is required. To the extent any

response is necessary, Balina refers to the provisions of the Securities Act, codified at 15 U.S.C.

§ 77a et seq.

21.    The registration statements contemplated by the Securities Act are filed with the Commission and require disclosures of essential facts that provide potential investors with information necessary to make informed investment decisions. These required disclosures include: a description of the issuer's properties and business, a description of the securities to be offered for sale, information about the management of the company, financial statements audited by independent accountants, and a description and analysis of the risks and material trends that would affect the enterprise.

**ANSWER:**

The allegations consist of legal conclusions to which no response is required. To the extent any response is necessary, Balina refers to the provisions of the Securities Act, codified at 15 U.S.C. § 77a et seq.

22.    On July 25, 2017, well before the Sparkster Offering, the Commission issued the DAO Report of Investigation (the "DAO Report"), regarding the 2016 sale of DAO Tokens on the Ethereum blockchain. The DAO Report expressed the SEC's view that, depending upon their particulars, digital tokens or coins may be securities for purposes of the federal securities laws.

**ANSWER:**

To the extent that this paragraph purports to quote, characterize or summarize a document, the document speaks for itself and Balina respectfully refers to the full text of the document. Balina denies the remaining allegations.

23.    Unless an exemption is applicable, Section 5 [15 U.S.C. § 77e] creates liability for any offer or sale of securities where a registration statement is not in effect and does *not* limit liability to the initial distribution. As demonstrated below, Balina purchased SPRK tokens from Sparkster in an unregistered offering, with a view to distributing the tokens in his own offering. He offered the purchased tokens in a general solicitation, and at the time he paid for the tokens, he had already contracted for their resale. He then distributed the tokens to members of the investing pool he had organized. No exemption from Section 5 [15 U.S.C. § 77e] was applicable to Balina's offers or resales, and scienter is not an element for this claim.

**ANSWER:**

The allegations in the first sentence consist of legal conclusions to which no response is required and, to the extent any response is necessary, Balina refers to the provisions of the Securities Act, codified at 15 U.S.C. § 77a et seq. Balina denies the remaining allegations.

24. Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)] prohibits the publication or circulation via interstate commerce of a notice or communication describing a security, for a consideration received from an issuer, underwriter, or securities dealer, without full disclosure of the consideration received or to be received, and the amount thereof. Scienter is not an element of a Section 17(b) [15 U.S.C. § 77q(b)] claim.

**ANSWER:**

The allegations consist of legal conclusions to which no response is required. To the extent any

response is necessary, Balina refers to the provisions of the Securities Act, codified at 15 U.S.C.

§ 77a et seq.

25. After receiving bachelor's and master's degrees in computer engineering from George Washington University in 2010 and 2012, Balina began his career at various technology companies in the Washington, D.C. area. He left his job as a "Sales Evangelist" at a Fortune 500 technology company in 2017 to focus on crypto assets and blockchain-related issues full time. Balina subsequently claimed that his initial motivation to get involved with crypto assets was to make enough money with his ICO investments to "quit his corporate job and have financial freedom." Balina, who was born in Uganda, became a United States citizen in 2017.

**ANSWER:**   Admit.

26. Around the time he left his job at the Fortune 500 technology company, Balina created a Delaware limited liability company called *Diary of a Made Man LLC*, a vehicle for Balina's social media and publishing activities with its principal place of business in Washington, D.C. He then began documenting his investment process and ICO research on YouTube, Instagram, and other social media through an online diary entitled "Diary of a Made Man." As part of this process, Balina became an ICO promoter. A press release for his 2021 book described Balina as having a "data-driven moneyball style approach to investing in crypto assets" and stated that he used this approach to "turn $20,000 into over $5 million by investing in cryptocurrencies."

**ANSWER:**

Balina admits the allegations in the first, second, and fourth sentences. Balina denies the

remaining allegations.

27. During 2017 and 2018, as the market for ICOs exploded, Balina regularly posted videos about ICOs on his YouTube channel, including a 2017 post entitled "How to Make Millions with Initial Coin Offerings (ICOs)" that has garnered over 350,000 views to date. He currently has approximately 110,000 Twitter subscribers, and his videos have cumulatively attracted over 2,300,000 views to date on YouTube. Balina has previously claimed that he built a following on social media based on the value that he was providing to people.

**ANSWER:**     Admit.

28.     Balina also began operating a public website, *ianbalina.com*, in 2017, using a hosting provider in Dallas, Texas.  At all relevant times for the allegations in this complaint, Balina published a free "ICO spreadsheet" containing rankings of what he considered the top ICOs of the year, which he linked on the front page of his website and regularly promoted through social media. According to a press release issued for Balina's 2021 book, his ICO spreadsheet "was accessed by more than one million investors per month." The ICOs on the spreadsheet reflected Balina's alleged personal investment strategy and were the subject of many of his YouTube videos and social media posts.

**ANSWER:**

Balina admits the allegations in the first sentence. Balina admits that he publicly disclosed a spreadsheet on his website ranking certain ICOs but lacks sufficient information to either admit or deny the remaining allegations in the second sentence as to what is meant by "[a]t all relevant times" and therefore denies them. Balina admits the allegations in the third sentence. To the extent that the fourth sentence purports to quote, characterize or summarize a document, the document speaks for itself and Balina respectfully refers to the full text of the document. Balina denies the remaining allegations.

29.     In 2018, Balina launched the "Ian Balina Crypto World Tour," which would eventually lead to him meeting Sparkster's CEO.  During the tour, he hosted live "pitch contests" in different cities around the world, where technology startups pitched their ideas to live crowds, competing for an opportunity to be interviewed by Balina on his YouTube channel. Balina described his goal to audiences as wanting to "evangelize and share with other people out there who have their own dreams and goals of having financial freedom."

**ANSWER:**

Balina admits the allegations in the first sentence. In the second sentence, Balina admits that he hosted contests in different locations in the world that included technology startups and some of the companies were interviewed by Balina on his YouTube channel. Balina admits that he has expressed the goal set forth in the third sentence to people and groups of people. Balina denies the remaining allegations.

30.    Because of Balina's influence as an ICO promoter, Sparkster's CEO understood that if the Sparkster Offering was included in Balina's ICO spreadsheet and promoted through his social media channels, it would reach his large audience of crypto asset investors and enthusiasts, drawing attention and investors to the Sparkster Offering.

**ANSWER:**

Balina lacks sufficient information to either admit or deny the allegations concerning Sparkster's

CEO's understanding and therefore denies them.

31.    In late 2016 and 2017, Sparkster and its CEO began development of a "no code" software development platform (the "no code platform") inspired by an idea developed at the Massachusetts Institute of Technology that allowed children to code more easily using a "drag and drop" interface.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. Balina lacks sufficient information to

either admit or deny the allegations and therefore denies them.

32.    In April 2018, Sparkster began publishing on its website a whitepaper containing details about the Sparkster Offering ("the Whitepaper") and began promoting it on its Telegram channel. The Whitepaper stated that the purpose of the Sparkster Offering was to raise funds for the development and marketing of the no code platform that would allow users to develop software applications using a "drag and drop" graphical interface instead of writing code.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that the second sentence

purports to quote, characterize or summarize a document, the document speaks for itself and

Balina respectfully refers to the full text of the document. Balina lacks sufficient information to

either admit or deny the allegations and therefore denies them.

33.    According to the Whitepaper, this no code platform would run on "the world's fastest Decentralized Cloud for Smart Software" (the "decentralized cloud") using a network of cell phones, notebooks, laptops, and other personal devices held by "miners," who would be rewarded with SPRK tokens for contributing their spare computing capacity to the network.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that this paragraph purports to quote, characterize or summarize a document, the document speaks for itself and Balina respectfully refers to the full text of the document.

34. The Whitepaper proposed a marketplace for software created using the no code platform (the "marketplace") where contributors could sell software created on the platform to other users, with SPRK tokens constituting the exclusive form of payment.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that this paragraph purports to quote, characterize or summarize a document, the document speaks for itself and Balina respectfully refers to the full text of the document.

35. The Whitepaper stated that SPRK tokens "may be placed on third-party exchanges" and that any users seeking to buy SPRK tokens after the Sparkster Offering would have to buy them on these exchanges. The Whitepaper provided details regarding the token sale and distribution, including Sparkster's retention of 2% of tokens to "facilitate liquidity for an exchange listing."

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that this paragraph purports to quote, characterize or summarize a document, the document speaks for itself and Balina respectfully refers to the full text of the document.

36. The Whitepaper stated that the no code platform would launch in April 2018, the marketplace would launch in May 2018, and the decentralized cloud would launch a public alpha release in the fourth quarter of 2018.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that this paragraph purports to quote, characterize or summarize a document, the document speaks for itself and Balina respectfully refers to the full text of the document.

37. According to Sparkster, the no code platform was finished and available for users to begin testing as of May 10, 2018.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that this paragraph purports to quote, characterize or summarize a document, the document speaks for itself and Balina respectfully refers to the full text of the document.

38.     Although Sparkster stated in the Whitepaper and the associated *Simple Agreement for Future Tokens* ("SAFT") contract that U.S. residents were not eligible to purchase SPRK tokens, U.S. residents, including Balina, did in fact participate in the Sparkster Offering and purchased SPRK tokens.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that this paragraph purports to quote, characterize or summarize a document, the document speaks for itself and Balina respectfully refers to the full text of the document. Balina admits that he purchased tokens from Sparkster. Balina denies the remaining allegations.

39.     The Sparkster Offering included both a "presale" phase and a "crowdsale" phase. Sparkster conducted the Sparkster Offering on the Ethereum blockchain, selling SPRK Tokens directly to participants in exchange for ETH, using ERC-20 smart contracts. ERC-20 smart contracts are used by ICOs on the Ethereum blockchain and allow the offering party to create and sell fungible tokens. Sparkster stated that it would proceed with the Sparkster Offering until it reached an aggregate cap of $30 million.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. Balina admits that a sale by Sparkster was conducted on the Ethereum blockchain. Balina admits the characterization in the second sentence. To the extent that the third sentence in this paragraph purports to quote, characterize or summarize a document, the document speaks for itself and Balina respectfully refers to the full text of the document. Balina denies the remaining allegations.

40.     At the direction of the Sparkster CEO, during the "presale" phase, Sparkster sought out investment and endorsement by various ICO promoters or influencers, including Balina.

Sparkster's CEO told colleagues that he viewed obtaining Balina's endorsement as a way to draw participants to the Sparkster Offering and strategized on how to earn that endorsement.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. Balina admits that he was contacted by Sparkster. Balina is without knowledge or information sufficient to form a belief about the remaining allegations and therefore denies them.

41.     In an internal chat dated April 4, 2018, Sparkster's CEO stated, "Ian Belina [sic] took an ICO from 12 million tokens sold to 36 million sold in 1 day . . . Because it came up high on his spreadsheet . . . Getting Ian is gonna be easy."

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that this paragraph purports to quote, characterize or summarize a document, the document speaks for itself and Balina respectfully refers to the full text of the document. Balina denies the remaining allegations.

42.     On April 30, 2018, Sparkster published on its website a "presale whitelist" application form that would allow potential "presale" phase participants to request a desired allocation of SPRK tokens in U.S. dollars. The site specified that the "presale" phase minimum investment in SPRK Tokens was $25,000.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that this paragraph purports to quote, characterize or summarize a document, the document speaks for itself and Balina respectfully refers to the full text of the document.

43.     After an unsuccessful attempt to enter Balina's pitch contest in London during the "World Tour," Sparkster's CEO secured a spot at Balina's pitch contest in Amsterdam on May 11, 2018, and won that contest, earning him an interview on Balina's YouTube channel.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. Balina admits that Sparkster was not a contestant in London, was a participant and winner of the contest in Amsterdam, and its CEO was interviewed by Balina on his YouTube channel. Balina denies the remaining allegations.

44.     Over the next few weeks after Sparkster won Balina's contest, Balina promoted the Sparkster Offering in YouTube videos and on other social media, and he specifically included Sparkster in his ICO rankings spreadsheet—publicly available at *ianbalina.com*—as his "Hall of Fame" or top ICO pick for 2018.  An image of Balina's ICO rankings spreadsheet is included below:

| IAN INVESTED | IAN'S OPINION | Ranking | ICO | Rating |
|---|---|---|---|---|
| YES | HALL OF FAME | 1 | Sparkster | 90.00% |
| YES | ALL-STAR | 2 | Phantasma | 83.87% |
| YES | ALL-STAR | 3 | Quarkchain | 83.08% |
| YES | ALL-STAR | 4 | Edenchain | 82.76% |
| YES | ALL-STAR | 5 | Mainframe | 80.32% |
| | STARTER | 6 | Virtue Poker | 79.13% |
| | STARTER | 7 | Sovrin (Evernym) | 78.98% |
| | STARTER | 8 | Home Run (Code Name) | 76.92% |
| | STARTER | 9 | FarmaTrust | 76.64% |
| | STARTER | 10 | NEX | 76.07% |
| | STARTER | 11 | Atonomi | 76.01% |
| | STARTER | 12 | Belarus (Code Name) | 75.77% |
| | STARTER | 13 | Metronome | 75.42% |
| | SUBSTITUTE | 14 | TON (Telegram) | 74.00% |
| | SUBSTITUTE | 15 | Akropolis | 73.40% |

**ANSWER:**

Balina admits that he discussed Sparkster in YouTube videos and on social media and that Sparkster was rated based on a public data-driven fundamental analysis process that was public and could be replicated by others. To the extent that the image in this paragraph purports to quote, characterize or summarize a document, the document speaks for itself and Balina respectfully refers to the full text of the document. Balina denies the remaining allegations.

45.     On May 16, 2018, Sparkster announced on its Telegram channel that the first email invitations to "presale" phase participants were being sent and that the maximum participation for each "presale" phase participant would be 35 ETH.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that this paragraph purports to quote, characterize or summarize a document, the document speaks for itself and Balina respectfully refers to the full text of the document.

46.     Each participant in the "presale" phase entered into a purchase agreement or contract referred to as the SAFT.  Pursuant to the SAFT, the "presale" investors purchased SPRK Tokens at a price of $.15 per token.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that this paragraph purports to quote, characterize or summarize a document(s), the document speaks for itself and Balina respectfully refers to the full text of the document.

47.     On May 17, 2018, Sparkster gave Balina a private demonstration of its software. On May 18, 2018, Sparkster posted on its public Telegram channel that "[b]onus tokens would be eliminated to deter anyone from dumping." However, on June 23, 2018, well after Balina's promotion, Sparkster announced that "strategic partners" were given bonus tokens that were locked.  Sparkster did not provide the names of those strategic partners at that time.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. Balina admits that Sparkster provided a purported demonstration of its software to him. To the extent that the second and third sentences of this paragraph purport to quote, characterize or summarize a document(s), the document speaks for itself and Balina respectfully refers to the full text of the document. Balina is without knowledge or information sufficient to form a belief about the allegations in the last sentence and therefore denies them. Balina denies the remaining allegations.

48.     On May 18, 2018, Sparkster posted on its public Telegram channel that "[b]onus tokens would be eliminated to deter anyone from dumping." However, on June 23, 2018, well after Balina's promotion, Sparkster announced that "strategic partners" were given bonus tokens that were locked. Sparkster did not provide the names of those strategic partners at that time.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that the first and second sentences of this paragraph purport to quote, characterize or summarize a document(s), the document speaks for itself and Balina respectfully refers to the full text of the document. Balina is without knowledge or information sufficient to form a belief about the allegations in the last sentence and therefore denies them. Balina denies the remaining allegation and denies that he promoted Sparkster.

49.     On May 19, 2018, Balina began promoting the Sparkster Offering on his Telegram channel. For example, Balina posted: "After Sparkster won my Amsterdam Crypto World Tour ICO Pitch event, word is getting out that attending my Crypto World Tour was more fruitful than attending #Consensus2018 😱 😅. I respect their hustle to fly all the way from London to pitch. The crowd voted and I agree 🚀 🙂 💯."

**ANSWER:**

Balina admits that he discussed Sparkster after the Amsterdam contest. Balina denies that he promoted Sparkster. To the extent that the second and third sentences of this paragraph purport to quote, characterize or summarize a document(s), the document speaks for itself and Balina respectfully refers to the full text of the document. Balina denies the remaining allegations.

50.     On June 5, 2018, during a live *Ask Me Anything* ("AMA") session on YouTube, when asked if he was "still bullish on Sparkster," Balina said, "Yes. Very bullish, guys. They crushed it. … I think Sparkster has definitely overachieved in publicly showing what they have more than any ICO. That's why I still believe in Sparkster. … Sparkster, I am personally very bullish on."

**ANSWER:**

To the extent this paragraph purports to quote, characterize or summarize a document(s) or statement, the document or statement speaks for itself and Balina respectfully refers to the full text of the document or statement.

51.     During the "presale" phase, Sparkster raised $24.3 million from approximately 900 investors, including investors residing in multiple U.S. states. Approximately 350 additional persons, again including U.S. investors, purchased tokens through third-party investing pools.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. Balina is without knowledge or information sufficient to form a belief about the allegations in this paragraph and therefore denies them.

52.     The investing pools, including the pool organized by Balina as described below, used their own smart contracts, which provided that pool participants would receive their SPRK tokens by sharing in the allotment of SPRK tokens purchased directly from Sparkster by the individual directing the distribution to that pool.

**ANSWER:**

Balina admits that he and others purchased Sparkster tokens. Balina is without knowledge or information sufficient to form a belief about the remaining allegations and therefore denies them.

53.     On July 7 and July 8, 2018, during the "crowdsale" phase, Sparkster additionally raised approximately $5.7 million from approximately 3,000 individuals, including investors residing in multiple states in the U.S., bringing the total sale proceeds from SPRK tokens to $30 million.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. Balina is without knowledge or information sufficient to form a belief about the allegations in this paragraph and therefore denies them.

54.     In June 2019, SPRK tokens were unlocked and briefly listed on a crypto asset-trading platform, but the listing was removed shortly thereafter.  Beginning on September 6, 2019, SPRK tokens were listed on another crypto asset-trading platform. As soon as trading began on that platform, the value of SPRK tokens dropped dramatically.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. Balina admits that the Sparkster tokens were listed on a trading platform in June 2019 and on a trading platform in September 2019 with the value of a Sparkster token being in the approximate range of 2/10 and 3/10 of one U.S. cent in September 2019. Balina denies the remaining allegations.

55.     On May 13, 2018, two days after Sparkster won Balina's contest in Amsterdam and before his promotion of the Sparkster Offering began, Balina asked Sparkster's CEO to provide him with a "5000+ ETH," or approximately a $3,500,000, allocation for the Sparkster ICO—well above what Sparkster was allowing other investors to purchase individually.

**ANSWER:**

Balina admits that he inquired about purchasing Sparkster tokens after the Amsterdam contest. Balina is without knowledge or information sufficient to form a belief about the allegation concerning what Sparkster was allowing other investors to purchase individually. Balina denies the remaining allegations.

56.     On May 20, 2018, after further discussions between Balina and Sparkster's CEO, Balina signed a SAFT with Sparkster, agreeing to purchase 7,143 ETH, or approximately $5,000,000, worth of SPRK tokens.  The SAFT also stated that Balina would receive a 30 percent bonus in SPRK tokens. Sparkster's CEO informed Balina at the time that he was "the only one that's been allowed to invest more than the [minimum]."

**ANSWER:**

Balina admits that he had discussions with Sparkster's CEO after the Amsterdam contest. To the extent that this paragraph purports to quote, characterize or summarize a document, the document speaks for itself and Balina respectfully refers to the full text of the document. Balina denies the remaining allegations.

57.     The same day that he signed the SAFT—May 20, 2018—Balina named the Sparkster Offering as his "Hall of Fame" or top ICO of the year in his ICO rankings.  While Balina disclosed that he was an investor in Sparkster when he promoted the Sparkster Offering, he did not disclose that he had received bonus tokens from Sparkster for his endorsement of the Sparkster Offering.

**ANSWER:**

Balina admits that he identified Sparkster as the top ICO of the year. Balina admits that he disclosed that he was an investor in Sparkster. Balina denies the remaining allegations.

58.     The SAFT that Balina signed with Sparkster expressly stated that U.S. residents, like Balina, were *not* eligible for and "must not buy" SPRK tokens.  Balina nevertheless proceeded with the SPRK token purchase, but instead of submitting a U.S. passport for the registration

process, he submitted a Ugandan passport and utility bill as proof of citizenship and residence during the SPRK token purchase registration process. At that time, Balina was a United States resident, living in Potomac, Maryland, where he had lived for a number of years.

**ANSWER:**

Balina admits that he purchased tokens from Sparkster and, as a Ugandan citizen, used his Ugandan passport. To the extent that this paragraph purports to quote, characterize or summarize a document, the document speaks for itself and Balina respectfully refers to the full text of the document. Balina denies the remaining allegations.

59.     On May 21, 2018, Sparkster's CEO privately messaged Balina and told him that the Sparkster Telegram group had voted to eliminate bonuses for all presale participants, but he said that a few strategic partners, including Balina, would receive bonuses of up to 30 percent. Balina responded, "I think [the Sparkster website] should be changed to document that the highest bonus given out was 30%. I have to publicly disclose it to my audience due to SEC regulations. So I suggest to do this."

**ANSWER:**

To the extent that this paragraph purports to quote, characterize or summarize a document(s), the document(s) speaks for itself and Balina respectfully refers to the full text of the document(s). Balina denies the remaining allegations.

60.     On May 25, 2018, during a live AMA session on YouTube, where he hosted a demonstration by Sparkster's CEO, Balina said that after Sparkster's previous pitch in Amsterdam: "I … and my team ended up doing more homework on the project and after two demos ... our team basically came to a conclusion that this was a project that we wanted to be a part of.  Disclosure: I have invested. I was part of their token sale.  That being said, this is not a paid endorsement."

**ANSWER:**

To the extent that this paragraph purports to quote, characterize or summarize a document or statement, the document or statement speaks for itself and Balina respectfully refers to the full text of the document or statement. Balina denies the remaining allegations.

61.     On May 26, 2018, Balina transferred 7,143 ETH to the Ethereum wallet address provided by Sparkster's CEO.

**ANSWER:**

Balina admits that ETH were transferred on or about May 26, 2018 to the Ethereum wallet

address provided by Sparkster. Balina denies the remaining allegations.

62.     Contrary to his acknowledgement and statement on May 21, 2018 that he needed to disclose the compensation Sparkster provided him, Balina never publicly disclosed that Sparkster had agreed to provide him with bonus tokens as a consideration for his promotion of SPRK tokens. The federal securities laws require that a person who receives or is to receive from an issuer of securities a consideration for the person's use of interstate transportation, communication, or commerce to publicize a security must fully disclose the past or prospective receipt of the consideration, as well as the amount thereof.

**ANSWER:**

The allegations in the second sentence contain characterizations and legal conclusions to which

no response is required. To the extent any response is necessary, Balina denies the allegations.

Balina denies the remaining allegations.

63.     Almost six months later, on November 16, 2018, during a live YouTube AMA and in response to a direct question about the price at which Balina received SPRK Tokens, Sparkster's CEO disclosed that the company had provided a 30% bonus to Balina and that he was one of only three strategic partners to receive a bonus.

**ANSWER:**

Balina admits that he disclosed the volume-based discount from the public price that he, as well

as others, received. To the extent that this paragraph purports to quote, characterize or

summarize a document or statement, the document or statement speaks for itself and Balina

respectfully refers to the full text of the document or statement. Balina denies the remaining

allegations.

64.     On May 21, 2018, the day after he signed the SAFT, Balina announced on Telegram that he was forming an investing pool for members of that group. Balina directed potential investors to a third-party website used for hosting investing pools, posting a link to the site and stating "get whitelisted for my Sparkster pool." Balina's pool used a smart contract to allow pool participants to contribute ETH and share in Balina's allocation of SPRK tokens he would receive pursuant to the SAFT he signed with Sparkster.

**ANSWER:**

To the extent that this paragraph purports to quote, characterize or summarize a document or statement, the document or statement speaks for itself and Balina respectfully refers to the full text of the document or statement. Balina denies the remaining allegations.

65.     The link that Balina posted on Telegram included an online form that the members of his investing pool would have to complete in order be potentially included in the whitelist for the SPRK token investing pool.  In addition to providing the details of Balina's offering for his investing pool, the form requested potential investors to provide information about themselves, how much money they were willing to invest, and to identify the Ethereum wallet address that they intended to use for Balina's offering.  The form also contained a disclaimer from *Diary of a Made Man LLC*, which identified Balina's company as being responsible for the investing pool.

**ANSWER:**

To the extent that this paragraph purports to quote, characterize or summarize a document or statement, the document or statement speaks for itself and Balina respectfully refers to the full text of the document or statement. Balina denies the remaining allegations.

66.     Approximately fifty individuals, including 12 U.S. residents, ultimately contributed approximately $3.8 million worth of ETH to participate in Balina's investing pool. Balina controlled who was allowed to participate in the pool and provided regular updates to the Telegram group about the status of the pool.  Through the information provided by the pool participants to the investing pool provider, Balina—himself a U.S. resident—was also aware that U.S. residents were participating in the pool, but he did not take steps to restrict their participation.

**ANSWER:**

Balina admits that he purchased tokens from Sparkster, that others purchased tokens from Sparkster, that he provided information concerning Sparkster through Telegram and other media, and that he is a U.S. resident. To the extent that this paragraph purports to quote, characterize or summarize a document or statement, the document or statement speaks for itself and Balina respectfully refers to the full text of the document or statement. Balina denies the remaining allegations.

67.     The members of the Telegram group repeatedly thanked Balina for the opportunity to invest in his pool. When members had problems with their contributions being approved or "whitelisted," Balina addressed the problems and told the group when the issue was resolved. He also removed members from the Telegram group who had not been invited by him to participate.

**ANSWER:**

Balina admits that he communicated with people concerning the purchase of tokens from Sparkster, including a group of people on Telegram. Balina is without knowledge or information sufficient to form a belief about the generalized allegations as to such communications and the identity of such persons. Balina denies the remaining allegations.

68.     On May 26, 2018, Balina announced on Telegram: "Sending funds soon. Those that want to pull out please do so asap. We won't wait long." Balina's pool participants submitted ETH to the address provided by Balina, and, when Sparkster distributed its tokens to Balina, a portion of those tokens was automatically distributed to the pool participants via a smart contract. Balina agreed to share with the participants in his investing pool the bonus tokens that he would receive from Sparkster, in accordance with the amount of the investment by each participant. Sparkster ultimately distributed the bonus tokens on or about August 26, 2019.

**ANSWER:**

To the extent that the first sentence of this paragraph purports to quote, characterize or summarize a document or statement, the document or statement speaks for itself and Balina respectfully refers to the full text of the document or statement. Balina admits that he purchased tokens from Sparkster with others and each person received a portion of the Sparkster tokens in accordance with the money that they had paid. Balina admits that the first transmission of Sparkster tokens occurred in August 2019. Balina denies the remaining allegations.

69.     The U.S.-based investors in Balina's pool irrevocably committed to the transaction when, from within the United States, they sent their ETH contributions to Balina's pool. At that point, their ETH contributions were validated by a network of nodes on the Ethereum blockchain, which are clustered more densely in the United States than in any other country. As a result, those transactions took place in the United States.

**ANSWER:**

The allegations consist of characterizations and legal conclusions to which no response is required. To the extent any response is necessary, Balina denies the allegations.

70.     As alleged below, the SPRK tokens that Balina distributed to the pool were securities under federal law. Balina included a disclaimer in the online form that his investing pool participants were required to complete, stating that the offering may constitute an "unregistered securities offering." Balina received the SPRK tokens from Sparkster with the intention to distribute them, and he did in fact distribute the SPRK tokens. Balina's distribution of SPRK tokens through his investing pool was therefore a separate offering of securities.

**ANSWER:**

The allegations in the first, third, and fourth sentences of this paragraph consist of characterizations and legal conclusions to which no response is required. To the extent any response is necessary, Balina denies the allegations. To the extent that the second sentence of this paragraph purports to quote, characterize or summarize a document or statement, the document or statement speaks for itself and Balina respectfully refers to the full text of the document or statement. Balina denies the remaining allegations.

71.     Balina's offering of securities was done without any filing or registration with the SEC, and no exemption from registration was applicable.

**ANSWER:**

The allegations in this paragraph consist of characterizations and legal conclusions to which no response is required. To the extent any response is necessary, Balina denies the allegations, except Balina admits that he did not file a registration statement with the SEC because none was required.

72.     In setting up, communicating the particulars of, and conducting the distribution to his investing pool, Balina offered to sell, and sold, unregistered securities through the use of interstate communication or commerce, in violation of the offering registration provisions of the federal securities laws.

**ANSWER:**

The allegations in this paragraph consist of characterizations and legal conclusions to which no response is required. To the extent any response is necessary, Balina denies the allegations and denies that he violated federal securities laws.

73.     The SPRK Tokens offered and sold in the Sparkster Offering were securities under the federal securities laws, the Offering was not registered with the SEC, and no exemption from registration was applicable.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. The allegations in this paragraph consist of characterizations and legal conclusions to which no response is required. To the extent any response is necessary, Balina denies the allegations, except Balina admits that he did not file a registration statement with the SEC because none was required.

74.     *First*, the Sparkster offering involved an investment of money. Purchasers paid using a crypto asset – ETH – in exchange for SPRK Tokens.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. The allegations in this paragraph consist of characterizations and legal conclusions to which no response is required. To the extent any response is necessary, Balina denies the allegations, except Balina admits that he paid money in exchange for Sparkster tokens.

75.     *Second*, investors in SPRK Tokens had an expectation of profits from their investment in a common enterprise.  Sparkster and its CEO led investors to expect that they would receive profits because of their SPRK Token purchases.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. The allegations in this paragraph consist of characterizations and legal conclusions to which no response is required. To the extent any response is necessary, Balina denies the allegations. Balina is without knowledge or

information sufficient to form a belief about the expectations of the other purchasers of Sparkster tokens and what they were led to expect.

76.     Sparkster's promotion of the offering to investors and its representations regarding the value of SPRK tokens pitched the tokens as a way for investors to make money.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. The allegations in this paragraph consist of characterizations and legal conclusions to which no response is required. To the extent any response is necessary, Balina respectfully refers to the full text of the document that contains the promotion. Balina denies the remaining allegations.

77.     During and after the Sparkster Offering, Sparkster's CEO repeatedly stated on social media that SPRK tokens would increase in value and that his goal was to preserve the value of the tokens and eventually list them on crypto asset trading platforms.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that this paragraph purports to quote, characterize or summarize a document or statement, the document or statement speaks for itself and Balina respectfully refers to the full text of the document or statement.

78.     Sparkster decided to postpone the planned "crowdsale" phase of the Offering based on the value of the tokens. On June 29, 2018, Sparkster's CEO posted on Sparkster's Telegram channel: "Hey guys, I have been listening to your concerns, and from seeing the deteriorating market conditions, I have decided to postpone the crowdsale."

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. Balina admits that Sparkster delayed the sale of its tokens. To the extent that the second sentence of this paragraph purports to quote, characterize or summarize a document or statement, the document or statement speaks for itself

and Balina respectfully refers to the full text of the document or statement. Balina denies the remaining allegations.

79.     Moreover, in a Telegram comment posted on July 4, 2018, Sparkster's CEO stated, "Stick with us, and we'll deliver 300x. Our platform is truly life changing." A screenshot of this statement was widely shared and discussed among SPRK investors.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that this paragraph purports to quote, characterize or summarize a document or statement, the document or statement speaks for itself and Balina respectfully refers to the full text of the document or statement. Balina denies the remaining allegations.

80.     Also in July 2018, Sparkster distributed all SPRK tokens in locked format, prohibiting their use and transfer, and Sparkster did not list them on crypto asset trading platforms for almost a year. Sparkster told token holders that it was taking those actions because it did not want SPRK tokens to decrease in value as a result of a general decline in the ICO market. Sparkster's CEO repeatedly told investors that the reason for the lengthy lockup of SPRK tokens, and the consequent delay in listing the tokens on a crypto asset trading platform or "exchange," was fear of the tokens losing value if they were unlocked in the context of a soft ICO market.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. Balina is without knowledge or information sufficient to form a belief as to whether Sparkster distributed "all SPRK tokens in locked format, prohibiting their use and transfer." Balina admits that he understands that Sparkster did not list the tokens on crypto asset trading platforms for almost a year. Balina admits that he is aware of statements by Sparkster claiming that it was taking certain actions because it did not want the tokens to decrease in value. To the extent that this paragraph purports to quote, characterize or summarize a document or statement, the document or statement speaks for itself and Balina respectfully refers to the full text of the document or statement. Balina denies the remaining allegations.

81.     On July 26, 2018, Sparkster's CEO posted on Telegram:

It's important that we list in fertile conditions. Nobody here wants our token to drop in value, and we are very conscious of this. We're lining up everything we can on our end to have a successful listing, but market conditions play a big role. We're keeping an eye on what's going on in the industry. Some of you may know that an ICO launched today and dropped below ICO price. We do not want this to happen to SPRK, so we're actively waiting for good conditions. We need to ensure that the market supports an exchange listing, we are monitoring other ICOs and their listing to determine an appropriate time. I think you will agree, nobody wants to lose money because of a poorly executing listing strategy.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that this paragraph purports to quote, characterize or summarize a document or statement, the document or statement speaks for itself and Balina respectfully refers to the full text of the document or statement.

82.     Sparkster's CEO made similar statements on social media and in YouTube AMAs through April 2019, including that other ICOs who had unlocked in the current ICO market had lost 80-90% of their value.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that this paragraph purports to quote, characterize or summarize a document or statement, the document or statement speaks for itself and Balina respectfully refers to the full text of the document or statement.

83.     The status of Sparkster's products also undermined statements in the Whitepaper that SPRK tokens constituted "utility tokens." The decentralized cloud did not launch until January 2019, almost six months after the offering, and the marketplace did not launch until more than a year after the Sparkster Offering, eliminating for many months the purported utilities for SPRK tokens as proposed in the Whitepaper.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that this paragraph purports to quote, characterize or summarize a document, the document speaks for itself and Balina respectfully refers to the full text of the document. Balina admits that Sparkster's actual timeline and products did not match the statements by Sparkster in its Whitepaper. Balina denies the remaining allegations.

84.     Moreover, Sparkster's promotional efforts for the Sparkster Offering were broadly aimed at crypto asset investors and enthusiasts and were not limited to potential users of the Sparkster platform. To assist their promotional efforts, Sparkster and its CEO recruited ICO promoters, like Balina, who, according to Sparkster's CEO, would "make a lot of noise about the project," and who had an audience primarily consisting of crypto asset investors and enthusiasts.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that this paragraph purports to quote, characterize or summarize a document, the document speaks for itself and Balina respectfully refers to the full text of the document. Balina is without knowledge or information sufficient to form a belief about the aim of Sparkster's promotional efforts and its recruitment of persons that are characterized as promoters and therefore denies them. Balina denies the remaining allegation and denies that he promoted Sparkster.

85.     *Third*, any profits that would have come to Sparkster investors would have had to come from the efforts of others. The SPRK tokens were to be listed on a crypto asset trading platform, with a view to their increasing in value. Any such resulting profit would not come from the efforts of those investing in the Sparkster Offering, but from the efforts of Sparkster management in creating an enterprise that would cause SPRK tokens to increase in market value.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. The allegations in this paragraph consist of characterizations and legal conclusions to which no response is required. To the extent any response is necessary, Balina denies the allegations.

86.     Representations by Sparkster and its CEO further led investors to believe that these profits would be derived from managerial efforts. Sparkster's CEO repeatedly made statements

on YouTube and other social media about the efforts of Sparkster management to grow Sparkster and the growth of the company generally. In the Whitepaper and on social media, Sparkster's CEO repeatedly emphasized his success in previous business ventures, stating that he had founded multiple businesses over the past 15 years with total revenue of $50 million.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. Balina is without knowledge or information sufficient to form a belief about whether "Sparkster and its CEO further led investors to believe that these profits would be derived from managerial efforts" and therefore denies them. To the extent that the second and third sentences in this paragraph purport to quote, characterize or summarize a document or statement, the document or statement speaks for itself and Balina respectfully refers to the full text of the document or statement. Balina denies the remaining allegations.

87.     Moreover, before and after the "crowdsale" phase, Sparkster repeatedly highlighted the company's and its employees' partnerships or affiliations with well-known technology companies and research institutions.

**ANSWER:**

The allegations in this paragraph are targeted at Sparkster. To the extent that this paragraph purports to quote, characterize or summarize a document or statement, the document or statement speaks for itself and Balina respectfully refers to the full text of the document or statement. Balina denies the remaining allegations.

88.     The Commission realleges and incorporates by reference paragraphs 1 through 87 as though fully set forth herein.

**ANSWER:**

Balina incorporates by reference his responses to paragraphs 1 through 87 as though fully set forth herein.

89.     By virtue of the foregoing, Defendant Balina, directly or indirectly, (a) without a registration statement being in effect as to those securities, made use of the means and instruments

32

of transportation or communication in interstate commerce and of the mails to sell securities through the use or means of a prospectus or otherwise, and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus or otherwise, securities as to which no registration statement had been filed.

**ANSWER:**   Denied.

90.   By engaging in the conduct described above, Defendant Balina directly violated, and unless enjoined will continue to violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

**ANSWER:**   Denied.

91.   The Commission realleges and incorporates by reference paragraphs 1 through 87 as though fully set forth herein.

**ANSWER:**   Balina incorporates by reference his responses to paragraphs 1 through 87 as though fully set forth herein.

92.   By virtue of the foregoing, Defendant Balina made use of the means and instruments of transportation or communication in interstate commerce or of the mails to publish, give publicity to, or circulate a notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

**ANSWER:**   Denied.

93.   As described herein, Defendant Balina promoted the Sparkster Offering without disclosing that he had received or would receive from Sparkster consideration for that promotion, in the form of bonus SPRK tokens and without disclosing the amount of that consideration.

**ANSWER:**   Denied.

94.   By reason of the conduct described above, Defendant Balina violated and, unless enjoined will again violate, Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

**ANSWER:**   Denied.

95.   Balina denies that Plaintiff is entitled to any relief.

96.   Balina admits that Plaintiff has demanded trial by jury.

## III. DEFENSES

1.      Plaintiff's claims are barred, in whole or in part, because they fail to state a valid, cognizable cause of action.

2.      Balina did not violate Section 5 of the Securities Act because the Sparkster tokens are not securities or "investment contracts" and any distribution or sale of Sparkster tokens is not a security or "investment contracts." No registration was required in connection with any distribution or sale of Sparkster tokens.

3.      Even if the Court were to find that the Sparkster tokens constitute a security or investment contract within Section 5 of the Securities Act, Plaintiff's claims against Balina are barred in whole or in part because any distribution or sale of the Sparkster tokens by Balina was exempt from the registration requirements of the Securities Act and/or the regulations promulgated thereunder.

4.      Plaintiff's claims are barred, in whole or in part, because Plaintiff does not have jurisdiction to assert the claims against Balina.

5.      Plaintiff's claim and Plaintiff's request for disgorgement is barred in whole or part because Plaintiff did not profit from his purchase of the Sparkster tokens.

6.      Balina did not have, and Plaintiff failed to provide, fair notice that his conduct was in violation of law, in contravention of Balina's due process rights. Due process requires that laws give a person of ordinary intelligence a reasonable opportunity to know what is prohibited. Here, due to the lack of clarity and fair notice regarding Balina's obligations under the law, in addition to the lack of clarity and fair notice regarding Plaintiff's interpretation of the law and the SEC's prior pronouncements that are contrary to its position in this matter, Balina lacked fair notice that his conduct was prohibited.

7.     Plaintiff lacks extraterritorial authority over all or some of the transactions alleged in the Complaint that took place outside the United States and/or were made on foreign exchanges.

8.     Plaintiff's claim and request for civil monetary penalties are barred in whole or part by an applicable statute of limitations.

9.     Plaintiff's request for injunctive relief in the Complaint is inappropriate, in whole or in part, because the Complaint fails to allege a reasonable likelihood of any future violation by Balina.

### IV.  RESERVATION OF OTHER DEFENSES AND BURDEN OF PROOF

Balina reserves the right to seasonably amend his answer and assert other defenses, as permitted under the Federal Rules of Civil Procedure and by the rules of the Court, including those which may become known upon his opportunity to conduct discovery in this matter. Balina does not waive Plaintiff's burden or otherwise undertake any burden of proof greater than what the rules of pleading require.

WHEREFORE, Defendant requests that the Court enter judgment in favor of Defendant Ian Balina and against Plaintiff SEC, on all counts in the Complaint, that Plaintiff SEC take nothing by way of its Complaint, and that the Court award Defendant Balina all of his recoverable costs and expenses, including, to the extent the Court determines that they are properly recoverable by the law applicable to this dispute, all of his reasonable attorneys' fees; and any and such further relief in favor of Balina that the Court deems appropriate and just.

Respectfully submitted,

/s/ Michael L. Navarre
Michael L. Navarre
State Bar No. 00792711
mnavarre@bnsfirm.com
BEATTY NAVARRE STRAMA, PC
901 S. MoPac Expy., Building 1, Suite 200
Austin, Texas 78746
(512) 879-5050
(512) 879-5040 (facsimile)

ATTORNEYS FOR DEFENDANT,
IAN BALINA

## CERTIFICATE OF SERVICE

The undersigned, counsel for Defendant, hereby certifies that the foregoing was filed with the Court's ECM/EF system, and thus a copy of the same made available to all counsel appearing in this matter via email transmission to their electronic email addresses of record via the Court's ECM/EF system, on this 18th day of November, 2022. I also certify that on this the 18th day of November, 2022, I served a true and correct copy of the foregoing instrument on the counsel of record below by email.

Melissa Armstrong
Fernando Campoamor Sánchez – via Email: campoamorsanchezf@sec.gov
Ivan J. Snyder
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-8523 (Telephone: Campoamor Sánchez)
(202) 772-9286 (Facsimile)

*Counsel for Plaintiff Securities and Exchange Commission*

/s/ Michael L. Navarre
Michael L. Navarre