UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,**<br><br>       **Plaintiff,**<br><br>-against-<br><br>**IAN BALINA,**<br><br>       **Defendant.** | Civil Action No. 1:22-CV-950-DAE<br><br>ECF CASE<br><br>**(Jury Trial Demanded)** |

### DEFENDANT IAN BALINA'S MOTION FOR SUMMARY JUDGMENT

Defendant Ian Balina ("Balina") hereby files his Motion for Summary Judgment and respectfully shows as follows:

### I. INTRODUCTION

On September 19, 2022, the U.S. Securities and Exchange Commission ("SEC" or "Plaintiff") announced that it had entered into a cease-and-desist order with Sparkster, Ltd. ("Sparkster") and its founder, Sajjad Daya ("Sparkster Order"). Pursuant to the Sparkster Order, Sparkster was required to pay over $35,000,000 and Daya was required to pay a civil penalty, along with additional punishments. The Sparkster Order resulted from Sparkster and Daya's wrongful conduct, including telling the public that they had a fully developed product that allowed users to develop computer code while selling SPRK Tokens.

Ian Balina was one of the numerous individuals who purchased SPRK Tokens. Mr. Balina purchased tokens along with a group of other individuals in a pool so that they could obtain a discount. Like the other purchasers – both in and out of this pool, Balina lost money because the SPRK Tokens are essentially worthless.

Ian Balina, like many others who were fooled by Sparkster and Daya, lost money after purchasing SPRK Tokens. Yet, on the same day that the SEC announced the Sparkster Order, the SEC filed this action against Balina and demanded disgorgement of all "ill-gotten gains." This is just one example of the fallacy of the SEC's claims. There are no "ill-gotten gains." There was no "ill-gotten." There were no "gains." The simple fact is that Balina purchased SPRK Tokens and – like others – lost money.

The SEC has brought two claims against Balina: (1) alleged violation of Section 5(a) and 5(c) of the Securities Act for selling or offering to sell unregistered securities and (2) alleged violation of Section 17(b) of the Securities Act for promoting the Sparkster sale without disclosing some type of alleged compensation. Balina seeks summary judgment on both claims on the following grounds:

1. Balina did not violate Section 17(b) because he did not agree to accept or otherwise accept any compensation for promoting SPRK Tokens.
2. Balina did not violate Section 5(a) and 5(c) because he did not sell or offer to sell SPRK tokens.
3. Balina did not violate the Securities Act because the alleged "promotion" and purported transactions occurred outside the United States.
4. Balina did not violate the Securities Act because the SPRK Tokens are not a security under the *Howey* test.
5. Balina did not violate the Securities Act because any such purported sales and offers to sell are exempt under Section 4(a)(1) of the Securities Act.

Balina requests that the Court grant this summary judgment and dismiss the SEC's claims in their entirety.

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Hall v. Thomas*, 190 F.3d 693, 695 (5th Cir. 1999). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote omitted). To meet its burden, the nonmoving party must present "significant probative" evidence indicating that there is a triable issue of fact. *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994). If the evidence rebutting the summary judgment motion is only colorable or not significantly probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

## IV.  ARGUMENT AND AUTHORITIES

A.  **The Court Should Grant Summary Judgment As To The SEC's Section 17(b) Claim Because Balina Did Not Agree To Accept Or Otherwise Accept Any Compensation For Allegedly Promoting SPRK Tokens.**

Balina never accepted and never agreed to accept any compensation for allegedly promoting SPRK Tokens.[1]

Previously, Balina posted and disclosed all of his crypto transactions.[2] By doing so, Balina became well-known in the crypto world. Balina has provided publicity to many crypto currencies by discussing various crypto currencies. In 2018, Balina went on a "World Tour" to try and assist the general public in identifying the good projects from the fraudulent projects in the burgeoning token world. The event that the SEC has put at issue in this case is the May 11, 2018 event that occurred outside the United States in Amsterdam.[3]

At the Amsterdam event, Balina was the master of ceremonies for a "Shark Tank" like event.[4] ***Balina did not*** invite, select or otherwise allow Sparkster to compete in the event.[5] ***Balina was not paid*** for his appearance by Sparkster.[6] The ***SEC does not allege*** that Balina received any payment or

---

[1] Ex. 1, Affidavit of Ian Balina.

[2] *Id.*

[3] *Id.*

[4] *Id.;* Ex. 2, Video of May 11, 2018 Amsterdam Event.

[5] Ex. 1, Affidavit of Ian Balina.

[6] *Id.*

inducement to favor Sparkster because ***Balina did not receive anything to favor Sparkster***.[7] During his presentation, Daya boasted that Sparkster had more than a minimum viable product ("MVP") because Sparkster, he stated, had a finished product.[8] Sparkster's project was selected by the attendees after three rounds of presentations.[9] None of the other participants, including the organizers of the event, have been charged with any wrongdoing, as the SEC only singled out Balina.[10] The crowd chose Sparkster as the top project at the event.[11]

The SEC's faulty allegation is that Balina was compensated in the form of a volume discount for promoting SPRK Tokens. That allegation is false. ***There was and is no agreement by which Balina would be compensated for promoting SPRK Tokens***.[12] The SEC cannot show any such agreement because no such agreement has ever existed.[13] Balina – to his frustration to this day – thought that the SPRK Tokens was a good project based on Sparkster's presentation and the information he received from Sparkster and others. As with other projects, Balina made his views well-known, including identifying Sparkster as "Hall of Fame" in his publicly distributed spreadsheet.[14] But, as with other crypto projects, ***Balina did not receive any compensation for discussing Sparkster or ranking Sparkster.*** He simply thought it was a good product and disclosed his opinion to the public.[15] There was no quid pro quo.[16]

---

[7] *Id.*

[8] *Id.;* Ex. 2, Video of May 11, 2018 Amsterdam Event.

[9] *Id.;* Ex. 2, Video of May 11, 2018 Amsterdam Event.

[10] Ex. 1, Affidavit of Ian Balina.

[11] *Id.;* Ex. 2, Video of May 11, 2018 Amsterdam Event.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

4

Balina – like the other purchasers in the pool – did receive the same volume discount for his purchase of SPRK Tokens.[17] Discounts during an initial coin offering are common in the industry.[18] Every purchaser in the pool received the exact same discount of 30%.[19] ***Every purchaser received this same volume discount regardless of whether they promoted SPRK Tokens***.[20] This discount was not conditioned on Balina or anyone else in the pool promoting Sparkster or its tokens.[21]

The only member of the pool that was deposed in this case, aside from Balina, testified that he did nothing to promote, advertise, publicize or sell Sparkster or its tokens.[22] But, Furano, like all the other pool members, received the same volume-based discount.[23] This shows that the volume discount was not consideration for any promotion of the SPRK Tokens.

The volume discount that Balina and others received is the same as a volume discount that companies offer in grocery stores. For example, if a person decides to buy three – instead of one – Gatorades, the individual receives a lower price on the three Gatorades. The individual receives the volume discount regardless of whether they (1) promote Gatorade; (2) remain silent about Gatorade; or (3) bad-mouth Gatorade. The discount, as here, is solely premised on it being a volume purchase.

Therefore, the Court should dismiss the SEC's Section 17(b) claim because Balina did not agree to accept or otherwise accept any compensation for promoting SPRK Tokens.

**B.    The Court Should Grant Summary Judgment Because Balina Did Not Sell Or Offer To Sell SPRK Tokens.**

---

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] Ex. 3, Furano Depo. at 69:23-70:11.

[23] Ex. 1, Affidavit of Ian Balina.

Balina did not sell or offer to sell SPRK Tokens. Balina was a member of a pool of numerous individuals who purchased SPRK Tokens.[24] While outside the United States, Balina purchased SPRK tokens for $106,915.50 with 150 ETH (Ethereum digital assets) and received 450,923.77 SPRK Tokens.[25] Importantly,

- Balina paid the same price for each SPRK Token as the other members of the pool.[26]
- Balina, like the other members of the pool, received a 30% volume-based discount (207,903.68 SPRK tokens).[27]
- Balina, like other members of the pool, paid a fee of 0.5% to PrimaBlock.
- Balina, like other members of the pool, paid a fee of 0.5% to another individual for "KYC"[28] work.[29]

Balina did not own the SPRK Tokens that the other members of the pool purchased. At no time did Balina think that he had any right to the SPRK Tokens that the other members of the pool purchased.[30]

The fallacy of the SEC's claim that Balina sold SPRK Tokens to the other members of the pool is further shown by the transactions. As even the SEC must admit, Balina did not receive a commission for such sales.[31] Furthermore, as even the SEC must admit, the other pool members purchased their SPRK Tokens on the same price/volume-based discount/PrimaBlock fee/KYC fee as Balina.[32] The SEC would have the Court believe that Balina "somehow" sold the SPRK Tokens at no profit (or loss) to himself that just so happened to be on the exact same terms as those for Balina. The truth is far simpler: the pool members did not purchase their SPRK Tokens from Balina. Given

---

[24] Ex. 1, Affidavit of Ian Balina.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] "KYC" stands for know your customer.

[29] Ex. 1, Affidavit of Ian Balina.

[30] *Id.*

[31] *Id.*

[32] *Id.*

the facts of the transactions, the economic reality is that the pool members did not purchase their SPRK Tokens from Balina.

Therefore, the Court should grant summary judgment because Balina did not sell or offer to sell SPRK tokens.

**C.** **The Court Should Grant Summary Judgment As To The Purported Sales And Offers To Sell Because The Transactions And Purported Activities Occurred Outside The United States.**

The U.S. securities laws do not apply to foreign transactions. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) (affirming the dismissal of a securities action because the transactions occurred on a foreign exchange). "It is a 'longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Id.* at 255 (citing *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991) (Aramco) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949))). It is the SEC's burden to prove that the transactions were either for securities listed on a domestic exchange, "or that the purchase or sale occurred in the United States." *Id.* at 267. There is no liability for a transaction unless the SEC can show that the transaction is within this territorial scope of the U.S. securities laws. *Id.* at 254-55. The SEC's own regulations expressly state that Section 5 of the Securities Act applies only to offers and sales that occur within the United States:

> For the purposes only of section 5 of the Act (15 U.S.C. sec. 77e), the *terms offer, offer to sell, sell, sale,* and *offer to buy* shall be deemed to include offers and sales that occur within the United States and shall be deemed not to include offers and sales that occur outside the United States.

17 C.F.R. sec 230.901 (2020) (emphasis in original). Here, the purported transactions and alleged "promotion" did not occur within the United States.

Here, the admitted and/or undisputed facts as to territoriality are as follows:

- Sparkster, Ltd., as alleged by the SEC, is a company incorporated in the ***Cayman Islands.***

- The offering by Sparkster was in the United Kingdom.[33]
- PrimaBlock is a company registered under the laws of *Estonia.*[34]
- Balina was *outside the United States continuously from prior to May 4, 2018 until July 18, 2018*.[35]
- The "Shark Tank" like event at which Balina was the master of ceremonies *occurred in Amsterdam, outside of the United States*.[36]
- *All of the purported sales and offers to sale by Balina occurred while he was outside the United States* continuously from prior to May 4, 2018 until July 18, 2018.[37]
- All of the statements made by Balina concerning Sparkster or its ICO from May 4, 2018 until July 18, 2018 *occurred outside the United States*.[38]
- Balina signed the SAFT agreement while he was *outside the United States*.[39]
- All of Balina's alleged "promotional" efforts that the SEC claims violate Section 17(b) occurred, *according to the SEC, from May 19, 2018 to "the end of Sparkster's ICO on or about July 8, 2018"*[40] *while it is undisputed that Balina was outside the United States.*

The purported transactions and alleged "promotion" did not occur in the United States.

Because it is undisputed that the purported transactions did not occur on a United States exchange, the SEC is left with proving the second prong of *Morrison*: that the purported transactions were "domestic securities transactions." The Second Circuit has held that "to sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange . . . a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012). "A domestic transaction is necessary but not necessarily sufficient to make §10(b) applicable."

---

[33] Ex. 1, Affidavit of Ian Balina.

[34] *Id.*

[35] *Id.*

[36] *Id.;* Ex. 2, Video of May 11, 2018 Amsterdam Event.

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] Ex. 7, SEC'S Third Amended Responses and Objections To Defendant's First Requests For Production and First Set Of Interrogatories at Interrog. No. 3.

*Parkcentral Global HUB Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014). Here, the SEC cannot meet its burden because irrevocable liability was not incurred within the United States and title was not transferred within the United States.

Furthermore, *Parkcentral* is instructive given the predominantly foreign nature of the alleged "promotion" and purported transactions. In *Parkcentral*, the plaintiffs complained that "that they entered into . . . swap agreements referencing VW shares in the United States" but the complaints concerned "statements made primarily in Germany with respect to stock in a German company traded only on exchanges in Europe." *Id.* at 207, 216. The *Parkcentral* court did not find it necessary to apply the *Absolute Activist* standard for domestic transactions because the claims were "so predominantly foreign as to be impermissibly extraterritorial." *Id.*

Here, all of the alleged promotion and purported transactions occurred **outside of the United States** while **Balina was outside of the United States from prior to May 4, 2018 until July 18, 2018.** Also, as in *Parkcentral,* Sparkster is a foreign company and PrimaBlock is a foreign company. Given the SEC's improper attempt to acquire extraterritorial jurisdiction, the Supreme Court's warning in *Morrison* is well-founded:

> For it is a rare case of prohibited extraterritorial application that lacks all contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case.

*Morrison*, 561 U.S. at 266. Here, the Court should deny the SEC's improper attempt to put the watchdog of jurisdiction into the kennel.

The Supreme Court's recent decision in *Abitron* follows *Morrison* and further shows the lack of jurisdiction over these alleged activities that occurred outside the United States. *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 143 S. Ct. 2522 216 L. Ed. 2d 1013 (2023). In *Abitron*, after the Court determined that the Lanham Act was not extraterritorial, the Court proceeded with the second step of

9

its analysis. *Id.* at 2528. The Court explained that, when making the determination of "whether the suit seeks a (permissible) domestic or (impermissible) foreign application", courts must focus on the on the congressional concern underlying the provision and "ask whether the *conduct relevant to that focus* occurred in United States territory." *Id.* (quoting *WesternGeco LLC v. ION Geophysical Corp.*, 585 U. S. \_\_\_, \_\_\_, 138 S. Ct. 2129, 201 L. Ed. 2d 584 (2018)) (emphasis in original). The Court concluded that "if the relevant conduct occurred in another country, 'then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U. S. territory.'" *Id.* at 2529 (citing *WesternGeco*, 585 U. S., at \_\_\_, 138 S. Ct. 2129, 201 L. Ed. 2d 584 and quoting *RJR Nabisco, Inc. v. European Community*, 579 U. S. 325, 337 (2016)).

Here, all of the alleged activities occurred outside the United States. Balina was outside of the United States **from prior to May 4, 2018 until July 18, 2018**.[41] This includes all of the activities that the SEC claims constitute his promotion of Sparkster, including the Amsterdam "shark tank" event. This also includes the time during which Balina allegedly offered to sell and sold the SPRK Tokens to the pool members. Therefore, consistent with *Morrison* and *Abitron*, this suit and the SEC seek an "(impermissible) foreign application" of the Securities Act.

Therefore, the Court should grant summary judgment because the U.S. securities laws do not apply to this alleged extraterritorial conduct.

D. **The Court Should Grant Summary Judgment Because The SPRK Tokens Are Not An Investment Contract.**

In *Howey*, the Supreme Court set forth the test to determine what qualifies as an "investment contract." *SEC v. W.J. Howey Co.,* 328 U.S. 293, 301 (1946). "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* Here, the SPRK Tokens fail the second and third prongs of this test. Additionally,

---
[41] *Id.*

consistent with the SEC's guidance, *Howey*, and *Forman*, the SPRK Tokens were a finished product, and not an investment contract.

> **1.   The SPRK tokens were marketed as a finished product and are not an investment contract pursuant to the SEC's guidance, *Howey*, and *Forman*.**
>
>> **a.   Sparkster was marketed as a "finished product" that was usable with a SPRK Token.**

Sparkster and its CEO, Daya, marketed Sparkster as a "finished" product that was usable with a SPRK Token.[42] At the May 11, 2018 Amsterdam event, Sparkster CEO Sajad Daya presented what he said was a developed and usable product.[43] In Sparkster's initial one-minute presentation, Daya said that Sparkster had already developed a highspeed network, a decentralized cloud, and with them a product for natural language code development:[44]

> "Now all of you can build decentralized software with no code, a hundred times faster than traditional software development."

In the next round, during his three-minute presentation, when Balina asked Daya whether Sparkster had a prototype, Daya said that Sparkster had a "finished product":[45]

> **Mr. Daya:** No, *we have a finished product. Not an MVP, but a finished product.* We've been building it for over four years. *I've spent eight million dollars of my own money to do it.* . . . So I've built companies for the last fifteen years that generate over fifty million dollars a year in revenue . . . That product, to be able to build software without writing any code, *firstly it's finished today* and it's blockchain-integrated, meaning that you can build Ethereum smart contracts, plain English, right now today . . . What we're building today is a blockchain to run the software that you build . . . "

Daya said that he had already spent the money necessary to build the "finished product."[46]

---

[42]  *Id.;* Ex. 2, Video of May 11, 2018 Amsterdam Event.

[43]  *Id.*

[44]  *Id.* at 21:36 to 23:00.

[45]  *Id.* at 32:14 to 35:25.

[46]  *Id.*

11

In his five-minute winner's presentation, Daya gave what appeared to be a demonstration of the finished product, as already developed by Sparkster.[47] At the conclusion of Daya's five-minute winner's presentation, Balina opened it up to an AMA (Ask Me Anything). Daya continued to give additional details of Sparkster's purportedly finished product.[48] Sparkster and Daya claimed – and marketed – Sparkster as a finished product.

      **b.**      **The Sparkster Token Agreement further shows that SPRK Tokens were marketed as a finished product, not as investment contracts.**

The Sparkster Token Agreement further shows that SPRK Tokens were meant to be used to access the finished Sparkster product, not investment contracts.[49] A SPRK Token was "a non-exclusive, non-transferable, revocable license to access and use the [Sparkster] Ecosystem" – which was a finished product according to Sparkster and Daya.[50] A SPRK Token did not entitle or grant its owner (1) any shares of stock in Sparkster (or any other company); (2) any voting rights; (3) any rights to a dividend or other profit share; or (4) any other financial rights.[51] Furthermore, any person purchasing a SPRK Token agreed that they were "not purchasing Tokens for any other purposes, including, but not limited to, any investment, speculative or other financial purposes."[52]

As the following excerpts show, the Sparkster Token Agreement makes it clear that the SPRK Tokens were meant to be used in Sparkster's finished product, not as an investment contract:

> **AS FOR NOW OWNERSHIP OF SPARK TOKENS CARRIES NO RIGHTS OTHER THAN THE RIGHT TO PARTICIPATE IN SPARKSTER PROJECT.**[53]

---

[47] *Id.*

[48] *Id.* at 46:30 et seq.

[49] Ex. 4, Sparkster Token Sale Agreement.

[50] *Id.* at 12.

[51] *Id.* at 17.

[52] *Id.*

[53] *Id.* at 8 (capitalization in original) (bold added).

12

IN PARTICULAR, NOTHING IN THIS AGREEMENT CONSTITUTES AN OFFER OF SECURITIES FOR SALE IN THE USA.[54]

1.9   SPARK Tokens ("SPARK", "Tokens") - cryptographic tokens, which are software digital products (not being cryptocurrency), which are created by the Company and is a digital representation for participation in SPARKSTER project, including the participation in distribution of Platform rewards. The SPARK token is designed as a decentralized token on the Ethereum Blockchain platform.[55]

\*   \*   \*

2.6   **The use of Tokens in connection with the Ecosystem** may be governed by other applicable terms and policies (collectively, the "Ecosystem Terms and Policies") that may be devised in the future by the Company's in its sole discretion.[56]

\*   \*   \*

5.3   **You are being granted a non-exclusive, non-transferable, revocable license to access and use the Ecosystem.** Limitation to the transferability of license shall not be understood in a way, that the users are not allowed to transfer Tokens to third parties.[57]

5.4   **You shall use the Website, the Ecosystem and the Tokens strictly in accordance with the provisions of this Agreement and the respective White Paper.** As a condition of your use of the Website, the Ecosystem and Tokens you warrant to the Company that you will not use the Website, the Ecosystem and Tokens for any purpose that is unlawful or prohibited by the provisions of this Agreement.[58]

\*   \*   \*

15.9   You understand that Tokens is only a digital representation for participation in SPARKSTER Project, including the anticipation in distribution of Platform rewards **and offer no other rights of any form with respect to the Ecosystem or Company or its corporate affiliates, including, but not limited to, any voting, distribution, redemption, liquidation, proprietary (including all forms of intellectual property), or other financial or legal rights.**[59]

15.10   **You are purchasing Tokens solely for the purpose of participating in SPARKSTER Project,** including the participation in distribution of Platform rewards, accessing and using the Ecosystem and SPARKSTER Services, and supporting the development, testing, deployment and operation of the Ecosystem, being aware of the commercial risks associated with the Company and the Ecosystem.

---

[54]   *Id.* at 9 (emphasis in original).

[55]   *Id.* at 10.

[56]   *Id.* at 11 (emphasis added).

[57]   *Id.* at 12 (emphasis added).

[58]   *Id.* (emphasis added).

[59]   *Id.* at 17 (emphasis added).

> **You are not purchasing Tokens for any other purposes, including, but not limited to, any investment, speculative or other financial purposes.**[60]
>
> Risks Associated with Markets for Tokens. **Tokens are intended to be used solely on the Ecosystem,** and Company will not support or otherwise facilitate any secondary trading or external valuation of Tokens.[61]

Therefore, the SRK Tokens were to be used solely to access the finished product, not as an investment contract.

        c.        **The SPRK tokens are not an investment contract pursuant to the SEC's guidance, *Howey*, and *Forman*.**

The SEC has drawn a distinction between (1) a participation interest in a finished product, like Sparkster, as opposed to (2) an investment contract to fund the costs to build a yet-to-be-built system. For example, On December 11, 2017, Chairman Clayton made this distinction between a token for using an existing system, which would not be a security, as opposed to a token sold for the sole purpose of financing the development of a planned future system, which would be a security:[62]

> For example, *a token that represents a participation interest in a book-of-the-month club may not implicate our securities laws*, and may well be an efficient way for the club's operators to fund the future acquisition of books and facilitate the distribution of those books to token holders. **In contrast, many token offerings appear to have gone beyond this construct and are more analogous to interests in a yet-to-be-built publishing house with the authors, books and distribution networks all to come.**

Subsequently, William Hinman, the Director of the SEC's Corporation Finance Division, repeated this distinction in his June 14, 2018 speech.[63] One factor that tends to make a token not a security:

---

[60] *Id.* (emphasis added).

[61] *Id.* at 20 (emphasis added).

[62] Ex. 5, SEC Chairman Jay Clayton, "Statement on Cryptocurrencies and Initial Coin Offerings," Dec. 11, 2017 (emphasis added).  See also https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.

[63] Ex. 6, June 14, 2018 speech by William Hinman entitled "Digital Asset Transactions: When Howey Met Gary (Plastic)."  See also https://www.sec.gov/news/speech/speech-hinman-061418.

14

"Is the application fully functioning or in early stages of development?"[64] Here, according to Sparkster and Daya, it was fully functioning.

The SEC's distinction is consistent with the Supreme Court's decision in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837 (1975) that relied on, followed, and cited *Howey*. In *Forman,* the Court noted that the securities laws apply to cases in which "the investor is 'attracted solely by the prospects of a return' on his investment." *Id*. 421 U.S. at 852, *quoting Howey*, 328 U.S. at 300. However, on the other hand, per *Forman*, the securities laws do ***not*** apply to cases in which an already-existing product, service or system usable and developable by the purchaser are non-security cases. *Id.* at 853. The Court ruled:

> "By contrast, **when a purchaser is motivated by a desire to use or consume the item purchased – 'to occupy the land or to develop it themselves**,' as the *Howey* Court put it, ibid. – **the securities laws do not apply**."

*Id.* (emphasis added). The distinction made by the SEC and Court in *Forman* follows from the plain language and holding of the *Howey* test that requires that it be marketed based on an expectation of profits based "***solely*** from the efforts of others." *Id.* at 300 (emphasis added).

Here, Sparkster and Daya stated that there was a finished product and marketed the SPRK Tokens as the means by which an individual could use the finished product. Moreover, pursuant to the Sparkster Token Sale Agreement, a SPRK Token was nothing more than a revocable license to use the finished product. Consistent with the SEC's guidance, a token for the use of a finished product is not a security. This is also the case under *Howey* and *Forman*. The bottom line is that the SPRK Token is akin to a participation interest in the book-of-the-month club, not an as "yet-to-be-built publishing house with the authors, books, and distribution networks all to come."

---

[64] *Id*.

Therefore, the Court should grant Balina's Motion for Summary Judgment because the SPRK Tokens are not investment contracts.

2. **Pursuant to the second prong of the *Howey* test, the SPRK Tokens are not investment contracts.**

The second prong of the *Howey* test is the existence of a "common enterprise." *Howey*, 328 U.S. at 301. The SEC must prove that the holder of the alleged investment contract obtained a participatory interest in the future economic performance of the purported "common enterprise." *Id.* at 300. In *Howey*, the Court stated that the companies were offering more than a fee simple interest in a citrus orchard. Rather, they were offering an opportunity to contribute money and "share in the profits of a large citrus fruit enterprise." *Id.* at 299. Based on this, the Court concluded that "all the elements of a profit-seeking business venture are present." *Id.* at 300. The Court explained:

> "The investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise."

*Id.*

Here, the facts are opposite. The pool members who purchased SPRK Tokens do not share in earnings or profits. The pool members who purchased SPRK Tokens did not obtain a participatory interest in Sparkster. The pool members who purchased SPRK Tokens did not obtain an ownership share in Sparkster. Instead, the pool members purchased oranges. Oranges that they can use to access the finished Sparkster product.

Therefore, the Court should grant Balina's Motion for Summary Judgment because the SPRK Tokens are not investment contracts.

3. **Pursuant to the third prong of the *Howey* test, the SPRK Tokens are not investment contracts.**

The third prong of the *Howey* test is that purchasers were "led to expect profits solely from the efforts of others." *Howey,* 328 U.S. at 301. The SEC cannot meet this requirement for at least three reasons.

16

First, there was no contractual obligation by Sparkster, Balina or anyone else to undertake any efforts to create profits for the purchasers.[65] There can be no expectation to profit solely from the efforts of others if nobody has an obligation to undertake any such efforts.

Second, the SPRK Tokens, as discussed above, were marketed as a revocable license that allowed the user to use the finished product. The SPRK Tokens were not marketed as a participatory right that would enable the purchaser to share in the profits of Sparkster. In fact, such a participatory right was expressly disclaimed in the Sparkster Token Sale Agreement.[66]

Third, any increase in value that might be caused by market forces is not sufficient to satisfy this third requirement. *SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 744 n.5 (11th Cir. 2005) ("If the realization of profits depends significantly on the post-investment operation of market forces," this does "not satisfy *Howey's* third prong."). It may be that some purchasers acted, in part, on a speculative motive. However, a speculative motive "does not evidence the existence of an 'investment contract' within the meaning of the [Securities Act]," *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 253 F. Supp. 359, 367 (S.D.N.Y. 1966). As the Court explained, "anyone who buys or sells a horse or an automobile hopes to realize a profitable 'investment.' But the expected return is not contingent upon the continuing efforts of another." *Id.* (citing *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 348 (1943)).

Therefore, the Court should grant Balina's Motion for Summary Judgment because the SPRK Tokens are not investment contracts because purchasers were not "led to expect profits solely from the efforts of others." *Howey,* 328 U.S. at 301.

3. **Even if the SEC is correct that Balina sold SPRK Tokens to the pool members – which he did not – the SPRK Tokens are not investment contracts, as recently held by the *Ripple* court.**

---

[65] Ex. 1, Affidavit of Ian Balina; Ex. 4, Sparkster Token Sale Agreement.

[66] Ex. 4, Sparkster Token Sale Agreement.

The SEC alleges that Balina immediately sold his SPRK Tokens to the other pool members, aside from a small amount that he kept, at the same price and volume based-discount terms as those on which he purchased the SPRK Tokens from Sparkster. Even if the SEC's allegation that Balina sold the tokens was true – which it is not – the Court should grant Balina's Motion for Summary Judgment because, as in *Ripple*, the SPRK Tokens would not be investment contracts.

In *Ripple*, the Court considered the economic reality of "Programmatic Sales" and concluded that such sales did not meet the third prong of the *Howey* test. *SEC v. Ripple Labs, Inc.,* 2023 U.S. Dist. LEXIS 120486, *35 (S.D.N.Y. July 13, 2023). Programmatic Sales were sales of XRP "to public buyers ("Programmatic Buyers") on digital asset exchanges." *Id.* The *Ripple* court determined that the Programmatic Buyers "could not reasonably expect" that Ripple would use the capital it received from its sales to improve XRP and increase the price of XRP. *Id.* A factor in the *Ripple* court's decision was that the Programmatic buyers were "blind bid/ask transactions", and the Programmatic Buyers would not have known whether the money went to Ripple (to develop and increase the value of XRP) or some other seller of XRP. *Id.* at *35-36. Based on the SEC's failure to meet the third prong of the Howey test, the *Ripple* court granted summary judgment to the defendants for the Programmatic Sales of XRP because they did not constitute the offer and sale of investment contracts. *Id.* at *39.

Here, according to the SEC's allegations, it is even more clear that the pool members would have no reasonable expectation that their money would be used as capital by Sparkster to improve Sparkster and increase the price of SPRK Tokens. According to the SEC, the pool members knowingly purchased their SPRK Tokens from Balina. Therefore, according to the SEC, the pool members knew that their money would go to Balina, not Sparkster. Therefore, there could be no reasonable expectation that the pool members' money would be used as capital by Sparkster to improve Sparkster and increase the price of SPRK Tokens.

Therefore, as in *Ripple*, the Court should grant summary judgment because there was no offer or sale of investment contracts.

### E. The Court Should Grant Summary Judgment Because Any Such Purported Sales And Offers To Sell By Balina Are Exempt Under Section 4(a)(1) of the Securities Act.

Pursuant to Section 4(a)(1) of the Securities Act, exempt transactions include "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). Here, Balina is not an issuer, underwriter, or dealer, as those terms are statutorily defined.[67] 15 U.S.C. § 77b(a)(4); (11); (12). Nor was a Balina (1) an officer of Sparkster; (2) a director of Sparkster; (3) a majority shareholder of Sparkster; or (4) directly or indirectly controlling or controlled by Sparkster.[68]

Therefore, the purported sales or offers of sale by Balina are exempt and the Court should grant summary judgment.

### V. CONCLUSION

For the reasons discussed above, Defendant Ian Balina respectfully requests that the Court grant his Motion for Summary Judgment and further requests that the Court grant him all other relief to which he may be entitled.

Respectfully submitted,

*/s/ Michael L. Navarre*
Michael L. Navarre
State Bar No. 00792711
mnavarre@bnsfirm.com
BEATTY NAVARRE STRAMA, PC
901 S. MoPac Expy., Building 1, Suite 200
Austin, Texas 78746
(512) 879-5050
(512) 879-5040 (facsimile)

ATTORNEYS FOR DEFENDANT,
IAN BALINA

---

[67] Ex. 1, Affidavit of Ian Balina.

[68] *Id.*

## CERTIFICATE OF SERVICE

I certify that I served a true and correct copy of the foregoing instrument on the counsel of record below by email on this 28th day of September, 2023:

Fernando Campoamor Sánchez
Ivan J. Snyder
U.S. Securities and Exchange Commission
100 F Street N.E.
Washington, DC 20549

*Counsel for Plaintiff Securities and Exchange Commission*

　　　　　　　　　　　　　　　　　　　　　　*/s/ Michael L. Navarre*
　　　　　　　　　　　　　　　　　　　　　　Michael L. Navarre