**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**-against-**<br><br>**IAN BALINA,**<br><br>**Defendant.** | **Civil Action No. 1:22-CV-950-DAE**<br><br>**ECF CASE**<br><br>**(Jury Trial Demanded)** |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
TO EXCLUDE TESTIMONY OF DR. SHIMON KOGAN**

Dr. Shimon Kogan, a tenured professor who has both written academic papers on crypto markets and assets and taught courses dealing with blockchain, cryptocurrencies, and decentralized finance, is qualified to help the jury understand and assess, among other things, the Ethereum blockchain evidence about Ian Balina's control over the investment pool at issue. Unable to challenge his credentials or opinions, Balina instead distorts the content of Dr. Kogan's report and testimony to make straw-man arguments, falsely claiming that: (1) his opinions rely on documents or videos that he did not review; and (2) that his opinions lack any reasoning or methodology. Both arguments lack any substance or merit, and the Court should deny the motion.

## I. RELEVANT FACTUAL BACKGROUND

### A. Defendant Ian Balina's Violations of the Federal Securities Laws

Balina, a crypto asset investor, promoter, and influencer, claimed that he could help people "make millions with initial coin offerings ["ICOs"]." Compl. (ECF No. 1) ¶¶ 1, 10. Balina previously published a spreadsheet with the rankings of his top ICOs, which he promoted on social media and his website. *Id.* ¶ 28. This spreadsheet "was accessed by more than one million

investors per month" (*id.*), which helped Balina generate a large following on social media, with over 100,000 followers on YouTube, Twitter, and Telegram. *Id.* ¶ 27; *see also* Ex. A at 4 (Transcript of Balina's May 11, 2018, Crypto World Tour Event).[1] Balina also claimed that his spreadsheet ICO picks could "move the market" through what he called the "Ian Balina effect," which he compared to Oprah Winfrey's book club. Ex. A at 18; Ex. B (Balina Tr. 140:8-22; 145:14-25). Capitalizing on his influence, Balina offered and sold exclusive memberships where, in exchange for thousands in monthly payments, he gave members access to his "deal flow, my favorite ICO's of the week and month, weeks and days *before I share them publicly*." Ex. C (Balina's Patreon webpage) (emphasis added); *see also* Ex. B (Balina Tr. 67:4-25).

On or about May 11, 2018, Balina initiated talks with Sparkster Ltd. ("Sparkster") to invest in their ICO of a crypto asset security called SPRK Tokens. Compl. ¶¶ 2, 3, 29, 55. Days later, Balina signed a contract with Sparkster to invest $5 million in their ICO and began to promote the ICO on social media, naming Sparkster his "Hall of Fame" ICO in his spreadsheet. *Id.* ¶¶ 3, 44, 49, 56-57. Balina's contract with Sparkster provided that he would receive a 30 percent bonus in SPRK Tokens, and Balina knew that he was "the only one that's been allowed to invest more than the min[imum]." *Id.* ¶¶ 56-57. Despite acknowledging he had a duty to "publicly disclose it to my audience due to SEC regulations" (*id.* ¶ 59), Balina never publicly disclosed that Sparkster had agreed to provide him with bonus tokens as consideration for his promotion of SPRK Tokens (*id.* ¶¶ 3, 62), in violation of Section 17(b) of the Securities Act of 1933. *Id.* ¶¶ 91-94.

Shortly after signing the contract, Balina organized a Sparkster investment pool running on PrimaBlock, a third-party website. *Id.* ¶ 64; *see also* Ex. G ¶ 19, 30 (Dr. Kogan's Report

---

[1] In support of its Opposition to the Motion to Exclude Dr. Shimon Kogan's Testimony, Plaintiff submits the Declaration of Campoamor-Sánchez with a copy of all exhibits referenced herein.

("Report")). Balina invited or allowed individual investors, including members of his private group to whom he had promised access to his "deal flow," to participate in the pool by purchasing SPRK Tokens from his allocation of tokens under his contract with Sparkster. Compl. ¶¶ 4, 64-68. In a private chat with his dues-paying members, Balina urged them to get "whitelisted for *my Sparkster pool*," and said that if they contributed to the pool within 24 hours, he would guarantee them a spot but, afterwards, he would "share the allocation with others from *my private network*." Ex. D at 2 (Telegram group for Patreon Members) (emphasis added). Balina's distribution of SPRK Tokens through his investing pool was an unregistered offering of securities in violation of Section 5(a) and 5(c) of the Securities Act of 1933. Compl. ¶¶ 70-72, 88-90.

### B. Balina's Denial of Control Over the Sparkster Investing Pool

To avoid liability for his offering of SPRK tokens, and despite his statements on social media that it was *his* pool, Balina has denied the allegations in the Complaint that he controlled the pool. *See* Answer (ECF No. 7) ¶¶ 64-68. Balina now claims he was only a participant in the pool and that it was his friend and business partner from Australia, Kostantin Olabountou, who controlled the pool. *See*, *e.g.*, Ex. E at 3-4 (Answer to Interrogatory No. 6); Ex. B (Balina Tr. 249:14-251:21). According to Balina: "What I do recall is Kosta created the Primablock pool and added me as an admin/moderator," but Balina was "not sure exactly" of his own permissions. Ex. B (Balina Tr. 269:23-270:23). When confronted at his deposition with *Etherscan*[2] printouts that show the instructions he sent to the Sparkster investing pool from his wallet address, Balina claimed he was not sure what the *Etherscan* printout showed, and that only information from PrimaBlock "would help." Ex. B (Balina Tr. 277:11-279:3); *see also* Ex. F (*Etherscan* (P-131)).

---

[2] Etherscan (https://etherscan.io) is a website that provides a web-based platform to review transactions on the Ethereum blockchain. *See* Ex. G ¶ 31 n.50 (Report).

## II. DR. KOGAN'S ASSIGNMENT AND OPINIONS

### A. Balina's Transactions on Ethereum Blockchain Related to Investing Pool

The SEC asked Dr. Kogan to independently review and opine on Balina's transactions on the Ethereum blockchain related to the Sparkster investment pool at issue. Ex. G ¶ 1 (Report). This analysis of the Ethereum blockchain and related evidence is necessary because Balina denied that he controlled the pool and, despite his experience, claimed he was unable to understand or interpret the publicly available data on the blockchain about his transactions with the pool.

Section 4 of Dr. Kogan's report (¶¶ 30-49) details his analysis of *all* transactions related to the Sparkster investment pool, including Balina's transactions. Dr. Kogan obtained and reviewed the Ethereum blockchain data and cross-referenced it with the PrimaBlock database file for the Sparkster investment pool and with Balina's spreadsheet that recorded the information participants submitted via a Google Form. Ex. G ¶¶ 30-31 (Report). By cross-referencing and analyzing these sources of information, Dr. Kogan was able to identify 68 separate Ethereum addresses that contributed to the Sparkster investing pool, and he matched 63 investors to those addresses, leaving only five Ethereum addresses for which there is no identifying information. *Id.* ¶ 32.

Dr. Kogan then identified six transactions on the Ethereum blockchain initiated by Balina that modified the Sparkster investment pool's "whitelist," the list of who was allowed to participate in the pool. *Id.* ¶ 44. Dr. Kogan determined that Balina's modifications accounted for 64 of the total 68 Ethereum addresses that contributed to the pool. *Id.* He also identified a transaction where Balina modified the minimum and maximum amounts that investors could contribute and the total cap for the pool. *Id.* ¶ 45. Finally, Dr. Kogan identified the Ethereum blockchain transaction where Balina initiated the transfer of funds from the pool to pay Sparkster for the SPRK Tokens (*id.* ¶ 47), for a total of eight administrative transactions by Balina. *Id.* ¶ 46 (Report, Table 3).

Because Dr. Kogan analyzed *all* transactions, he also identified and detailed three administrative transactions that were *not* initiated by Balina, but by Olabountou. *Id.* ¶ 46. Olabountou initiated the transaction that created the pool and modified the whitelist to add 2 of the 68 investor addresses to the pool. *Id.* ¶¶ 44-46. After reviewing all the data and transactions, and based on his education and experience, Dr. Kogan opined that Balina controlled the pool. *Id.* ¶¶ 44, 50. Dr. Kogan's report also includes tables and figures that summarize the blockchain evidence and related data including, for example, tables that identify the participants and their contributions (Table 1), a table that itemizes *all* administrative transactions for the pool (Table 3), and figures with Etherscan screenshots of how Balina modified the pool whitelist (Figure 9) and how Balina transferred the funds from the pool to Sparkster (Figure 10). *Id.* at pp. 54-55, 59, and 65-66.

**B. Background and Context for the Ethereum Blockchain, Smart Contracts, ICO's, and the Role of Promoters in ICOs**

The SEC also asked Dr. Kogan to provide essential background and context for the jury to understand the technical terms and evidence to be elicited at trial. As a result, Dr. Kogan's report explains not only the Ethereum blockchain, but how its addresses, wallets, and smart contracts work. Ex. G ¶¶ 9-21 (Report). Similarly, his report explains Initial Coin Offerings ("ICOs"), and the important role promoters play in ICOs. *Id.* ¶¶ 22-29. Dr. Kogan's description and expected testimony about the role of promoters in ICOs is based on academic research. *Id.* ¶ 24.

**C. Summary of Dr. Kogan's Opinions**

In addition to providing the necessary background and context, Dr. Kogan's report contains three main opinions that the Court should allow him to provide at trial.

First, Dr. Kogan concluded that "[b]ased on [his] review of the blockchain evidence, using the services of an ICO investment pool provider [PrimaBlock], Balina controlled the smart

contract used by the Sparkster investment pool." Ex. G ¶ 8 (Report). His opinion is based on his analysis of the blockchain and related evidence, as detailed in Section 4 of his report. *Id.* ¶¶ 30-49. Specifically, Dr. Kogan found that Balina initiated the significant majority and key transactions for the pool, including adding 64 of the 68 investor addresses to the pool, exclusively modifying the investing parameters of the pool, and sending the collected funds to Sparkster. *Id.* Based on his professional expertise in crypto assets and blockchain technology, and after considering that Olabountou also had administrative rights to the pool, Dr. Kogan concluded that the blockchain evidence demonstrates that Balina's address had predominant control of the pool. *Id.* ¶ 50. Relatedly, as discussed in Section 4 of his report, Dr. Kogan found his opinion about Balina's control of the pool to be consistent with other documentary evidence including, for example, (1) Balina's social media posts instructing people to "get whitelisted for my Sparkster pool" or stating that he was removing investors from the group; (2) a Google Form that required investors to agree to a disclaimer from Balina's company and self-identify by pre-selected groups related to Balina; and (3) the contract between Sparkster and Balina for the purchase of SPRK Tokens, the amount of which matched the amount invested by the investment pool. *Id.* ¶¶ 8, 51.

Second, based on the Ethereum address Balina identified as his own, Dr. Kogan concluded that the evidence from the blockchain showed that "Balina invested at least $104,883 in the pool and received a bonus of 30% on his investment." *Id.* Dr. Kogan's opinion is presented in terms of "at least" because 5 out of the 68 Ethereum addresses that contributed funds to the pool remain unidentified. If Balina used one of those addresses, he could have invested additional funds and received additional bonus tokens, and Dr. Kogan cannot rule out that possibility.

Third, Dr. Kogan concluded that "[p]romoters played a significant role in ICOs between 2016 and 2018, with academic research finding that endorsements by promoters are associated

with the ICO raising more funds." *Id.* However, aside from helping to raise funds, "promoters have, on average, no discernible impact on the success of the funded project." *Id.* Dr. Kogan's opinion is relevant to other evidence that will be presented at trial, including internal discussions at Sparkster as to why they believed obtaining Balina's assistance to promote the Sparkster ICO was crucial. *See*, *e.g.*, Complaint ¶ 41; Ex. H at 2-3 (Sparkster Internal chat).

## III. DR. KOGAN'S QUALIFICATIONS

Dr. Kogan's report describes his qualifications in some detail (Ex. G ¶¶ 2-5) and included a copy of his *curriculum vitae* (pp. 37-47). Dr. Kogan has a Ph.D. in Finance and is currently an Associate Professor of Finance at the Wharton School, the University of Pennsylvania, and at the Arison School of Business, Reichman University in Israel, having also previously served on the faculty at the McCombs School of Business, University of Texas at Austin, the Sloan School of Business at MIT, and at the Tepper School of Business at Carnegie Mellon University. *Id.* ¶ 2. His primary research interest has been financial technology, and more recently, he has focused on crypto markets. *Id.* ¶ 3. He is a published author in various finance-economics journals and has two recent working papers that focus on crypto markets. *Id.* He also previously developed and taught two courses that are relevant to his testimony in this matter: a course titled "Fintech: Business, Finance and Technology" that includes a deep dive into blockchain technology; and a course on cryptocurrencies and decentralized finance. *Id.* ¶ 4. Finally, Dr. Kogan also serves on the advisory boards of multiple startups, including two in the blockchain space. *Id.* In short, Dr. Kogan is eminently qualified to review and analyze blockchain evidence, and to provide his opinions about what the evidence shows and its significance.

## IV. BALINA MISCHARACTERIZED THE REPORT AND TESTIMONY

Balina's Motion to Exclude the Testimony of Dr. Shimon Kogan ("Def. Mot.") takes

snippets of Dr. Kogan's report and deposition testimony out of context and mischaracterizes his work and opinions. Moreover, by omitting from the exhibits submitted to the Court key portions of Dr. Kogan's testimony and report, Balina presented a misleading picture to the Court.[3]

**A. Mischaracterization of Dr. Kogan's Testimony About Drafting of Report**

In bold type for emphasis, Balina's motion claims that Dr. Kogan admitted that "Integra wrote and revised sections of 'his' report." Def. Mot. at 3 (*citing* to Balina Ex. 1 at 16:23-17:4). But that was not Dr. Kogan's testimony—and Balina improperly redacted Dr. Kogan's relevant testimony immediately after the cite he provided the Court and excluded a page with additional discussion about this issue. After explaining that he worked collaboratively with the consulting firm Integra FEC ("Integra"), including exchanging draft reports, but that Integra was *not* responsible for any portion of the report, Dr. Kogan stated: "I ultimately reviewed, edited the entire document, so I stand fully behind it." Ex. I (Kogan Tr. 17:5-15). In response to repeated questions as to whether Integra wrote portions of his report, Dr. Kogan testified: "Again, I want to clarify. I'm not implying that [Integra] wrote those sections and I signed off at – at the dotted line." *Id.* (Kogan Tr. 21:12-19). Similarly, there was no surprise at Dr. Kogan's deposition regarding Integra's assistance, as his report explicitly stated that he had "been assisted by Integra FEC" who helped him "to analyze the blockchain" and whose personnel "assisted [him] in analyzing these issues." Ex. G ¶ 5 (Report).

---

[3] Balina filed under seal *all* exhibits submitted in support of its motion. *See* ECF No. 18. While the SEC did not object to Dr. Kogan's testimony being filed under seal until it had an opportunity to confirm that the excerpts provided did not contain personal information—which we have now confirmed—it objected to the other exhibits being under seal because any personal or financial information could be redacted so they could be publicly filed. *See* Ex. K (Sept. 12, 2023, email to counsel). Balina cannot overcome the presumption in favor of the common law right to inspect and copy judicial records, and *all* exhibits to Balina's motion should be unsealed and, if necessary, redacted of any *specific* financial information. *See SEC v. Van Waeyenberghe*, 990 F.2d 845, 848 (5th Cir. 1993) (*citing Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978)).

### B. Mischaracterization of Dr. Kogan's Assignment and Methodology

Balina's motion incorrectly claims that Dr. Kogan did not consider whether anyone other than Balina may have controlled the pool. Def. Mot. at 4 (*citing* Kogan Tr. 68:23-69:11). Dr. Kogan did consider Olabountou's role, but, once again, Balina improperly redacted from his exhibit Dr. Kogan's relevant answer *immediately after* the cite he provided to the Court. *See* Ex. I (Kogan Tr. 69:12-25) (*Question*: Were you asked by the SEC to investigate Mr. Olabountou's actions with respect to the pool …? *Answer*: I was not instructed to do so. **I did so** because, as I said, he had administrative rights ….) (emphasis added). Balina also excluded from his sealed exhibits Table 3 from Dr. Kogan's report, which summarizes all administrative transactions related to the pool that both Balina and Olabountou initiated. *See* Ex. G at 59 (Report, Table 3). Dr. Kogan did *not* evaluate whether Olabountou was a promoter, but he is not opining on whether Balina was a promoter either. *See* Ex. I (Kogan Tr. 69:12-25).

Balina's motion also argues that Dr. Kogan's analysis and opinions should be disregarded because he was not asked to determine whether statements by Sparkster's CEO were accurate or false, which incorrectly assumes that his analysis and opinions depend on such determinations. Def. Mot. at 4. They do not. It is accurate that Dr. Kogan's assignment did *not* include opining on whether anyone told the truth. *See* Ex. I (Kogan Tr. 134:17-24). But Dr. Kogan's assignment, and his analysis and opinions, have nothing to do with, let alone do they depend upon, any "true" or "false" statement by Balina or anyone else. Rather, Dr. Kogan was tasked with examining data from the blockchain and then, applying his knowledge and experience to the facts he gleaned from the blockchain review, and opining on Balina's control over the pool and on Balina's payment into the pool. *See supra,* Section II.

**C. Mischaracterization of Dr. Kogan's Work Analyzing Blockchain Data**

Balina's motion claims that Dr. Kogan admitted that "he did not perform ***any*** of the work concerning the publicly available blockchain data." Def. Mot. at 3 (emphasis added). Balina did not provide a single cite to support this unfounded claim because Dr. Kogan made no such statement. To the contrary, Dr. Kogan wrote that he reviewed and analyzed data collected from the blockchain, data provided by PrimaBlock, Balina's spreadsheet with information about pool participants, and other documents he specifically listed in Section 4 of his report. Ex. G ¶¶ 30-32 (Report). What Integra did—and what is referenced in Balina's selectively-edited and out-of-context cites to his deposition transcript—was to help Dr. Kogan, under his direction (*id.* ¶ 5), collect blockchain and other data and then create charts and figures to help analyze and highlight the important information from that data. Dr. Kogan then reviewed and checked that information for accuracy. *See*, *e.g.*, Ex. I (Kogan Tr. 56:12-60:16).

**D. Mischaracterization of Materials and Documents Dr. Kogan Relied Upon**

Balina's motion argues that Dr. Kogan admitted that his opinions *rely* on materials that he did not read or see, could not remember reading, or that he did not entirely read. Def. Mot at 2-3. Dr. Kogan made no such admission. Balina's claim relies on the incorrect premise that every item listed in Appendix B of Dr. Kogan's report—entitled "Documents Relied Upon *and Considered*" (emphasis added)—is something he said he relied upon for his opinions. Balina's counsel understood *before* the deposition the distinction between what Dr. Kogan relied upon versus what he had available. *See*, *e.g.* Ex. I (Kogan Tr. 96:8-11) (*Question*: Okay. Now Exhibit B, you did not read and look at everything in Exhibit B, did you? *Answer*: That's right.).

First, Appendix B to Dr. Kogan's report included a listing of *all* documents and materials made available to Dr. Kogan and was therefore an over-inclusive list that went well beyond the

documents and materials he relied on for his opinions. In contrast, Section 4 of his report, where Dr. Kogan detailed his analysis and opinions about Balina's transactions with the pool, expressly stated what he relied upon. Dr. Kogan wrote that in addition to the publicly available data from the Ethereum blockchain, he relied on "the SAFT[4] signed by Balina, communications between Balina and Sparkster employees, social media posts by Balina, a spreadsheet recording Sparkster Investment Pool participants' information that they entered via Google Forms, and a database file from Primablock." Ex. G ¶ 30 (Report). The report also included footnotes within Section 4 with citations to the specific documents and pages he relied upon. Balina nevertheless complains—*in bold font*—that Dr. Kogan did not see Balina's video of the contest Sparkster won. Def. Mot. at 2. But the video has nothing to do with and would not affect Dr. Kogan's analysis and evaluation of the blockchain evidence, nor was it cited in Section 4 of the report. It is irrelevant to his opinions. *See, e.g.*, Ex. I (Kogan Tr. 130:19-131:11); *see also* Ex A (Transcript of portions of Balina's contest).

Second, because it was a remote deposition, counsel for the SEC asked Balina's counsel before the deposition to identify the documents—other than the report—needed at the deposition so that Dr. Kogan could have them when answering questions. Ex. J (Aug. 30-31, 2023 emails). Balina's counsel said that Dr. Kogan "should have a clean copy of his report and the documents … produced on August 25, 2023 …." *Id.* (The documents produced on August 25, 2023 were not the documents listed in Appendix B.) At the deposition, however, Balina's counsel—without showing any documents to Dr. Kogan—asked him to testify from memory whether he remembered reading each document listed in the six pages of Appendix B (Ex. I (Kogan Tr.

[4] SAFT stands for *Simple Agreement for Future Tokens*, which is the contract that Balina signed with Sparkster to purchase $5 million in SPRK Tokens from Sparkster. *See* Ex. G ¶ 33.

96:12-97:24))—a line of questioning that continued for about 30 pages. *See, e.g.*, Ex I (Kogan Tr. 96:12-125:10). Not only was this unfair memory test an inaccurate way to get reliable evidence, but it was apparent from the list that Dr. Kogan did not rely on all documents in Appendix B to form his opinions about Mr. Balina's transactions with the pool. When Dr. Kogan had the opportunity to look at the documents listed in Appendix B after his deposition, he confirmed that he had read many of them before he finished his report. *See* Ex. I errata sheet.

## V. ARGUMENT

### A. Requirements of Rule 702 of the Federal Rules of Evidence

The admissibility of Dr. Kogan's testimony is governed by Rule 702 of the Federal Rules of Evidence, which allows an expert who is qualified "by knowledge, skill, experience, training or education to testify in the form of an opinion . . . if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also MEDARC LLC v. Scott and White Health Plan*, 618 F.Supp.3d 365, 370 (N.D. Tex. 2022). The main issue to be decided by the Court under Rule 702 is whether Dr. Kogan has "sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case." *MEDARC LLC*, 618 F.Supp.3d at 370 (*quoting Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999)).

The SEC is responsible for establishing the admissibility of Dr. Kogan's testimony by a preponderance of the evidence. *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993). However, the SEC only need demonstrate that Dr. Kogan is qualified, and that the proposed testimony is relevant

and reliable, not that his opinions are correct. *Moore*, 151 F.3d at 276. The inquiry into whether Dr. Kogan's testimony is relevant and reliable is inherently flexible and "the judge has discretion in determining which [*Daubert*] factors are most germane in light of the nature of the issue, the particular expertise, and the subject of the expert's testimony." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (*citing Daubert*, 509 U.S. at 594-95; *Kumho Tire*, 526 U.S. at 142).

In assessing the reliability of non-scientific testimony, courts may consider "other factors including whether the expert has sufficient personal knowledge, work experience, or training to support the opinions offered." *MEDARC LLC*, 618 F.Supp.3d at 373 (*citing Kumho Tire*, 526 U.S. at 150-51). As the notes to Rule 702 explain, nothing in the amendments to the rule "is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony." Fed. R. Evid. 702, Advisory Committee's Notes (2000); *see also Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). "If the opinion is based solely or primarily on experience, the witness must connect the experience to the conclusion offered, must explain why the experience is a sufficient basis for the opinion, and must demonstrate the appropriateness of the application of the experience to the facts." *MEDARC LLC*, 618 F.Supp.3d at 373 (*citing* Fed R. Evid. 702, Advisory Committee's Notes (2000).

"[Q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility, and should be left for the jury's consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) (*citing Dixon v. Int'l Harvester Co*., 754 F.2d 573, 580 (5th Cir. 1985)). It is generally through cross-examination, submission of contrary evidence, and instructions on the burden of proof, that expert

opinion evidence should be contested or attacked. *See, e.g., Daubert*, 509 U.S. at 596. Ultimately, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Notes (2000) (*citing Daubert*, 509 U.S. at 579; *Kumho Tire*, 526 U.S. at 137).

### B. Dr. Kogan is Qualified, and His Opinions are Relevant and Reliable

In his motion, Balina did not challenge Dr. Kogan's qualifications, and for good reason. As summarized in Section III, *supra*, Dr. Kogan teaches students and business executives about blockchain and its applications, cryptocurrencies, and decentralized finance. Ex. G ¶¶ 2-5. As part of his research on crypto markets, Dr. Kogan has also authored two papers on that topic. *Id.* ¶ 3. And his experience is not limited to research and teaching, as he is an advisor to two startup companies in the blockchain space. *Id.* ¶ 5. In short, Dr. Kogan has deep experience—both academic and practical—in analyzing and understanding the blockchain. It is this experience, in addition to his education in this area, that qualifies Dr. Kogan to analyze blockchain evidence, understand and explain the data it contains, and opine about what the data means.

#### 1. Dr. Kogan's Opinion About Balina's Control of the Investment Pool

In his motion, Balina did not challenge *any* of the facts Dr. Kogan uncovered during his review and analysis of the blockchain evidence. *Not one*. Specifically, Balina did not dispute:

- Balina modified the pool whitelist on six separate occasions, adding 64 of the 68 total investor addresses to the pool. Ex. G ¶ 44.
- Balina modified the minimum and maximum amounts that investors could invest in the pool, and he also set the total cap for the pool. Ex. G ¶ 45.
- Balina sent the funds collected from pool participants to Sparkster. Ex. G ¶ 47.
- Balina initiated 8 out of a total of 11 administrative transactions for the pool, with Olabountou accounting for the other 3 transactions. Ex. G ¶ 46 (Table 3).
- Balina, from the Ethereum address he admitted he controlled, sent 150 ETH (approximately $104,883) to the pool. Ex. G ¶ 49.

- The pool received 33,212,355.3 SPRK Tokens on July 23, 2018. Ex G ¶ 48.
- The pool received 10,000,000 SPRK Tokens on August 27, 2019. Ex G ¶ 48.
- Balina, at the Ethereum address he admitted he controlled, received 690,471.1 SPRK Tokens on June 9, 2019. Ex. G ¶ 49.
- Balina, at the Ethereum address he admitted he controlled, received a 30% bonus of 207,903.68 SPRK Tokens on September 2, 2019. Ex. G ¶ 49.

What Balina disputes is the conclusion Dr. Kogan drew from his review and analysis of the blockchain evidence, *i.e.*, that Balina controlled the pool. Balina argues that Dr. Kogan's opinion should be excluded because his methodology is flawed and internally inconsistent, does not rest on sufficient facts or data, and it is not relevant. Def. Mot. at 7-9.

First, Dr. Kogan's opinion that Balina controlled the pool is clearly relevant and helpful to the jury, and Balina's argument to the contrary is nonsensical. The SEC alleges that Balina's distribution of SPRK Tokens through his investing pool was an unregistered offering of securities in violation of federal securities laws. Proving that he controlled the pool, by showing the jury the facts from the blockchain evidence that demonstrate the different ways in which Balina exercised control over the participants *and* the money in the pool, undoubtedly helps to prove that Balina—not Olabountou—is the person who conducted the unregistered securities offering of SPRK Tokens through the pool.

Second, Dr. Kogan's analysis and opinions, as detailed in his report, are based on his education and prior experience dealing with blockchain and with crypto assets and markets. While Balina claims Dr. Kogan's opinions lack any methodology, Balina's counsel did not even read Dr. Kogan's papers on crypto markets (Ex. I (Kogan Tr.167:21-168:10)), which use the same methodology, *i.e.*, review and analysis of evidence based on his education and experience. For example, a cursory review of academic papers related to crypto assets demonstrates an abundance of research conducted by professionals like Dr. Kogan, who reach conclusions and opine based

on their education, experience, and review and analysis of publicly available blockchain data.[5] As the Supreme Court acknowledged in *Kumho Tire*, and as reflected in the Advisory Committee Notes to Rule 702 discussed *supra*, Dr. Kogan's experience related to blockchain, in conjunction with his knowledge, skill, training and education, is sufficient to satisfy the reliability requirement necessary to allow his testimony at trial under Rule 702.

Third, Balina argues that Dr. Kogan's opinion does not rest on sufficient facts or data, but Balina does not specify what is allegedly missing from Dr. Kogan's review and analysis. While Balina can cross examine Dr. Kogan at trial about any alleged missing fact or data that he did not consider, this argument is not a proper basis to exclude his testimony and prevent the jury from learning about the available blockchain evidence for the Sparkster investment pool. *See Wellogix, Inc. v. Accenture LLP*, 788 F.Supp.2d 523, 538 (S.D. Tex. 2011) (rejecting exclusion of expert based on documents relied upon and reserving such issues for cross-examination); *Rogers v. City*

---

[5] *See, e.g.*, Qi Yuan, Baoying Huang, Jie Zhang, Jiajing Wu, Haonan Zhang & Xi Zhang, *Detecting Phishing Scams on Ethereum Based on Transaction Records*, 2020 IEEE INTERNATIONAL SYMPOSIUM ON CIRCUITS AND SYSTEMS (ISCAS), SEVILLE, SPAIN (October 2020), available at https://ieeexplore.ieee.org/document/9180815 (Develops a method, based on the public record of the Ethereum transactions and known instances of phishing, by which it is possible to predict which accounts would engage in phishing activity); Igor Makarov & Antoinette Schoar, *Blockchain Analysis of the Bitcoin Market*, (October 13, 2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3942181 (Uses public bitcoin transaction data to characterize the user holding concentration of bitcoin over time); Jiageng Liu, Igor Makarov, & Antoinette Schoar, *Anatomy of a Run: The Terra Luna Crash*, NBER WORKING PAPER NO. 31160 (April 2023), available at https://www.nber.org/system/files/working_papers/w31160/w31160.pdf (Uses the publicly available Terra blockchain data to analyze the LUNA and Terra stablecoin collapse in May 2022 that wiped out $50 billion); Dan Amiram, Bjorn N. Jorgensen & Daniel Rabetti, *Coins for Bombs: The Predictive Ability of On-Chain Transfers for Terrorist Attacks*, 60 J. ACCOUNTING RESEARCH 427 (May 2022), available at https://onlinelibrary.wiley.com/doi/epdf/10.1111/1475-679X.12430 (Applies a variety of analytical approaches to publicly available bitcoin blockchain data, along with dataset of terrorist attacks, to predict the financing of terrorist activities).

*of Hutto*, No. 1:19-CV-166-RP, 2020 WL 5099953, at *4 (W.D. Tex. June 29, 2020) (rejecting exclusion of expert based on reliance on certain evidence because that "argument is best addressed during cross examination").

Fourth, Balina argues that the Court should exclude Dr. Kogan's testimony because he has "materially different" opinions in his report, which he argues is another methodological defect. Def. Mot. at 7. Dr. Kogan's opinion about Balina's control remained the same throughout his report, and any alleged variation in the language used is simply explained by the context of Dr. Kogan's statement. In his introductory summary, Dr. Kogan stated: "Balina controlled the smart contract used by the Sparkster Investment Pool." Ex. G ¶ 8. After discussing the administrative actions taken by both Balina and Olabountou, Dr. Kogan stated: "Balina's *address* 0xe33e had predominant control of who was able to participate in the Sparkster Investment Pool." *Id.* ¶ 44 (emphasis added). Dr. Kogan further explained his reasoning: "While Konstantin Olabountou, who Balina describes as having an administrative role in Balina's investments, also had administrative rights in the Primablock smart contract … it is Balina who overwhelmingly initiated the key transactions." *Id.* ¶ 50. Dr. Kogan then repeated his overall conclusion stating: "*Balina's control of the Sparkster Investment Pool* on the Ethereum blockchain is consistent with documentary evidence." *Id.* ¶ 51 (emphasis added).

Finally, as Dr. Kogan explains his opinion to the jury about Balina's control over the pool, it is appropriate for him to also be able to identify and discuss the other documentary evidence in the case that is consistent with, and corroborates, his findings based on his review and analysis of the blockchain evidence. That testimony, as detailed in his report, is therefore also relevant and helpful to the jury and should be permitted by the Court.

### 2. Dr. Kogan's Opinion About Balina's Investment in the Pool

While Balina does not dispute Dr. Kogan's conclusion that Balina invested $104,883 into the pool, he argues that the Court should exclude Dr. Kogan's testimony about his contribution because Dr. Kogan has not established or proven that the "unidentified addresses could possibly be Balina's account." Def. Mot. at 10. Balina misapprehends Dr. Kogan's opinion when he calls his opinion "rank speculation" as Dr. Kogan is *not* providing any opinion as to who is the owner of the unidentified five Ethereum address." Ex. G. ¶¶ 32, 49. Dr. Kogan simply noted that while the blockchain shows that Balina contributed $104,883 into the pool, he cannot exclude the possibility that Balina contributed more because he does not know who owns the 5 unidentified addresses. *Id.* There is nothing inappropriate when an expert notes the facts uncovered by his investigation and explains the limitations of what he can say based on that evidence.

The fact that Balina is willing to admit that he sent $104,883 to the pool is not a reason a exclude Dr. Kogan's testimony. *See* Def. Mot at 9 ("This is not in dispute."). To the contrary, Balina's admission confirms the reliability of Dr. Kogan's analysis of the blockchain evidence as he correctly determined this fact. The jury should know that Dr. Kogan's analysis on this point was correct so it can properly determine how much weight to give Dr. Kogan's other conclusions based on the same analysis. There is no basis to exclude Dr. Kogan's opinion under Rule 702.

### 3. Dr. Kogan's Opinion About Promoters Significant Role in ICOs

Balina argues that any testimony about the significant role promoters played in ICOs between 2016 and 2018 should also be excluded as lacking any methodology or basis, and because it will allegedly confuse the jury. Def. Mot. at 10. For the same reasons discussed before, Dr. Kogan's analysis and opinions as to this topic, as detailed in his report, are based on his education and experience, and should therefore be allowed.

Dr. Kogan's proffered testimony as to the significance of the role of promoters in ICOs between 2016 and 2018, which is based on academic research, is also relevant and helpful to the jury when they evaluate whether an agreement existed between Sparkster and Balina to promote the ICO. The SEC alleges that Sparkster agreed to provide Balina with bonus tokens as consideration for his promotion of SPRK Tokens, in violation of federal securities laws. To establish that agreement, the SEC will introduce evidence that Sparkster needed Balina's assistance, precisely because he could ensure that their ICO would succeed. *See*, *e.g.*, Ex. H. Because they needed Balina's help to promote their ICO, Sparkster was therefore willing to allow Balina to invest more than the minimum and provide him with the corresponding bonus tokens.

The jury is also unlikely to be familiar with the role of promoters in the crypto asset space. Dr. Kogan's testimony will help the jury understand what promoters are, how they can be helpful in the launch of a token, and why companies are willing to compensate promoters for their services. Courts routinely allow experts to testify as to general principles to assist the jury in their consideration of the facts. *See, e.g., Meganathan v. Signal Int'l L.L.C.*, No. 1:13-CV-497, 2015 WL 11109846, at *10 (E.D. Tex. June 26, 2015) (permitting expert testimony to educate and inform the jury on the general features of human trafficking schemes); *United States v. Murra*, No. CV 4:16-CR-00078-O, 2016 WL 10954316, at *4 (N.D. Tex. July 20, 2016) (permitting expert testimony regarding the U.S. immigration system, as helpful to the jury).

As the Advisory Committee's Notes provide, "it might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case." Fed. R. Evid. 702, Advisory Committee's Notes (2000). Precisely because the proffered testimony has been narrowly tailored to what research shows—instead of opining whether Balina acted as a promoter here—there is no real danger of

confusion for the jury or prejudice to Balina. The jury will still have to decide on their own, without the benefit of expert testimony, whether Balina agreed to promote SPRK Tokens in exchange for the preferential treatment and bonus tokens received. But, as they consider the evidence of why Sparkster was interested in securing Balina's help, they will have the benefit not only of the evidence from Sparkster as to their motivations, but also Dr. Kogan's testimony about the academic research on the role of promoters in ICOs.

### C. Dr. Kogan Should be Allowed to Provide Context and Background to Jury

Finally, Balina asks the Court to prevent Dr. Kogan from providing even background and context to the jury about the technical terms and evidence that will be elicited at trial. While not opinion testimony, Dr. Kogan's report nevertheless detailed the expected testimony to be provided, and this testimony is relevant and helpful for the jury to understand and assess the technical evidence to be presented. The Court should allow this testimony. *See Huawei Tech. Co., Ltd. v. Huang*, Civil Action No. 4:17-CV-00893, 2019 WL 2077821, at *8 (E.D. Tex. May 9, 2019) (rejecting exclusion of expert opinion in background section regarding "technology at issue in the case"); *see also supra, Meganathan*, 2015 WL 11109846, at *10; *Murra*, 2016 WL 10954316, at *4; and Fed. R. Evid. 702, Advisory Committee's Notes (2000).

## VI. CONCLUSION

Dr. Kogan is qualified to provide the proffered testimony, and his opinions are relevant and helpful to the jury as they evaluate this case while contending with technical blockchain evidence. This is precisely why Balina is desperate to exclude his testimony, and why the Court should deny this motion and permit Dr. Kogan to testify.

Dated: September 29, 2023

Respectfully submitted,

*/s/ Fernando Campoamor*
Melissa Armstrong, State Bar No. 24050234
Fernando Campoamor-Sánchez*
Ivan J. Snyder*
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-8523 (Campoamor Sánchez)
Email: campoamorsanchezf@sec.gov
*Counsel for Plaintiff Securities and Exchange Commission*

Of Counsel:
Carolyn M. Welshhans
David Frohlich

*Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I certify that on September 29, 2023, I electronically submitted the foregoing Plaintiff's Opposition to Defendant's Motion to Exclude the Testimony of Dr. Shimon Kogan with the clerk of the court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court.

*/s/ Fernando Campoamor*
Fernando Campoamor Sánchez