UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, Plaintiff, | C.A. No. 1:22-CV-950 |
| -against- | ECF CASE |
| IAN BALINA, | (Jury Trial Demanded) |
| Defendant. | |

**************************************************************

ORAL REMOTE DEPOSITION OF SHIMON KOGAN, Ph.D.

VOLUME 1 OF 1

SEPTEMBER 1, 2023

**************************************************************

ORAL REMOTE DEPOSITION OF SHIMON KOGAN, Ph.D., produced as a witness, duly sworn by me, at the instance of the Defendant, taken in the above-styled and numbered cause on the 1st day of September, 2023, from 4:00 p.m. to 8:09 p.m. Israel Daylight Time, before Audrey L. Waldrop, Certified Shorthand Reporter No. 6218 in and for the State of Texas, via Zoom, with the witness located in Binyamina, Israel, pursuant to the Federal Rules of Civil Procedure (and the provisions stated on the record or attached therein).

04:14:51 the answer is yes, but I don't know that for -- I don't
04:14:54 have any -- you know, any cases that I can point to.
04:14:58 Q. (By Mr. Navarre) And who was it at Integra
04:15:01 that you worked with on this matter?
04:15:02 A. David Lam.
04:15:03 Q. Anybody else?
04:15:05 A. There were -- yes, there were -- there was -- I
04:15:14 don't remember -- don't recall his last name. I can
04:15:16 look it up, but Matt helped as well.
04:15:20 So they operate as a team, so there were
04:15:23 two other individuals. One was an economist. The other
04:15:27 one was a director that at some point provided help with
04:15:32 this case.
04:15:32 Q. Okay. You're going to get -- you may
04:15:37 have caught this at the very beginning of the deposition
04:15:42 before we got on the record, but you'll get a copy of
04:15:47 the deposition that you can review and then sign and
04:15:50 make any changes you need to. Can you fill in the names
04:15:54 of those two people?
04:15:56 A. Sure.
04:15:56 Q. Thank you.
04:15:56 A. ______________________, ___________________________.
04:15:58 Q. What was it that Integra did for you in this
04:16:00 matter?
04:16:03 THE WITNESS: I'm just going to write down

04:16:13 there. (Making note.)
04:16:14 A. Yes, they helped me conduct -- collect some of
04:16:18 the data, process some of the data, run some of the
04:16:20 analysis, and helped draft parts of the report.
04:16:27 Q. (By Mr. Navarre) What parts of the report did
04:16:30 they help draft?
04:16:34 A. I cannot point to any particular part that --
04:16:37 that they've drafted. It was a collaborative work. So
04:16:44 I wrote parts, I went over drafts that they provided,
04:16:50 and it went back and forth. So it was a collaborative
04:16:53 effort. It's impossible for me to disentangle. Like,
04:16:58 it wasn't -- it wasn't parsed out into sections that
04:17:03 they wrote and sections that I wrote.
04:17:05 I ultimately reviewed, edited the entire
04:17:10 document, so I stand fully behind it.
04:17:14 MR. NAVARRE: Objection, nonresponsive to
04:17:16 the tail end, that you stand fully behind it.
04:17:19 Q. (By Mr. Navarre) My question is as to which
04:17:21 parts did they draft.
04:17:24 You mentioned in your answer that they
04:17:29 provided drafts. How did y'all send drafts back and
04:17:33 forth?
04:17:33 MR. CAMPOAMOR: Objection to the form of
04:17:35 the question.
04:17:35 A. It was mainly through a secure Google Drive

04:17:38 set -- set by Integra.
04:17:44 Q. (By Mr. Navarre) And are those drafts still in
04:17:46 existence?
04:17:51 A. I believe they -- I -- I believe they are.
04:17:54 Q. Okay. So you mentioned that they drafted some
04:17:59 sections, you drafted some sections. What portions of
04:18:06 the report are drafts -- come from original drafts from
04:18:11 Integra?
04:18:11 MR. CAMPOAMOR: Objection to the form of
04:18:14 the question.
04:18:18 A. I -- I don't think I have a meaningful way of
04:18:22 answering this, Mr. Navarre.
04:18:25 Again, as I said, it wasn't -- it wasn't
04:18:28 like we split our work into sections that they wrote and
04:18:32 others that I wrote. So I don't know -- like, it's very
04:18:36 similar to the way, again, I do research.
04:18:38 I conduct research with co-authors and with
04:18:41 graduate students and RAs. It's kind of asking me to go
04:18:47 back to these papers and identify which sentences or
04:18:51 paragraphs or sections are mine and which are my
04:18:55 co-authors or my RAs; and, there again, it would be
04:18:58 impossible to do.
04:19:00 Q. (By Mr. Navarre) Okay. Well, let's see what
04:19:02 we can do.
04:19:03 A. Okay.

04:19:03 Q. So there are five main sections: Introduction, Summary of Opinions, Background, Balina's Involvement in the Sparkster Investment Pool, and Conclusion. Do you see that?

04:19:18 A. Yeah.

04:19:19 Q. Were there any portions of the Introduction that come from original drafting by people at Integra?

04:19:30 MR. CAMPOAMOR: Objection to the form of the question.

04:19:39 A. Again, I don't -- I'm going -- I'm doing my best here to answer fully to your question, but...

04:19:57 I definitely wrote the qualifications.

04:20:00 They may have drafted the initial draft of 1.3.

04:20:25 (Examines document.) Do you want me to keep going?

04:20:27 Q. (By Mr. Navarre) Well, I mean, that's Section 1. So is there anything else that you have to testify about in Section 1?

04:20:33 A. No.

04:20:33 Q. Okay. In Summary of Opinions, was there any part of the Summary of Opinions that come from an original draft by somebody at Integra?

04:20:43 MR. CAMPOAMOR: Objection to the form of the question.

A. Again, it was back and forth. I don't remember how it started, whether they started the initial draft and then I edited and it went back. Obviously, that's a central section to the report, so we went back and forth multiple times.

Q. (By Mr. Navarre) Okay.

A. I don't -- I don't know.

Q. And we would only be able to tell that from looking at the drafts that went back and forth, correct?

A. That's right.

Q. Okay. And you did rely upon the work that was done by the people at Integra, correct?

A. That's absolutely right.

Q. Okay. And do you know if there were people aside from Mr. Lam and the two names that you're going to fill in that worked on this project at Integra?

A. To the best of my -- my knowledge, no.

Q. I'm sorry. I didn't --

A. I believe those are the three people that worked on this case.

Q. Okay. Do you know if there were people that they had working underneath them at Integra?

A. I don't know.

Q. Okay. Could be or could not be, you just don't know, right?

A. Yeah, that's right. That's right.

Q. Okay. Going back to our prior line of questioning, in the Background, is there any section in the Background that you can identify as an original draft of Integra or as an original draft of yourself?

MR. CAMPOAMOR: Objection to the form of the question.

A. The vast majority of Section 3 was -- was started out by me.

Section 3.6 may have -- the original -- the initial draft may have been started by Integra, and 3.7.

Again, I want to clarify. I'm not implying that they wrote those sections and I signed off at -- at the dotted line. I'm responding to the question of to the best of my recollection, whether the very first draft of those sections -- and I think they have different numbers and different structure back then, so that too. I'm -- again, I'm trying to be as helpful as can be here, but I'm qualifying my answer.

Am I making myself clear?

Q. (By Mr. Navarre) Yeah, I think -- you know, I understand what you're saying.

MR. NAVARRE: I'm going to object nonresponsive to after you identified Section 3.7.

MR. CAMPOAMOR: Objection.

04:23:20 Q. (By Mr. Navarre) In Section 4, are there any parts of Section 4 that you can tie to an original draft by Integra or that you can tie to an original draft by yourself?
04:23:31 MR. CAMPOAMOR: Objection, form.
04:23:51 A. (Examines document.) I am not sure about Section 4.
04:23:54 Q. (By Mr. Navarre) Either way?
04:23:55 A. Yeah.
04:23:56 Q. Okay. And Section 5 --
04:23:59 A. Then all the --
04:24:00 Q. I'm sorry.
04:24:00 A. All the -- all the figures and tables were produced by Integra.
04:24:06 Q. Okay.
04:24:08 A. Okay.
04:24:10 Q. Okay. Section 5, is there any part of Section 5 that you can tie directly to an original draft by yourself or tie directly to an original draft by Integra?
04:24:23 MR. CAMPOAMOR: Objection, form.
04:24:24 A. Again, I -- I cannot.
04:24:26 Q. (By Mr. Navarre) Okay. Now, in addition to sharing drafts with Integra, did you also share drafts with the SEC's lawyers?

04:24:37 A. Yes, I have.
04:24:38 Q. Okay. And when was the first time you -- was the first time that you shared a draft with the SEC's lawyers prior to the completion of the report?
04:24:52 A. I don't remember.
04:24:53 Q. Okay. Well, a draft is something that's not finished, correct?
04:24:58 A. Yeah, yeah. So I -- I don't remember -- it must have been toward the end of June, but I don't -- I don't recall a date.
04:25:13 Q. Okay. Do you recall the feedback that you received from the SEC on your draft?
04:25:23 A. No.
04:25:24 Q. Okay. But that would be something that, again, we could see in the drafts that were saved, correct?
04:25:34 A. We may. I don't believe that they edited the drafts, but -- but I may be wrong on that. I don't think that they provided any to the drafts. There was -- yeah. So we may be able to see that in the history of the file on Google.
04:25:53 Q. But you think the feedback was more verbal or in some other written form aside from the draft report; is that correct?
04:26:04 A. That's right. We had a call, and there was discussion about the report.

04:26:11 Q. Okay. And who-all was on that call?
04:26:14 A. The same, Mr. Cam- -- Campoamor, Mr. Snyder,
04:26:24 and Mr. Lam.
04:26:26 MR. NAVARRE: Okay. And with Counsel's
04:26:27 permission, is it okay if Dr. Kogan refers to you as
04:26:32 "Fernando"?
04:26:33 MR. CAMPOAMOR: Yeah, that's fine. He can
04:26:36 refer to me any which way he wants.
04:26:38 MR. NAVARRE: The door is -- the door is
04:26:40 open, Dr. Kogan.
04:26:42 THE WITNESS: Okay. No, I'll keep -- I'll
04:26:43 keep on insisting.
04:26:43 MR. NAVARRE: Okay.
04:26:47 Q. (By Mr. Navarre) There are some appendixes
04:26:50 listed in the Table of Contents I think you have open in
04:26:53 front of you.
04:26:53 A. Correct.
04:26:53 Q. Your CV, I'm assuming -- but correct me if I'm
04:26:58 wrong -- that you did the CV yourself, correct?
04:27:01 A. That's correct.
04:27:01 Q. Okay. The Documents Relied Upon and
04:27:04 Considered, who put that together?
04:27:09 A. Integra did.
04:27:10 Q. Okay. The Appendix C, the tables, is that also
04:27:16 Integra?

04:27:16 A. Correct.
04:27:17 Q. Okay. And Appendix D, the Etherscan screenshots, is that also Integra?
04:27:24 A. That's correct.
04:27:31 Q. Okay. Do you know -- were you aware of the SEC's investigation of Sparkster and Mr. Daya before this matter?
04:27:42 A. No.
04:27:44 Q. Have you talked to anybody who either worked for Sparkster or was associated with Sparkster concerning this matter?
04:27:55 A. No, I was not -- I was not aware of the Sparkster ICO before I got involved with this case.
04:28:01 Q. Understood. But even after you got involved in this case, did you talk to anybody who previously worked at Sparkster?
04:28:09 A. No.
04:28:09 Q. Okay. And I'm assuming then you've never talked to Mr. Daya, correct?
04:28:12 A. That's right.
04:28:13 Q. Okay. Have you ever met Mr. Daya, or do you know about him or?
04:28:16 A. No.
04:28:16 Q. Okay. Did anybody at the SEC talk to you about their investigation of Sparkster and Daya?

05:04:59 So then there's the next file in that Raw Data subdirectory, at least alphabetically?
05:05:10 A. Uh-huh.
05:05:10 Q. It's a file that ends in "cd1." Do you see that?
05:05:14 A. Yeah. Let me open that up. Yep.
05:05:32 Q. And that's an Excel spreadsheet, correct?
05:05:35 A. That's correct.
05:05:35 Q. Okay. Did you use this Excel spreadsheet in your work?
05:05:40 A. Yes.
05:05:41 Q. Okay. What did you do with this Excel spreadsheet?
05:05:46 A. For example, we used that to determine -- I used that to determine how much ETHE was contributed to the pool.
05:05:56 Q. You did that personally?
05:05:58 A. No, Integra did. I went over this.
05:06:01 Q. Okay. So let me go back to my prior question, then. Did you use this spreadsheet, you personally?
05:06:12 A. You have to -- for me to answer that question, you have to define what do you mean by "use."
05:06:18 Integra produced the analysis based on this data, and this data comes from Etherscan.
05:06:27 Did I use it? Yes, in the sense of

checking, going over those entries verifying that, to the best of my knowledge, the analysis that they produced was correct, all that stuff. I did.

So I made use of that, but I did not run the actual -- I didn't write the code that went from this to the tables and figures.

MR. NAVARRE: Okay. Objection, nonresponsive.

Q. (By Mr. Navarre) Let's try it this way. As I understand it, you did not take this spreadsheet, grab data out of it that was then used in the figures; is that correct?

A. That is correct.

Q. Okay. And -- but I think what I heard you say is what you did use this spreadsheet for was you verified the numbers in the charts?

A. That's correct.

Q. Okay.

A. I also wanted to understand what -- there was some entries that I wasn't sure about, so I went and did some research on those. So I made use of that Excel as well, which is basically mirroring the PrimaBlock data. It's just a download of the transactions corresponding to the investment pool from PrimaBlock.

Q. Okay. And what were the entries that you

weren't sure of that you wanted to go back and check out?

A. So those are the entries where the method shows up as a hexadecimal rather than basically identify as a function of like deposit or withdrawal or modify.

Q. Okay. So you've got it open in front of you, correct?

A. That's right.

Q. Okay. Can you give me an example of one that you just identified as something that you verified?

A. Sure. So I actually went -- I believe I went through all of them, but I just wanted to understand kind of where these functions come from.

But, for example, line 110.

MR. CAMPOAMOR: And, Michael, whenever is good for you, if we could have a quick five-minute break, it would be great.

MR. NAVARRE: Sure.

Q. (By Mr. Navarre) So in line 110, what is it about line 110 that made you look at it? Is that because of in Column P, it's got a hexadecimal?

A. That's correct.

Q. Okay. So your testimony is that for any entry on this spreadsheet in Column P that had a hexadecimal, you would have gone back and checked it?

05:09:12 MR. CAMPOAMOR: Objection, form.
05:09:14 A. That -- that's correct. I also went over all the modified white list entries because they are quite important for this case, right, and I -- I made sure that they corresponded to what's in the report.
05:09:27 Q. (By Mr. Navarre) Okay. So, yeah, that was -- my next question was: When you say you went back and checked them -- let me try again.
05:09:35 When you say you went back and checked them, what did you check the modified white list and the hexadecimal entries in Column P against?
05:09:48 A. So I actually -- it's not -- it is not in the report. It's just for -- to complete my understanding of what was going on in this Prima- -- so PrimaBlock is a service provider that wrote the smart contract. Smart contracts can be rather complex.
05:10:07 In that smart contract, they define unique functions. Each of those unique functions, to the extent that they're not generic functions like deposit or withdrawal or modified white list, are the hexadecimal.
05:10:18 So I was able to take the byte code from the smart contract, convert it to Solidity, and -- and find these functions in there. So I kind of verified that those were functions written by PrimaBlock.

05:10:34 Q. Okay. And so when you did that work, where is that work located?
05:10:38 A. It's not in the report. I don't think it's material for the -- yeah, it's not in the report.
05:10:46 Q. It didn't really matter to your opinions; is that correct?
05:10:49 A. That's right.
05:10:50 Q. Okay. How long did it take you to do this verification of all the modified white list and all the hexadecimal?
05:10:59 A. A couple hours.
05:11:00 Q. Okay. So "a couple hours" means different things to different people, so --
05:11:05 A. About two.
05:11:06 Q. I'm sorry?
05:11:07 A. About two.
05:11:08 Q. Two. Okay.
05:11:09 MR. NAVARRE: All right. Counsel wanted a break, so we will take a break. My clock says 9:11. What time do y'all want to get back together?
MR. CAMPOAMOR: I just want at least a five-minute break, but Dr. Kogan can tell us how much time he needs.
THE WITNESS: Yeah, I mean, let's do seven minutes.

05:25:58 Q. (By Mr. Navarre) Let me try it this way.
05:26:00 A. Okay.
05:26:00 Q. As part of your assignment from the government, did the government ask you to look into, to investigate, to determine whether any member of the pool aside from Mr. Balina had taken any actions to promote Sparkster, its initial coin offering, or the sale of Sparkster tokens?
05:26:22 MR. CAMPOAMOR: Objection --
05:26:22 A. The answer is --
05:26:24 MR. CAMPOAMOR: Objection, form.
05:26:26 You can answer. Go ahead.
05:26:27 A. No. The answer to that is no.
05:26:29 Q. (By Mr. Navarre) Okay. So did anybody at the SEC ask you to take a look at the actions of anybody aside from Mr. Balina?
05:26:36 MR. CAMPOAMOR: Objection, form.
05:26:37 And if you're getting to our discussions, then I will instruct him not to answer. So I'd ask you to please rephrase your question.
05:26:45 MR. NAVARRE: No, I'm not going to. You can -- if you think you should instruct him not to answer, go ahead.
05:26:53 A. I -- I was not instructed to evaluate anyone's -- anyone outside of Mr. Balina. I mean, I

obviously looked at Mr. Olabountou's involvement in the pool because he had administrative rights, but no one outside that.

Q. (By Mr. Navarre) And the SEC did not instruct you or ask you to look at the actions of Mr. -- ah. I'm not going to be able to pronounce that name -- the gentleman you just mentioned, Kosta?

A. Olabountou?

Q. Yes.

MR. CAMPOAMOR: Michael, are you asking for his report, what the assignment was?

MR. NAVARRE: I'm -- I'm asking the question. Okay?

MR. CAMPOAMOR: Right. But if -- all right. I object to the form of the question.

Go ahead and answer.

A. I was asked to evaluate what role, if any, Mr. Balina had in promoting and controlling this investment pool.

MR. NAVARRE: Okay. Objection, nonresponsive.

Q. (By Mr. Navarre) That's not my question.

Were you asked by the SEC to investigate Mr. Olabountou's actions with respect to Sparkster or the pool?

MR. CAMPOAMOR: Objection to the form of the question.
MR. NAVARRE: All right. Let me ask it again to hopefully get around that one.
MR. CAMPOAMOR: Okay.
Q. (By Mr. Navarre) Were you asked by the SEC to investigate Mr. Olabountou's actions with respect to the Sparkster initial coin offering?
MR. CAMPOAMOR: Objection to the form.
You can answer.
A. No.
Q. (By Mr. Navarre) Were you asked by the SEC to investigate Mr. Olabountou's actions with respect to the pool that purchased Sparkster tokens?
MR. CAMPOAMOR: Objection to the form.
You may answer.
A. I was not instructed to do so. I did so because, as I said, he had administrative rights and he was one of the -- you know, he had administrative rights.
If I recall -- I can look it up -- but he also helped administer one of the Telegraph groups. So he clearly showed up in the evidence that I reviewed for this case, but I was not asked to evaluate his role as a promoter.

05:29:19 MR. NAVARRE: Objection, nonresponsive to everything after I was not asked to do so. I think that's what you said at the very beginning. I know you started with I was not asked to, but whatever...

05:29:30 Q. (By Mr. Navarre) Do you know if Mr. Olabountou received any sort of a fee for his work with respect to the pool?

05:29:41 A. I don't.

05:29:42 Q. Okay. Do you know if PrimaBlock received any sort of a fee with respect to its work with respect to the pool?

05:29:49 A. I do know. I don't remember the fee, but, yes, they -- I don't remember their standard fees, but, yes, they charged a fraction of all the ETHE that was contributed. So when the ETHE went out to Sparkster, basically sponsor the Etherwood address. PrimaBlock collected their fees.

05:30:13 Q. Okay. Let's go back to this spreadsheet. I think you may still have it open in front of you.

05:30:21 A. Uh-huh, I do.

05:30:23 Q. And that's "export-address-token," ends in "cd1," correct?

05:30:29 A. Correct.

05:30:29 Q. And this is a spreadsheet that the Integra people would have used in putting together the data sets

06:04:35 Q. Okay. So this is the background on different topics, and there are many footnotes in that background, correct?
06:04:47 A. Correct.
06:04:48 Q. Okay. And those footnotes would then match up to what's on Exhibit B, correct?
06:04:55 A. They should.
06:04:57 Q. Okay. Now, Exhibit B, you did not read and look at everything in Exhibit B, did you?
06:05:11 MR. CAMPOAMOR: Objection to the form.
06:05:15 A. (Examines document.) That's right.
06:05:18 Q. (By Mr. Navarre) Okay. So on Exhibit B, which is starting on page 48 --
06:05:28 A. Yes.
06:05:29 Q. -- what I'd like to do is go through this list; and for each item, let me know which ones you read and which ones actually impacted your opinions.
06:05:46 So we can do both topics at the same time as we go through, or we can do one topic, go through the list, and then do the second topic and go through the list, whichever way you would like to do it.
06:06:04 A. Okay. When you say "read," could you help me understand what you mean?
06:06:09 Because, for example, the first source there is a paper. Okay? Now, I didn't read every word

06:06:17 of that paper. Okay? So would that constitute reading
06:06:24 or not?
06:06:25 Q. Well, why don't you tell me as we go through
06:06:29 whether you read the whole thing or part of it and, if
06:06:34 so, what percentage of it you read.
06:06:35 So let's go ahead and do it by topic, then.
06:06:42 So on page 48, which items did you read?
06:06:49 A. Let's go --
06:06:49 MR. CAMPOAMOR: Michael, you're asking that
06:06:52 he identify one by one or that he read the whole page
06:06:56 first and then tell -- can you clarify?
06:06:58 Q. (By Mr. Navarre) Dr. Kogan, did you understand
06:07:00 the question?
06:07:00 A. No, I'm not sure. So do you want me to -- so
06:07:03 are we going to go now through every entry here?
06:07:06 Q. (Nods head.)
06:07:07 A. And you want me to say whether I read it and
06:07:12 whether that affected -- so even if -- and whether they
06:07:17 affected my report, right?
06:07:18 Q. I think what we're going to have to do
06:07:21 probably, based on your prior answer, is just go through
06:07:24 whether you read it first, and then we'll go back
06:07:26 through. Okay?
06:07:27 A. Okay.
06:07:27 Q. So on page 48, which of these documents did you

actually read?

MR. CAMPOAMOR: Objection to the form.

Q. (By Mr. Navarre) And if it's a video, which ones did you view?

MR. CAMPOAMOR: Objection to the form.

A. Okay. So the first. The second. I don't remember if the third. The fourth. I didn't actually look at the actual spreadsheet. I also read all the Telegraph and WhatsApp correspondence. So that should cover a whole bunch of them, right?

Q. (By Mr. Navarre) Okay. So on the first page, the first two you said you read?

A. Yep.

Q. Did you read those in their entirety?

A. (Examines document.) No, I don't know, actually, what it means to read the website in its entirety, but -- you know.

I'm not trying to be difficult. I just -- you know, I know that we're on record. I want to be very careful about the statements that I make.

But I read partially the first one. I didn't read every word on his website. That holds for the second and the fourth source. I don't remember if I read the third one.

Q. Okay. Let me stop you so we can -- so we get a

06:09:22 clean record.
06:09:22 A. Okay.
06:09:23 Q. So the first item, the "Survey of Attacks on Ethereum Smart Contracts, you read part of that, correct?
06:09:31 A. Correct.
06:09:31 Q. Okay. What percentage do you think you read of that paper?
06:09:42 A. I don't remember.
06:09:43 Q. How much time did you spend reading that?
06:09:49 A. Not -- not a long time.
06:09:52 Q. Okay. Let's be --
06:09:53 A. Oh, okay, fine. So I -- I don't know. Maybe ten minutes.
06:10:00 Q. Okay. All right. The second one "About Ian Balina," the website, you said you did not read the entire website, correct?
06:10:14 A. Yeah.
06:10:15 Q. Okay. Did you read -- now, this is an archived website, correct?
06:10:20 A. So I -- I correct my answer. No, I went to his current website.
06:10:26 Q. Okay. So you did not read this archived website, correct?
06:10:30 A. That's right. That's right.

06:10:31 Q. Okay. The third one is Mr. Balina's answer to the Complaint. I thought your testimony before was that you didn't recall if you read it or not.
06:10:40 A. That's right.
06:10:40 Q. Okay. You don't recall.
06:10:40 A. Yeah.
06:10:43 Q. The next website -- or the next item is --
06:10:46 A. Is also from the archive. I -- again, I did not -- I did not see it.
06:10:51 Q. Okay.
06:10:51 A. Yeah.
06:10:52 Q. And then we have ICO spreadsheets from there down to the second-to-last item. Am I correct that you didn't read any of those?
06:11:07 A. That's right.
06:11:09 Q. Okay. And then the last item on page 48 is "Ian Balina Crypto Alerts," the Telegram Channel, which was Exhibit P-69, but it says only "p.68," meaning page 68.
06:11:25 Did you read only that page, did you read the entire exhibit, or did you not read anything at all or something else?
06:11:36 A. I don't remember what part of that I read.
06:11:40 Q. No idea?
06:11:42 A. No.

06:11:43 Q. Okay. Do you recall how much time you spent on that?
06:11:53
06:12:01 A. No.
06:12:02 Q. Okay. All right. Going to page 49.
06:12:06 A. Yes.
06:12:06 Q. Okay. Take your time, look through each of those items.
06:12:11
06:12:12 A. I did not read the archive from his Twitter profile. I didn't -- yeah, so I did not read the first, the second.
06:12:20
06:12:27
06:12:35 Q. The next four are videos. Did you rev- --
06:12:42 A. I don't remember which one of them I watched, but -- but to be on the safe side, let's mark them as I have not watched them.
06:12:45
06:12:52
06:12:53 Q. To be on the safe side what?
06:12:57 A. Let's mark them as I have not watched them.
06:12:59 Q. Have not. Okay. I just couldn't hear you, sir. Sorry.
06:13:03
06:13:03 A. No, no worries.
06:13:05 Q. And then the next one is the Amsterdam live event; and I believe your testimony previously was you did not view that, correct?
06:13:10
06:13:13
06:13:14 A. That's right.
06:13:16 MR. CAMPOAMOR: Objection to the form.
06:13:18 MR. NAVARRE: Basis?

06:13:20 MR. CAMPOAMOR: Assumes facts not in evidence.
06:13:20 MR. NAVARRE: Okay.
06:13:23 Q. (By Mr. Navarre) All right. The next is the LinkedIn profile for Mr. Balina.
06:13:26 A. I checked it out.
06:13:29 Q. So you did read that?
06:13:30 A. Yep.
06:13:31 Q. Okay. And then go ahead. I'll let you continue from there.
06:13:48 A. This is -- I'm not sure about the SEC-Balina-E. That's -- I'm not sure about that.
06:14:06 I read the deposition. I spent quite a bit of time on that.
06:14:10 MR. NAVARRE: Okay. Objection --
06:14:15 A. How -- yes, I -- I read it in entirety. I don't remember -- but it's in order of -- it probably took me an hour or so.
06:14:23 MR. NAVARRE: Okay. Objection, nonresponsive. I don't think the deposition's here yet.
06:14:27 Q. (By Mr. Navarre) So let's keep going on the page we're on.
06:14:29 A. I mean, I think it -- it says Exhibit P-91 from the deposition of Ian Balina, so I thought it was referring to the deposition.

06:14:39 Q. It's referring to an exhibit to the deposition. Did you read all of the exhibits to the deposition?
06:14:44 A. No.
06:14:45 Q. Okay. Did you read Exhibit P-91, the Sparkster interview, from the deposition?
06:14:51 MR. CAMPOAMOR: Objection --
06:14:51 A. I believe --
06:14:51 MR. CAMPOAMOR: -- to the form.
06:14:51 A. -- I have. I believe I have.
06:14:53 Q. (By Mr. Navarre) How long did you spend reading that?
06:15:00 A. I don't remember. It was all in the first part of the kind of onboarding onto the case.
06:15:07 Q. Okay.
06:15:07 A. So I spent -- I spent hours, actually, reviewing background materials before I got started, but I don't remember how -- how much time on this particular one.
06:15:17 Q. Okay. Did you read the Digital Tulips article?
06:15:21 A. I have.
06:15:21 Q. Okay. Did you read that for this report, or is this something that you had read previously?
06:15:27 A. For this report.
06:15:28 Q. Okay. And you read it in its entirety?
06:15:32 A. About 50 percent of it. I -- I didn't read

06:15:35 every word in that paper.

06:15:37 Q. What was it that you were trying to get -- or
06:15:39 did you get anything out of that paper that you used in
06:15:42 your work in forming your opinions?

06:15:45 A. Yeah, it was in the context of sort of
06:15:48 background, you know, the number of papers that looked
06:15:55 at -- gathered and analyzed ICO data, and I was just
06:16:01 trying to -- I was just trying to inform myself on what
06:16:05 the status facts were -- or what the facts were from
06:16:08 those papers. So it was in that context that I read
06:16:11 this paper.

06:16:11 Q. And that paper --

06:16:11 A. Does that make sense?

06:16:12 Q. -- didn't have anything to do with Sparkster or
06:16:14 the Sparkster tokens, correct?

06:16:16 A. It did not mention Sparkster or Sparkster
06:16:19 tokens in particular.

06:16:20 Q. And so what opinion that you expressed in your
06:16:24 report is based upon your reading of this article?

06:16:29 MR. CAMPOAMOR: Objection to the form.

06:16:32 A. If you want me, I can go back and see where
06:16:34 it's referenced. And it's going to take a few minutes.
06:16:39 Do you want me to do that? I'm happy to.

06:16:42 Q. (By Mr. Navarre) Sure.

06:16:43 A. (Examines document.) Okay. So it pertains to

06:17:17 this -- in the paper, it basically describes the ICO
06:17:20 process; and so it affected the first sentence in
06:17:25 paragraph 22.
06:17:38 Q. Is that a sentence that you wrote or that the
06:17:40 people at Integra wrote?
06:17:42 A. I have.
06:17:47 Q. Okay. The next one is a white paper on
06:17:51 Ethereum.
06:17:51 A. Yeah.
06:17:53 Q. Did you read that?
06:17:53 A. Yes.
06:17:54 Q. And did you read that for your work in this
06:17:56 matter?
06:17:56 A. I read it before.
06:17:57 Q. Did you read it again after you --
06:17:59 A. Yeah, I reviewed it. Not in entirety, but, you
06:18:03 know, approximate.
06:18:04 Q. Okay. And -- okay. How much time did you
06:18:08 spend reading it for this matter?
06:18:13 A. I don't remember.
06:18:15 Q. Five minutes, ten minutes, an hour?
06:18:20 MR. CAMPOAMOR: Objection, asked and
06:18:27 answered.
06:18:27 A. I -- I -- you know, Mr. Navarre, I -- I'm -- I
06:18:32 don't remember.

06:18:32 Q. (By Mr. Navarre) Do you have any idea the approximate amount of time that you spent reading this white paper?
06:18:39 MR. CAMPOAMOR: Objection, asked and answered.
06:18:42 A. I said I don't remember.
06:18:46 Q. (By Mr. Navarre) The next document, "Ethereum Historical Data," did you read that?
06:18:55 A. Yes.
06:18:56 Q. And you read that within the scope or the work that you did for this matter, correct?
06:19:01 A. That's correct, used it to obtain market cap data.
06:19:06 Q. Did you read it in its entirety?
06:19:09 A. Only there are two numbers that are relevant on that page, so -- so I read the entire relevant part of that web page.
06:19:19 Q. Okay. The CoinMarketCap "Today's Cryptocurrency Prices," when did you look that up, if you did?
06:19:29 A. I have. So I'm pretty sure that that one lists the ERC-20 tokens.
06:19:42 MR. NAVARRE: So objection, nonresponsive.
06:19:44 Q. (By Mr. Navarre) My question is when --
06:19:45 A. When?

06:19:46 Q. -- did you get on this website?
06:19:50 A. What date?
06:19:51 Q. Yes, sir.
06:19:54 A. I don't remember.
06:19:56 Q. Okay. Do you remember what month?
06:19:58 A. Yeah. It was either late June or early July.
06:20:02 Q. Okay. Well, your report dates till June, and the report was done July 20th. So you can't narrow it between that?
06:20:12 MR. CAMPOAMOR: Objection, asked and answered, form.
06:20:20 A. No, I don't remember.
06:20:21 Q. (By Mr. Navarre) Okay. And how did looking up this information on some day in June or July impact your opinion, if at all?
06:20:34 MR. CAMPOAMOR: Objection to the form.
06:20:35 A. All it did was, you know, in the "Background" section I talk about ERC tokens and their prevalence. I wanted to give the reader a quantitative sense of how prevalent ERC tokens are. And it hasn't changed much since then.
06:20:56 Q. (By Mr. Navarre) Okay. But how does that impact your opinions at all with respect to Mr. Balina?
06:21:00 MR. CAMPOAMOR: Objection, asked and answered, form.

06:21:02 A. It didn't. Part of what I was asked to do was provide background information about blockchains, Ethereum smart contracts, and ICOs; and so it -- it was provided in that context.

MR. NAVARRE: Okay. Objection, nonresponsive to everything after, "It didn't."

Q. (By Mr. Navarre) The last item is the "Blockchain Disruption and Smart Contracts." Did you read that for your work in this matter?

A. I have.

Q. Okay. Did you read it in its entirety?

A. No.

Q. How much time did you spend reading that for this matter?

A. I don't remember as well.

And I'm going to anticipate what you're going to ask, so I'm going to look up where it's referenced so I can provide you with a link for how it's used. Do you want me to do that or not?

Q. No, I'm good.

A. Okay.

Q. We only have four hours, so instead of having you look stuff up in the report, I'd rather ask the questions. Does that make sense?

A. Yeah.

06:22:06 Q. On page 50, if you could go through the items on page 50 and tell me which ones you read for your work in this matter.
06:22:37 A. Okay. I have not read the first one. Okay. I've read the second, third, fourth, fifth, sixth, seventh, eighth, basically the rest of them.
06:23:11 We're on to page 51?
06:23:13 Q. Let me go back to page 50.
06:23:15 A. Okay.
06:23:16 Q. So you said you read the deposition of Brian Furano. On page 50, it says "Including exhibits." Do you see that?
06:23:22 A. Yeah. I don't remember if I read all the exhibits.
06:23:24 Q. Do you remember reading any of the exhibits?
06:23:27 A. I don't.
06:23:28 Q. Okay. How did Mr. Furano's deposition testimony impact your opinions, if at all?
06:23:37 A. I don't remember right now. I cannot recall the separation of these two depositions.
06:23:50 Q. So sitting here today, can you identify in any one way that the deposition of Mr. Furano impacted your opinions?
06:24:12 A. I cannot link specific items in the report to specific parts of the deposition. I'm happy to do that,

06:24:19 if you give me time, by just going over the report.
06:24:24 Q. So I'm not asking you to link a specific piece
06:24:27 of the report, you know, a sentence in the report or
06:24:30 what have you. I'm asking you a more general question.
06:24:34 Sitting here today, can you identify for
06:24:36 me --
06:24:37 A. Sorry, sorry. I don't recall -- I misread -- I
06:24:42 don't recall --
06:24:42 Q. I'm going to have to ask the question again
06:24:49 because we have to have a clean record.
06:24:49 So sitting here today, is there anything in
06:24:53 your opinions that was impacted by your reading of the
06:24:57 deposition of Mr. Furano?
06:24:59 A. I have not -- I -- I want to correct myself. I
06:25:03 misread this. I have not read the deposition of
06:25:05 Mr. Furano.
06:25:06 Q. Okay. And that would include the exhibits.
06:25:13 You didn't look at the exhibits either, correct?
06:25:15 A. Correct.
06:25:16 Q. Is there anything else on this list on page 50
06:25:22 that you need to change aside from that you actually did
06:25:27 not read Mr. Furano's deposition and the exhibits?
06:25:36 A. No.
06:25:38 Q. Okay. Now, the Etherscan transaction details
06:25:42 which are the five items on the bottom of page 50, did

06:25:47 you actually look at those transaction details?
06:25:50 A. I have.
06:25:51 Q. Each of those files?
06:25:52 A. Yeah.
06:25:53 Q. Okay. Going to page 51, same question. If you could go through that list and let me know which ones you read for this matter, for your work in this matter, and which ones you did not.
06:26:17 A. The first two, I have. I'm not sure about the third. The fourth is the exhibit that we talked about, so I -- I obviously read that.
06:26:53 Let me look. So this is one, two, three, four.
06:26:55 I'm not sure about the fifth.
06:26:57 I read carefully the sixth. I read briefly the seventh. I read carefully the eighth. I previously read the Bitcoin white paper, which is Nakamoto's paper. Not for this case. I read the one below.
06:27:29 So I don't know the count now. One, two, three, four, five, six, seven, eight, nine. So we are --
06:27:38 Q. Yeah, Dr. Kogan, let me --
06:27:38 A. -- up to ten.
06:27:39 Q. Let me interrupt you so I make sure we're on the same list.

06:27:43 A. Okay.
06:27:44 Q. On Howell, the paper by Howell, I have that as you are not sure that you read it for this matter; is that correct?
06:27:51 A. No, I read it carefully.
06:27:52 Q. You read that one carefully. Okay.
06:27:54 A. It's one of the better papers, in my view, on ICOs.
06:27:59 Q. Okay. And so you read that carefully in this time frame for this matter, correct?
06:28:03 A. That's right.
06:28:04 Q. So how long did you spend reading that?
06:28:06 A. At least half an hour.
06:28:08 Q. Okay. And then, so we're on the same --
06:28:15 A. The one --
06:28:15 Q. -- page --
06:28:15 A. The one below, I read it briefly.
06:28:19 Q. Okay.
06:28:20 A. The one below, Lyandres, I read carefully.
06:28:34 Nakamoto's Bitcoin white paper I read previously, not for this case.
06:28:38 Q. Okay.
06:28:39 A. The national standards, I read that briefly. Again this is just for the background information.
06:28:51 The McCormick I read briefly. It's an

academic paper talking about celebrity endorsements of products.

The OECD report, I spent some time on it. I don't know, say 15 minutes to half an hour or so.

I did not -- I did not read carefully the OpenZeppelin source code.

I read the PrimaBlock description, and I went to the web site.

We already opened the Primablock database file, so we're good on that, right? That's the ini file.

Q. Okay. Let's stop there for a second.

A. Okay.

Q. On OpenZeppelin, there's two separate items for OpenZeppelin.

A. Right. I haven't -- I haven't read either.

Q. You haven't read either one of those?

A. That's correct.

Q. Okay. And then the "PrimaBlock. How Does PrimaBlock work at a high level," you read that, correct?

A. That's correct.

Q. Okay. And you were not familiar with PrimaBlock before this engagement, correct?

MR. CAMPOAMOR: Objection, to the form.

06:30:08 A. That's correct. That's -- that's why I went on the website and looked it up.
06:30:12 Q. (By Mr. Navarre) Okay. And then I think you were about ready to go over to page 52. And just so we don't get out of order again, go ahead and as you identify whether you read or didn't read, maybe give, you know, the author or something that identifies it so that the record's clear on what you did read and what you didn't. Does that make sense?
06:30:32 A. It does.
06:30:33 Q. Okay. Go ahead, sir.
06:30:34 A. The first item, "PrimaBlock," have read.
06:30:38 Second item, "Primablock database file," have read. I didn't read every one of them. We opened it together. That's the ini file. Right.
06:30:49 Q. We went over that earlier, correct?
06:30:52 A. That's right. That's the file that we -- that we were -- that opened in the Latex editor.
06:30:59 I have not read the next one, the Rossolillo. I have not read the SEC's order.
06:31:23 I read the SAFT agreement. So that pertains to both items.
06:31:45 I'm not sure --
06:31:46 Q. When you say "both items," you mean the SAFT agreement and then the Sparkster Token Sale Agreement

below it?

A. Just give me... (Examines document.)

Q. Is that what you meant, Dr. Kogan?

A. Yeah, I'm -- I'm actually not sure. So I read the SAFT agreement.

I'm not sure what the -- what the item right below that refers to. It seems like --

Q. So you're not --

A. -- it's referring to the same thing, but it probably isn't, so I'm not sure.

Q. Okay.

A. I'm not sure if I have or not.

Q. Okay.

A. I have not read the Sparkster News & Announcements Channel.

I'm pretty sure that I saw the web capture from the Sparkster ICO Telegraph group.

I have not seen the one below that.

Q. That's the post by user Haligonian?

A. Correct.

I believe that those -- all the items that start with "Sparkster" and, you know, quotation, "Other," "Presale," et cetera, I don't remember if I saw that, or I believe that's -- that's what would end up being in the Google Sheet file, but I may be mistaken.

06:33:33 Q. But sitting here today, you don't recall whether you read any of those --
06:33:36
06:33:38 A. That's right.
06:33:39 Q. -- items, correct?
06:33:40 A. Correct.
06:33:48 I read -- I read most of the Telegraph -- Telegram communication and WhatsApp communication. I don't remember if I read this particular one or not.
06:33:54
06:33:59
06:34:08 I have not read the U.S. -- the SEC Commission against Ian Balina Complaint.
06:34:15
06:34:17 I read the WhatsApp logs. So those are the three last items.
06:34:20
06:34:25 Q. Okay. And the last page, 53?
06:34:29 A. 53, yep.
06:34:30 Q. What items have you read, what items have you not read?
06:34:33
06:34:33 A. So I believe that I read the first two, the WhatsApp. I read the Wheat paper. I read the White paper.
06:34:38
06:34:55
06:35:02 I don't recall if I read the Wood paper or not.
06:35:05
06:35:09 And I read the last item, the "ERC-20: Token Standard."
06:35:14
06:35:15 Q. Okay. And so for the Wheat and the White papers, did you read those in their entirety for your
06:35:18

06:35:21 work in this matter?
06:35:26 A. Not in their entirety.
06:35:28 Q. Okay. How much time did you spend on each one
06:35:31 of those?
06:35:33 A. I don't remember exactly, but probably
06:35:35 somewhere on the order of 15 minutes.
06:35:38 Q. For each?
06:35:39 A. Yeah.
06:35:43 Q. And how long did it take you to read the token
06:35:49 standard, the ERC-20?
06:35:51 A. I'm going back and forth on this. I don't know
06:35:55 how -- how much time in total. Make it 15 minutes.
06:36:01 Q. Okay. So in the "Background" section of your
06:36:13 report which starts at page 6 --
06:36:23 A. Yeah.
06:36:24 Q. -- Section -- and we'll do it by subsections,
06:36:28 if you will. We may have to go to paragraphs.
06:36:30 Subsection 3.1, that is just general
06:36:34 background information about Ethereum --
06:36:38 THE WITNESS: Let me just -- sorry for
06:36:42 cutting you off. Let's do this, but let's -- maybe
06:36:45 let's plan on another break sometime soon.
06:36:50 MR. NAVARRE: Well, let's do it now since
06:36:51 we're kind of switching topics. That's fine.
06:36:54 THE WITNESS: Okay. So is that okay for

06:36:58 everyone?
06:36:58 MR. CAMPOAMOR: Sure.
06:36:59 THE WITNESS: Okay. Sounds good. So let's
06:36:59 take five, seven minutes and regroup?
06:37:01 MR. CAMPOAMOR: Sounds great.
06:37:01 (Recess from 6:37 p.m. to 6:46 p.m. IDT.)
06:46:47 Q. (By Mr. Navarre) Dr. Kogan, are you ready to
06:46:49 go?
06:46:49 A. I am.
06:46:50 Q. Okay. Great.
06:46:51 A. We're on page 6.
06:46:53 Q. Actually, I forgot some questions back on the
06:46:57 appendix, so let's go to page 48.
06:47:06 A. I'm there.
06:47:07 Q. Okay. Great. The first item, the "Survey of
06:47:15 Attacks," do you see that?
06:47:16 A. I do.
06:47:17 Q. Okay. So I see that in your report that is
06:47:26 footnoted at footnote 12 on page 11. Do you see that?
06:47:49 A. Page 11, footnote 12, yes.
06:47:53 Q. Okay. So is that the only use of this
06:47:58 article --
06:47:59 A. Yes.
06:47:59 Q. -- as far as your opinions?
06:48:04 A. Yes.

Q. Okay. That was a -- that was, "Yes"?

A. Yes.

Q. Okay. Thank you.

And then on the bottom of page 48, there's the "Crypto Alerts!" Do you see that?

A. I do.

Q. And there is a footnote to that on page 37. Do you see that?

I'm sorry. It is actually footnote 37, and it is on page 15. Do you see that?

A. (Examines document.) Yes.

Q. Okay. And that is how you used that document in your report, correct?

MR. CAMPOAMOR: Objection --

A. Yes, sir.

MR. CAMPOAMOR: -- to the form.

Q. (By Mr. Navarre) I'm sorry. I couldn't hear your answer, Dr. Kogan, on account of the -- the objection that was louder than your voice, sir.

THE WITNESS: I'll let Fernando go first.

MR. CAMPOAMOR: I said objection, form.

Go ahead.

A. I believe so, yes.

Q. (By Mr. Navarre) Okay. And so what you're stating here in your report is that Mr. Balina you're

06:49:28 now aware put out a spreadsheet that identified
06:49:36 different tokens and his rankings, correct?
06:49:43 A. That's right.
06:49:43 Q. Okay. And you're aware that he also at one
06:49:47 time posted a spreadsheet that showed all of his
06:49:50 investments in various products or projects, correct?
06:49:55 MR. CAMPOAMOR: Objection to the form.
06:49:57 A. I'm not familiar with that.
06:49:59 Q. (By Mr. Navarre) Okay. So you're not familiar
06:50:01 that Mr. Balina had been publishing a document that
06:50:04 showed his transactions --
06:50:04 A. No.
06:50:08 Q. -- in various token --
06:50:09 A. I'm familiar with the spreadsheet that he
06:50:12 published that ranked ICOs and the one that got updated
06:50:18 to show that Sparkster was No. 1 right after he signed
06:50:22 the SAFT agreement, but I'm not familiar with a
06:50:26 spreadsheet that lists his personal investments.
06:50:30 MR. NAVARRE: Okay. Objection,
06:50:31 nonresponsive to everything after, "No."
06:50:32 Q. (By Mr. Navarre) So let's make sure we have a
06:50:34 clean record.
06:50:35 Are you aware that at some point in time
06:50:38 Mr. Balina published a document, whether it be a
06:50:45 spreadsheet, a Word document, or some other format, that

06:50:49 shows his investments, his transactions in various token
06:50:53 projects?
06:50:54 MR. CAMPOAMOR: Objection to the form.
06:50:55 A. No.
06:51:10 Q. (By Mr. Navarre) Okay. Moving on to page 49,
06:51:20 on page 49, you said that you had read Mr. Balina's
06:51:27 LinkedIn page, correct?
06:51:28 A. Yes.
06:51:29 Q. Did that impact your opinions in any way?
06:51:41 A. It helped me understand his background and how
06:51:46 he positioned himself to the public at large.
06:51:50 Q. And how did that impact your opinions, if at
06:51:54 all?
06:51:54 A. Well, for example, if his LinkedIn profile
06:51:59 didn't include anything related to crypto, that would be
06:52:03 a bit odd, right?
06:52:06 Q. So that's what impacted your opinion?
06:52:09 A. It helped me form my opinion. I don't know
06:52:12 what you mean by "impacted" my opinion. There's no
06:52:15 direct impact of his LinkedIn page to my report. It's
06:52:19 part of the -- of understanding his background and,
06:52:22 again, how he portrays himself to the public.
06:52:26 MR. NAVARRE: Objection, nonresponsive.
06:52:27 Q. (By Mr. Navarre) Let me ask it this way. This
06:52:29 is an item listed under documents relied upon in forming

06:52:33 your opinion. How did you rely upon Mr. Balina's
06:52:37 LinkedIn in forming your opinions?
06:52:40 MR. CAMPOAMOR: Objection, form.
06:52:47 A. It helped me form a picture about his
06:52:51 background and how he present himself -- presents
06:52:55 himself to the public.
06:52:58 MR. NAVARRE: Objection, nonresponsive.
06:53:00 Q. (By Mr. Navarre) Okay. I'm not asking about
06:53:02 background. I'm asking about reliance upon it in
06:53:06 forming your opinions.
06:53:06 A. It --
06:53:09 Q. What opinion --
06:53:10 A. -- did not form -- it did not change my
06:53:11 opinion.
06:53:11 Q. Okay. Did it help form any of your opinions?
06:53:16 A. Not that I can --
06:53:16 MR. CAMPOAMOR: Objection to the form.
06:53:16 A. -- recall.
06:53:18 Q. (By Mr. Navarre) Okay. If you hadn't looked
06:53:20 at the LinkedIn, would your opinions be the exact same
06:53:23 as the opinions you expressed in your report?
06:53:26 A. They would be.
06:53:31 Q. Okay. Moving down on page 49, the Sparkster
06:53:35 interview of May 25th, 2018, do you see that?
06:53:43 MR. CAMPOAMOR: Sorry, Counsel. Which page

were you referring to?
MR. NAVARRE: Page 49, the same page.
A. (Examines document.) Which item? I'm not sure that I -- that I...
Q. (By Mr. Navarre) Sure. It's about two thirds of the way down. It says "Balina, Ian, Sparkster Interview," and then it has May 25th, 2018. Do you see that?
A. That -- is that the deposition? Yes.
Q. That is not the deposition of Mr. Balina.
A. Okay. Sorry. I'm not sure if I read that.
Q. Okay. So disregard your prior testimony and now put this as not sure, correct?
MR. CAMPOAMOR: Objection --
A. That's correct.
MR. CAMPOAMOR: -- to the form.
Q. (By Mr. Navarre) Is that correct, Dr. Kogan?
MR. CAMPOAMOR: Objection to the form.
A. That's correct.
Q. (By Mr. Navarre) Okay. And so correct me if I'm wrong, but if you're not sure that you read this, then this did not have any impact on your opinions, correct?
MR. CAMPOAMOR: Objection to the form.
A. That's correct.

06:55:01 Q. (By Mr. Navarre) Okay. Then if we go to page 50, the first item is "Cryptopedia Staff." Do you see that?
06:55:14 A. Yeah.
06:55:15 Q. Okay. And I will try to help you out here. If you look at page 12, you'll see that's referenced in footnote 15. Do you see that?
06:55:32 A. (Examines document.) Yes.
06:55:45 Q. Okay. That is not something that you relied upon in forming your opinions about Mr. Balina, correct?
06:55:56 MR. CAMPOAMOR: Objection to the form.
06:56:03 A. That's correct. That's part of the background information provided in this report.
06:56:09 Q. (By Mr. Navarre) Okay. Now, on that same page, we have "Deposition of Ian Balina," "Including exhibits." I don't recall asking you --
06:56:19 A. What page? Okay.
06:56:19 Q. Same page. Just --
06:56:21 A. Page 50?
06:56:23 Q. Yes.
06:56:23 A. Okay.
06:56:24 Q. Just three items down from where we were.
06:56:26 A. Yeah.
06:56:26 Q. You see that?
06:56:27 A. Yes.

06:56:28 Q. Okay.
06:56:29 A. "Deposition of Ian Balina."
06:56:31 Q. Right. And then it says "Including exhibits,"
06:56:34 correct?
06:56:34 A. Yes.
06:56:34 Q. Did you read all of the exhibits to
06:56:36 Mr. Balina's deposition?
06:56:38 A. I don't remember if I read all of them.
06:56:40 Q. Do you remember reading any of them?
06:56:42 A. I don't remember -- I don't remember.
06:56:45 Q. Okay. What from Mr. Balina's deposition or
06:56:53 from the exhibits that you don't recall whether you read
06:56:56 them or not did you rely upon in forming your opinions
06:57:02 about Mr. Balina?
06:57:04 MR. CAMPOAMOR: Objection to the form of
06:57:06 the question.
06:57:08 A. Seems like --
06:57:08 Q. (By Mr. Navarre) I mean, Dr. Kogan, based --
06:57:08 (coughing).
06:57:14 MR. CAMPOAMOR: Doug will tell you that I'm
06:57:16 actually much better off today than I was a couple weeks
06:57:16 ago.
06:57:32 (Discussion off the record.)
06:57:32 Q. (By Mr. Navarre) Let me break that question up
06:57:43 into two. Maybe that'll take care of the objection,

save us some time.

Looking just at the deposition of Mr. Balina, is there anything in the deposition of Mr. Balina that you relied upon in forming your opinions about him in this case?

MR. CAMPOAMOR: Objection to the form of the question.

A. I was never -- I never opined about -- like, when you say "about him," I don't know what you mean.

About his role? Yes, of course.

Q. (By Mr. Navarre) What was it in the deposition that you relied upon in forming your opinion about his role?

MR. CAMPOAMOR: Objection to the form of the question.

A. I'll give you examples, but that's not going to be exhaustive, right? So that doesn't preclude -- that doesn't mean that's the only aspects.

But he describes his communication with Sparkster CEO, the ICO pitch competition that he participated in. I mean, he basically laid out the entirety of their communication and how he got involved with the Sparkster ICO.

He also described in the deposition his role as kind of like kind of an IC0 and crypto expert.

06:59:03 I believe that it's in that deposition that he also linked himself to the address that is being investigated in this report.
06:59:14 So those are some of the key items.
06:59:17 Q. (By Mr. Navarre) Okay. Any other items?
06:59:19 MR. CAMPOAMOR: Objection to the form.
06:59:21 A. Those are the main ones. I don't remember right now. But if more come to me, I'll -- I'll come back to that.
06:59:29 Q. (By Mr. Navarre) Okay. So let's start with the ICO pitch contest. What was it about the ICO pitch contest that you relied upon in forming your opinions concerning Mr. Balina's role?
06:59:42 MR. CAMPOAMOR: Objection to the form.
06:59:44 A. Well, it was clear that -- from his description and their communication that Sparkster employees viewed Mr. Balina as someone that can be very constructive -- let's put it that way -- in selling the tokens, right?
07:00:06 So they were eager to get in touch with him, they were eager to get him involved, and, in fact, they ended up consenting to terms that they described as -- as giving him that no one else got, right?
07:00:20 So everyone got limited to a 25,000-dollar investment. He got -- he got a much larger allocation both collectively but also individually, right? So he

ended up investing around $100,000 personally himself, so -- at least. So that is -- that is a central element of this case.

MR. NAVARRE: Okay. Objection, nonresponsive up to the point where you started talking about his communications with Sparkster.

Q. (By Mr. Navarre) How much Ethereum did Mr. Balina pay out of his account for the Sparkster tokens?

A. At least 150 ETHE.

Q. Well, you've looked at the transactions, correct?

A. That's right.

Q. Okay. And so looking at the transactions, how much did Mr. Balina pay in Ethereum for the Sparkster tokens?

MR. CAMPOAMOR: Objection, asked and answered.

A. There -- there are a number of addresses that are not identified either in his Google Sheet or in the database that we -- that the SEC got from PrimaBlock, right, so it is possible that some of those unidentified addresses actually belong to Mr. Balina.

As you know, Ethereum blockchain is pseudo anonymous, right, so it doesn't actually on the

07:01:51 blockchain report identities of individuals, just
07:01:55 include -- just records their addresses. So you need to
07:01:57 rely on off-chain data to match those addresses up with
07:02:01 individuals.
07:02:03 MR. NAVARRE: Objection, nonresponsive.
07:02:05 Q. (By Mr. Navarre) How much Ethereum did
07:02:08 Mr. Balina pay out of the wallet address that you
07:02:11 confirmed was his for the Sparkster tokens?
07:02:16 A. 150 ETHE.
07:02:18 Q. Okay. And that was the maximum amount that was
07:02:21 set forth, correct?
07:02:24 MR. CAMPOAMOR: Objection to the form.
07:02:26 A. By him in the pool; that's correct.
07:02:29 MR. NAVARRE: Well, objection,
07:02:31 nonresponsive.
07:02:31 Q. (By Mr. Navarre) What was the maximum amount
07:02:33 that Sparkster said people could purchase?
07:02:39 A. They set the limit for everyone eventually --
07:02:43 at least that's what they claim in their communication
07:02:46 with him -- to $25,000.
07:02:50 They allowed him -- they viewed him as an
07:02:54 individual -- to invest $5 million. That was -- that --
07:02:58 that's what's in the SAFT agreement that he signed.
07:03:01 MR. NAVARRE: Objection, nonresponsive to
07:03:02 everything after "$25,000."

07:03:05 Q. (By Mr. Navarre) How many Ethereum would $25,000 have been back then?
07:03:11 A. I think it traded at about $800, so I'll do the -- (calculating). About 30 -- about 30 ETHE or so.
07:03:27 Q. Okay. And have you checked to see if people outside the pool were able to pay more than 30 Ether and obtain more than the $25,000?
07:03:38 A. I have not.
07:03:38 Q. Okay. Do you know if anybody has for the government?
07:03:44 MR. CAMPOAMOR: Objection.
07:03:44 A. I don't know.
07:03:44 Q. (By Mr. Navarre) Okay. And you know that other wallet addresses in the pool that were identified as not being Mr. Balina's did pay 150 Ether just like Mr. Balina did for their Sparkster tokens, correct?
07:03:59 MR. CAMPOAMOR: Objection to the form.
07:04:01 A. Correct.
07:04:09 Q. (By Mr. Navarre) When you saw the pitch contest, you saw -- well, actually, when you were talking about the pitch contest just a little bit ago, you actually never saw the video of the pitch contest, correct?
07:04:23 MR. CAMPOAMOR: Objection.
07:04:23 A. Yes, sir.

Q. (By Mr. Navarre) So how do you know what occurred at the pitch contest?
A. Because I know the outcomes of that pitch contest. Sparkster received -- was awarded -- it was basically the winner of that competition.
Q. And that was a vote by the crowd, correct?
A. I don't know.
Q. Would that be important to you?
A. No.
Q. Would that have any impact on your opinions?
A. No.
Q. Did you talk to anybody about what occurred at the pitch contest in Amsterdam?
MR. CAMPOAMOR: Objection to the --
A. No.
MR. CAMPOAMOR: -- form.
Q. (By Mr. Navarre) I'm sorry. I couldn't hear what you said because of the objection.
A. No.
Q. Okay. But you do know that prior to the pitch contest, Mr. Balina had no interaction with anybody at Sparkster, correct?
A. That -- that appears to -- I don't know that, but that appears to be the case from their communication.

07:05:29 Q. Okay. And do you know whether Mr. Balina selected Sparkster to compete in the contest in Amsterdam or if it was somebody else who selected Sparkster to compete?
07:05:45 MR. CAMPOAMOR: Objection, form, relevance.
07:05:47 A. I don't know.
07:05:51 Q. (By Mr. Navarre) Okay. Now, is it your understanding that Mr. Daya was completely truthful in his statements to the public about Sparkster, the project, and the Sparkster ICO?
07:06:09 MR. CAMPOAMOR: Objection to the form, relevance.
07:06:13 A. I have no idea.
07:06:14 Q. (By Mr. Navarre) Okay. Well, let me break that up on account of the -- on account of the objection.
07:06:20 Is it your understanding that Mr. Daya, the CEO of Sparkster, was honest with the public about Sparkster prior to the initial coin offering for Sparkster?
07:06:32 MR. CAMPOAMOR: Objection to the form, foundation, relevance.
07:06:35 A. I don't know.
07:06:36 Q. (By Mr. Navarre) Was it your understanding that Mr. Daya, the CEO of Sparkster, was honest with the

public about the status of the project, the Sparkster project?

MR. CAMPOAMOR: Objection to the form, foundation, relevance.

A. I don't know.

Q. (By Mr. Navarre) Okay. Was it your understanding that Mr. Daya, the CEO of Sparkster, was honest in his public statements concerning Sparkster tokens?

MR. CAMPOAMOR: Objection to the form, foundation, relevance.

A. What do you mean "with respect to the tokens"?

Q. (By Mr. Navarre) Just what I said. With respect to the sale of the tokens, with respect to what the tokens represented, with respect to the price of the tokens, with respect to who could buy them, with respect to the maximum amount that could be purchased, with respect to whether people were going to get bonuses or discounts. Anything having to do with the sale of the Sparkster tokens.

MR. CAMPOAMOR: Objection to the form, foundation, relevance.

Go ahead.

A. The only thing that I observed is their conduct with Mr. Balina around the investment pool; and in that

07:07:50 regard, actually, they complied with -- to the best of my knowledge with the SAFT agreement.
07:07:54 But I don't know his conduct with the rest of the -- of the investment -- of the investors.
07:08:02 MR. NAVARRE: Objection, nonresponsive.
07:08:04 Q. (By Mr. Navarre) That's not my question. If you don't know, then just say you don't know; but if you know, then great.
07:08:09 So --
07:08:10 A. Well -- okay.
07:08:11 Q. -- do you have an understanding as to whether Mr. Daya was honest with the public about the sale of the Sparkster tokens?
07:08:21 MR. CAMPOAMOR: Objection to the form, foundation, relevance.
07:08:24 A. I don't know.
07:08:24 Q. (By Mr. Navarre) Okay. Has anybody at the government ever asked you to make a determination as to whether Mr. Daya, the CEO of Sparkster's statements to the public were accurate or not accurate?
07:08:37 MR. CAMPOAMOR: Objection.
07:08:38 And Dr. Kogan can answer as to what he was asked to do in this report.
07:08:46 A. I was not asked to opine on that.
07:08:49 Q. (By Mr. Navarre) Okay. And you did not look

into that either, did you?
A. I did not.
Q. Okay. And in your report, in forming your opinions, you've taken Mr. Daya's statements as being accurate, correct?
MR. CAMPOAMOR: Objection to the form, foundation.
A. That's correct.
Q. (By Mr. Navarre) Without any investigation as to whether or not they're accurate, correct -- or let me take that question back.
Without any investigation as to Mr. Daya, the CEO of Sparkster's truthfulness, correct?
MR. CAMPOAMOR: Objection.
A. I did check whether he was truthful with respect to his execution of the agreement with Mr. Balina.
Q. (By Mr. Navarre) Did you check to see whether he was truthful as to the statement that you talked about earlier that people could only buy up to $25,000?
A. No, I did not.
Q. Nor did you check the truthfulness of any of his other statements aside from if he just parroted what was in the SAFT agreement, correct?
MR. CAMPOAMOR: Objection to the form,

07:09:56 foundation.
07:09:56 A. Correct.
07:09:59 Q. (By Mr. Navarre) So I've asked you a series of questions. I want to go back to see if I refreshed your memory at all.
07:10:09 Do you recall now whether there were any exhibits in the deposition of Ian Balina that you did read in the course of your work in this matter?
07:10:17 A. I don't remember.
07:10:18 Q. Okay. On page 51, sir -- let me know when you're there.
07:10:46 A. Yeah, I'm there.
07:10:47 Q. Okay. Great. The very bottom item is the PrimaBlock website?
07:10:57 A. Yes.
07:10:57 Q. So just to be clear, this is a specific page on that website. Did you review the entire website or just this page?
07:11:05 A. I reviewed the landing page, I reviewed that page, I probably reviewed some other pages, but I don't think that I clicked on every single -- I actually don't remember which pages I -- you know, in addition to those I looked at.
07:11:22 But if I recall, their website is not very extensive, so I may have actually read most of the

07:53:17 Q. Okay. Which paper is that?
07:53:19 A. That's the first one listed under "Working Papers."
07:53:22 Q. Okay. So, yes, I was differentiating, I guess.
07:53:27 That has not yet been published, correct?
07:53:30 A. That's right. It is actually under review.
07:53:33 So we've got what's called "revise and resubmit" from the Journal of Financial Economics, which is one of the top three journals in finance. We're in the process of revising it, so I'm confident that it will get published shortly, but it is not yet published.
07:53:49 Q. Okay. And what stage is it? Is it in the -- you said "review and" --
07:53:51 A. Yeah, it's called "revise and resubmit." So you submit your paper. 95 percent of papers in top journals get rejected off the bat, and then a small fraction get an opportunity to make changes to the paper and see whether those changes are satisfactory to the referees and associate editors and editors. It's a fairly grueling process.
07:54:18 Q. So that paper is not available publicly, correct?
07:54:23 A. No, it is.
07:54:24 Q. It is?
07:54:25 A. Yeah. All my papers are available publicly.

07:54:29 You can -- it's a working paper under the National Bureau of Economic Research. It's also available publicly on SSRN.

07:54:38 Q. Okay.

07:54:38 A. So I'm pretty sure that if you just Google that -- you know, copy and paste that and put it in Google, you'll find multiple links to the pdf.

07:54:46 Q. Okay. And that is accessible to everybody, you don't have to be a member?

07:54:54 A. That's right.

07:54:54 Q. Okay. The Western Finance Association that you're a member of, is that a crypto-specific organization?

07:55:18 A. No.

07:55:19 Q. Have you made presentations there that would be relevant in any way to the opinions you've expressed today?

07:55:27 A. No.

07:55:28 Q. Okay. The papers that you have either published or are working papers, which of those, if any, would you say are relevant to the opinions that you've expressed in your report?

07:55:42 MR. CAMPOAMOR: Objection to the form of the question.

07:55:46 A. I mean, I want to believe that my body of

knowledge relies on a number of my papers, but most directly related are the first two listed under "Working Papers," and those are "Are Cryptos Different? Evidence from Retail Trading" and "Pure Momentum in Cryptocurrency Markets."

Q. (By Mr. Navarre) Okay. So tell me how "Pure Momentum in Cryptocurrency Markets" supports your opinions in this case.

MR. CAMPOAMOR: Objection to the form of the question.

A. It's not directly related to this case, but it is relevant for the working of cryptocurrency markets and the behavior of investors in them.

MR. NAVARRE: Okay. Objection, nonresponsive.

Q. (By Mr. Navarre) I've only got four minutes.

So how does anything contained in "Pure Momentum in Cryptocurrency Markets," the working paper that you're working on, how does that support or detract from the opinions that you've expressed in your report?

MR. CAMPOAMOR: Objection, asked and answered.

A. It does not. But in order to write that paper, I had to -- I had to be informed about cryptocurrencies and their working, so, in that way, it's relevant for

07:57:17 this.

07:57:19 I mean, if you're asking could I have written this report without having put together the paper "Pure Momentum in Cryptocurrency Markets," the answer is yes.

07:57:31 MR. NAVARRE: Okay. Objection, nonresponsive to everything after "It does not."

07:57:36 Q. (By Mr. Navarre) Is there anything in the paper, the working paper "Are Cryptos Different? Evidence From Retail Trading" that supports or detracts from the opinions in your expert report in this matter?

07:57:54 MR. CAMPOAMOR: Objection, form.

07:57:55 A. No.

07:58:20 MR. NAVARRE: Okay. Dr. Kogan, I'm going to give you your last two minutes free.

07:58:22 THE WITNESS: Okay.

07:58:24 MR. NAVARRE: So thank you for taking the time today/this evening. We had agreed that the deposition would be four hours, and I am at 3 hours and 58 minutes. So thank you again.

07:58:36 And if we could go off the record briefly, I'd like to talk to -- I'd like to mention something to him.

07:58:38 (Discussion off the record.)

07:58:38 THE REPORTER: Okay. Then I just need to

DEPOSITION ERRATA SHEET

Case Name: SEC V. IAN BALINA

CIVIL ACTION NO. 1:22-CV-950

Deposition Date: SEPTEMBER 1, 2023

Deponent: SHIMON KOGAN

| **Page** | **Line** | **Now Reads** | **Should Read** | **Reason** |
|---|---|---|---|---|
| 16 | 22 | _____ , ______ | Matt Byrnes, Cameron Friday | Requested to fill in names |
| 30 | 21 | Train | Trading | Transcript error |
| 49 | 12 | ETHE | ETH | Transcript error |
| 51 | 8 | ETHE | ETH | Transcript error |
| 52 | 10 | Adjacent | JSON | Transcript error |
| 56 | 15 | ETHE | ETH | Transcript error |
| 59 | 20 | modified | modify | Transcript error |
| 61 | 25 | ETHE | ETH | Transcript error |
| 63 | 2 | ETHE | ETH | Transcript error |
| 63 | 3 | ETHE | ETH | Transcript error |
| 70 | 14 | ETHE | ETH | Transcript error |
| 70 | 15 | ETHE | ETH | Transcript error |
| 75 | 8 | ETHE | ETH | Transcript error |
| 88 | 22 | Sort | Sources | Transcript error |
| 89 | 4-5 | I'm an expert | I'm not an expert | Transcript error |
| 90 | 10 | Exposed | Ex-post | Transcript error |
| 90 | 13 | Exposed | Ex-post | Transcript error |
| 100 | 4 | That's right | Incorrect | Correction needed as I misunderstood question |
| 100 | 6 | Yeah | I read Balina's answer | Correction needed as I misunderstood question |
| 100 | 15 | That's right | Incorrect. Counting from the top of the page, I have read item numbers 5, 10 and 11 | Correction needed after I had the opportunity to look at the actual documents referenced in the question |
| 109 | 4 | I have not read the first one | I have read the first one | Correction needed after I had the opportunity to look at the actual document referenced in the question |
| 114 | 20 | I have not read | I have read | Correction needed after I had the opportunity |

| | | | | |
|---|---|---|---|---|
| | | | | to look at the actual document referenced in the question |
| 115 | 17 | Telegraph | Telegram | Transcript error |
| 116 | 6 | Telegraph | Telegram | Transcript error |
| 116 | 9 | I have not read | I have read | Correction needed after I had the opportunity to look at the actual document referenced in the question |
| 128 | 10 | ETHE | ETH | Transcript error |
| 129 | 9 | ETHE | ETH | Transcript error |
| 130 | 4 | ETHE | ETH | Transcript error |
| 139 | 4 | Fin tech | FinTech | Transcript error |
| 141 | 25 | ETHE | ETH | Transcript error |
| 157 | 25 | Telegraph | Telegram | Transcript error |
| 162 | 16 | ETHE | ETH | Transcript error |

9/27/23
Date

Shimon Kogan

HEATHER MARIE ADAMS
Electronic Notary Public
Commonwealth of Virginia
Registration No. 7999977
My Commission Expires Apr 30, 2026

Jurat Statement on Next Page

JURAT

State of Virginia
County of Chesterfield
} SS.

Subscribed and Sworn to (or affirmed) before, me this

27th day of September, 2023 for
*Date* *Month* *Year*

Shimon Kogan
*Name of Signer No. 1*

*Name of Signer No. 2 (if any)*

HEATHER MARIE ADAMS
Electronic Notary Public
Commonwealth of Virginia
Registration No. 7999977
My Commission Expires Apr 30, 2026

*Place Notary Seal/Stamp Above*

Heather Marie Adams
*Signature of Notary Public*
Notary Public Heather Marie Adams
Commission 7999977 Expires 04/30/2026
*Any other Required Information*
*(Residence, Expiration Date, etc.)*

Notary Public of Chesterfield County, Virginia

**OPTIONAL**

*This section is required for notarizations performed in ARIZONA but is optional in other states. Completing this information can deter alternation of the document or fraudulent reattachment Of this form to an unintended document*

**Description of Attached Document**

**Title or Type of Document** Deposition Errata Sheet

~~**Document**~~ Deposition **Date** September 1, 2023 **Number of Pages** 2

**Signer(s) Other Than Named Above** N/A

Date of Notarization / Signing: September 27, 2023

COMPLETED VIA REMOTE ONLINE NOTARIZATION USING TWO WAY AUDIO/VIDEO TECHNOLOGY