**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Civil Action No. 1:22-CV-950-DAE** |
| **-against-** | **ECF CASE** |
| **IAN BALINA,** | **(Jury Trial Demanded)** |
| **Defendant.** | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ........................................................................................1

SUMMARY JUDGMENT STANDARD ..........................................................................2

ARGUMENT ...................................................................................................................2

    I.      Balina Violated the Registration Provisions of the Securities Act ................................2

          a.   Elements of a Claim Under Section 5(a) and (c) of the Securities Act ..................3

          b.   Balina Conducted an Unregistered Offering of SPRK Tokens Through His Investing Pool ……………………………….........................................................3

          c.   Balina Offered and Sold SPRK Tokens as an Underwriter .....................................5

    II.     Balina Violated the Touting Provision of the Securities Act by Not Disclosing the Consideration He Received for Promoting SPRK Tokens ............................................6

          a.   Elements of a Claim Under Section 17(b) of the Securities Act…...........................6

          b.   Balina Received Consideration for His Promotion of SPRK Tokens ……...............7

    III.    SPRK Tokens Were Offered and Sold as Securities ......................................................8

          a.   The Supreme Court's Test in *Howey* Governs Whether an Offering Involves an Investment Contract and, Therefore, a Security .......................................................8

          b.   Balina Cannot Carry His Burden to Demonstrate, as a Matter of Law, That as Offered and Sold by Sparkster and Balina, SPRK Tokens Did Not Qualify as Securities Under the *Howey* Test .........................................................................10

               i.   SPRK Tokens Were Not Marketed as a Finished Product .........................10

                    1.   Sparkster Did Not Claim SPRK Tokens Could Be Used With a Finished Product .........................................................................10

                    2.   Sparkster Marketed SPRK Tokens to Potential Investors, Not Potential Users of Its Current or Planned Products .......................11

                    3.   The Sparkster Token Sale Agreement Has Limited Probative Value Regarding How SPRK Tokens Were Marketed .............................13

               ii.   SPRK Token Purchasers Invested in a Common Enterprise .....................14

           c.   Sparkster Created in Potential SPRK Token Purchasers an Expectation of Profits from Sparkster's Efforts .........................................................................15

    IV.   U.S. Securities Laws Apply to Balina's Conduct Because He Promoted, Offered, and Sold SPRK Tokens to U.S. Investors .......................................................................18

i

CONCLUSION ...................................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*Balestra v. ATBCOIN LLC,*

    380 F.Supp.3d 340 (S.D.N.Y. 2019) ........................................................... 9, 10, 16, 17

*Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.,*

    738 F.3d 703 (5th Cir. 2013) ........................................................................................ 2

*Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London,*

    147 F.3d 118 (2d Cir. 1998) ................................................................................. 18, 19

*Glen-Arden Commodities, Inc. v. Constantino,*

    493 F.2d 1027 (2d. Cir. 1974) ..................................................................................... 9

*Hill York Corp. v. Am. Int'l Franchises, Inc.,*

    448 F.2d 680 (5th Cir. 1971) ...................................................................................... 3

*In re Picard,*

    917 F.3d 85 (2d Cir. 2019) ........................................................................................ 18

*Long v. Shultz Cattle Co., Inc.,*

    881 F.2d 129 (5th Cir. 1989) ................................................................................. 9, 14

*Miller v. Cent. Chinchilla Grp., Inc.,*

    494 F.2d 414 (8th Cir. 1974) ...................................................................................... 9

*Morrison v. Nat'l Australia Bank Ltd.,*

    561 U.S. 247 (2010) ......................................................................................... 18, 19, 20

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE,*

    763 F.3d 198 (2d Cir. 2014) ...................................................................................... 20

*Pinter v. Dahl*,

    486 U.S. 622 (1988) ................................................................................. 19

*Royal v. CCC & R Tres Arboles, L.L.C.*,

    736 F.3d 396 (5th Cir. 2013) ...................................................................... 2

*SEC v. Blackburn*,

    15 F.4th 676 (5th Cir. 2021) ....................................................................... 6

*SEC v. Blackburn*,

    431 F.Supp.3d 774 (E.D. La. 2019) ............................................................ 6

*SEC v. CMKM Diamonds, Inc.*,

    729 F.3d 1248 (9th Cir. 2013) .................................................................... 6

*SEC v. Cont'l Commodities Corp.*,

    497 F.2d 516 (5th Cir. 1974) .................................................................... 14

*SEC v. Cont'l Tobacco Co.*,

    463 F.2d 137 (5th Cir. 1972) ...................................................................... 3

*SEC v. Glenn W. Turner Enters., Inc.*,

    474 F.2d 476 (9th Cir. 1973) ................................................................. 9, 14

*SEC v. Kik Interactive Inc.*,

    492 F.Supp.3d 169 (S.D.N.Y. 2020) ...................................... 11, 15, 16, 17

*SEC v. Koscot Interplanetary, Inc.*,

    497 F.2d 473 (5th Cir. 1974) ................................................................. 9, 14

*SEC v. LBRY, Inc.*,

    639 F.Supp.3d 211 (D.N.H. 2022) ...................................... 12, 14, 15, 16, 17

*SEC v. Liberty Capital Group, Inc.,*

 75 F.Supp.2d 1160 (W.D. Wash. 1999) ........................................................................ 8

*SEC v. NAC Foundation LLC,*

 512 F.Supp.3d 988 (N.D. Cal. 2021) ........................................................................ 16

*SEC v. Ralston Purina*,

 346 U.S. 119 (1953) ........................................................................................................ 3

*SEC v.Ripple Labs, Inc.*,

 No. 20 CIV. 10832 (AT), 2023 WL 4507900 (S.D.N.Y. July 13, 2023) .................... 17

*SEC v. Scoville*,

 913 F.3d 1204 (10th Cir. 2019) ................................................................................ 20

*SEC v. Telegram Grp. Inc.*,

 448 F.Supp.3d 352 (S.D.N.Y. 2020) ..................................................... 9, 12, 13, 15, 16

*SEC v.Terraform Labs Pte. Ltd..*,

 No. 23-CV-1346 (JSR), 2023 WL 4858299 (S.D.N.Y. July 31, 2023) ................ 16, 17

*SEC v. Traffic Monsoon, LLC*,

 245 F.Supp.3d 1275 (D. Utah 2017) ........................................................................ 20

*SEC v. Wall Street Pub. Institute*,

 851 F.2d 365 (D.C. Cir.1988) ..................................................................................... 8

*SEC v. W.J. Howey Co.*,

 328 U.S. 293 (1946) ............................................................................ 8, 9, 10, 14, 15

*Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*,

 883 F.3d 904 (D.C. Cir. 2018) .................................................................................. 18

*Tcherepnin v. Knight*,

    389 U.S. 332 (1967) .................................................................................... 9

*Vohs v. Dickson*,

    495 F.2d 607 (5th Cir. 1974) ...................................................................... 5

*United Housing Found., Inc. v. Forman*,

    421 U.S. 837 (1975) .................................................................................... 9

*United States v. Amick*,

    439 F.2d 351 (7th Cir.1971) ...................................................................... 8

*United States v. Elbaz*,

    52 F.4th 593 (4th Cir. 2022) ............................................................... 19, 20

*United States v. Johnson,*

    718 F.2d 1317 (5th Cir. 1983) .................................................................. 10

*United States v. Vilar*,

    729 F.3d 62 (2d. Cir. 2013) ...................................................................... 20

*Williamson v. Tucker*,

    645 F.2d 404 (5th Cir. 1981) ...................................................................... 9

**Statutes**

15 U.S.C. § 77b ..................................................................................... 5, 6, 8

15 U.S.C. § 77d ......................................................................................... 3, 5

15 U.S.C. § 77e .................................................................... 1, 2, 3, 5, 18, 19

15 U.S.C. § 77q ..................................................................................... 1, 6, 7

**Rules**

Fed. R. Civ. P. 56     .............................................................................. 2

## PRELIMINARY STATEMENT

Ian Balina's Motion for Summary Judgment ("Mot.") is replete with factual errors and omissions that misconstrue the evidentiary record. While Balina also misstates and misapplies the governing law, those flaws are secondary to the false narrative that Balina presented to the Court.

Most egregiously, Balina claims that he merely purchased $106,91.50 worth of SPRK Tokens through a pool; that he did not own the SPRK Tokens that the other members of the pool purchased; and that he never believed that he had "any right" to the SPRK Tokens that the other members of the pool purchased. Mot. at 6. Balina fails to acknowledge several essential facts:

- On May 20, 2018, Balina executed a "Simple Agreement for Future Tokens" or SAFT, in which Balina agreed to purchase $5,000,000 worth of SPRK Tokens (33,333,333 token) and receive a 30% bonus of 10,000,000 additional tokens.

- On May 21, 2018, Balina announced that he was forming an investment pool.

- Balina encouraged his followers to "get whitelisted for my Sparkster pool."

- Balina's investment pool used a smart contract to allow participants to share in Balina's allocation of SPRK Tokens under the SAFT.

Balina was not a mere purchaser of SPRK Tokens. By organizing his investment pool and letting others purchase tokens from his allocation, he conducted his own offering of SPRK Tokens.

Balina's SAFT with Sparkster is at the heart of both of Plaintiff Securities and Exchange Commission's ("SEC's") claims against Balina. With the SAFT, Balina received more favorable terms than others purchasing from Sparkster, specifically (1) the right to purchase more tokens than others and (2) bonus tokens. Those preferential terms were the compensation he received for promoting SPRK Tokens. Because Balina did not publicly disclose that compensation, he violated the touting provision of the Securities Act of 1933, 15 U.S.C. § 77q(b). And because there was no registration statement in effect for Balina's offers or sales of SPRK Tokens allotted to him under the SAFT, he violated the registration provisions of the Securities Act, 15 U.S.C. § 77e(a), (c).

Summary judgment is a party's opportunity to lay out the record evidence for the Court and demonstrate that there is no material issue to be decided by a jury.  By ignoring the terms and significance of one the most important pieces of evidence in the case, Balina's motion has failed to make that requisite showing, and the Court should deny the motion.[1]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (citation omitted). A court must view the summary judgment evidence in the light most favorable to the non-movant. *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013).

## ARGUMENT

**I.     Balina Violated the Registration Provisions of the Securities Act**

Section 5(a) of the Securities Act prohibits any person, directly or indirectly, from making use of the mails or interstate commerce to sell, or deliver after sale, a security, unless a registration statement is in effect as to the security or there is a valid exemption from registration;  Section 5(c) of the Act, in relevant part, prohibits any person, directly or indirectly, from making use of the mails or interstate commerce to offer to sell or offer to buy a security unless a registration statement has been filed or there is a valid exemption from registration.  15 U.S.C. §§ 77e(a), (c).

---

[1] The SEC intends to file its own summary judgment motion on each of its claims only *after* the parties have attempted to settle this matter at mediation, which is scheduled for November 7, 2023. Should it be necessary, in that motion the SEC will demonstrate that it is entitled to judgment as a matter of law of each of its claims.  In this opposition brief, however, the SEC will merely explain why the Court should deny Balina's summary judgment motion.

### a. Elements of a Claim Under Section 5(a) and (e) of the Securities Act

To establish a *prima facie* case for a Section 5 violation, the SEC must prove that "(1) no registration statement was in effect as to the securities, (2) the defendant sold or offered to sell these securities, and (3) interstate transportation or communication and the mails were used in connection with the sale or offer of sale." *SEC v. Cont'l Tobacco Co. of S.C.*, 463 F.2d 137, 155 (5th Cir. 1972). Once the Commission has made its *prima facie* case, it becomes the defendant's burden to prove that it was entitled to an exemption from registration. *Cont'l Tobacco Co.*, 463 F.2d at 156 (*citing SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953)). These exemptions are narrowly construed to effectuate the remedial purposes of the Securities Act. *Id.* at 155 (*citing Hill York Corp. v. Am. Int'l Franchises, Inc.*, 448 F.2d 680, 690 (5th Cir. 1971)).

Balina argues that, as a matter of law, he did not offer or sell SPRK Tokens. But he wholly fails to acknowledge or negate the substantial evidence, including his own contemporaneous statements, that establishes that he organized and controlled the investing pool through which his followers purchased SPRK Tokens. Mot. at 5-7. Alternatively, he argues that he is entitled to summary judgment because an exemption from registration applies, specifically the exemption for transactions by any person other than an issuer, underwriter, or dealer. *See* 15 U.S.C. § 77d(a)(1). But Balina's conduct fits squarely within the definition of an underwriter, so the exemption does not apply. As demonstrated below there certainly are—*at the very least*—material issues of fact that preclude summary judgment in Balina's favor as to the Section 5 claims.

### b. Balina Conducted an Unregistered Offering of SPRK Tokens Through His Investing Pool

On May 20, 2018, the same day that he signed the SAFT with Sparkster, Balina announced on Telegram that he was forming an investing pool for members of that group, writing: "Sparkster Private Sale Whitelist: Please fill out this form to get whitelisted for ***my Sparkster pool***. It will be

starting in one day." App. 4.[2]  Balina included a link to a "Google form" for members of his group

to complete in order be potentially included in his Sparkster investing pool.  *Id*.  In addition to

providing the details of the investing pool, the Google form contained a disclaimer from Balina's

company, Diary of a Made Man LLC, which cautioned that "the ICOs identified herein may

constitute securities pursuant to federal and state securities laws and may not be appropriate for or

offered to investors residing in the United States." App. 4-5.

On May 21, 2018, Balina posted on his Telegram group and directed potential investors

to a third-party website used for hosting investing pools, writing: "Sparkster Primablock is now

live. You may contribute." App. 5.  He also provided a link to the PrimaBlock website.  *Id.*

Through PrimaBlock, the investing pool used a smart contract to allow pool participants to

contribute ETH and purchase a portion of the SPRK tokens Balina would receive pursuant to the

SAFT he signed with Sparkster.  *Id*.

Balina also controlled who could participate in the pool by modifying the list of approved

participants, which was accessed using the Ethereum address he controlled. App. 6.  Balina also

exercised control over the minimum and maximum investment for the pool as well as its total limit.

*Id*.  And Balina provided regular updates to the Telegram group about the status of the pool, and

its members repeatedly thanked Balina for the opportunity to invest in his pool.  *Id*.  When

members had problems with their contributions being approved or "whitelisted," Balina addressed

the problems and told the group about the resolution.  *Id*.

Pool participants submitted ETH to the address Balina provided, and when Sparkster

distributed its tokens to Balina, a portion of those tokens was automatically distributed to the pool

participants via a smart contract. App. 5-7.  On May 26, 2018, Balina announced on Telegram:

---

[2] Except where noted, all evidentiary citations are to Plaintiff's Appendix submitted herewith.

"Sending funds soon.  Those that want to pull out please do so asap.  We won't wait long." App. 6.  That same day, Balina initiated the transaction in the smart contract to send funds from the Sparkster ICO Pool to Sparkster.  *Id*.  After he initiated the transaction, Sparkster's CEO sent Balina a WhatsApp message reading: "Thank you for the contribution!"  App. 7.

In short, Balina offered and sold his allocation of SPRK Tokens, which he was entitled to under the SAFT with Sparkster, to the other members of his investing pool.  Balina suggests that he would have no reason to share his allocation with his followers at the same effective price per token as he received them under the SAFT (Mot. at 6), but during May 2018, Balina was earning approximately $34,000 per month from two of his Patreon subscriber groups, who were paying him, in part, to have access to his "deal flow" and who represented a substantial portion of the pool participants.  App. 2, 5.  Acquiring preferential terms for ICOs, and sharing them with his followers, was part of his business model.  There is no mystery about what was in it for Balina.

### c.  Balina Offered and Sold SPRK Tokens as an Underwriter

Section 5 does not apply to "transactions by any person other than an issuer, underwriter, or dealer."  15 U.S.C. § 77d(a)(1).  Section 2(a)(11) defines an underwriter as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security."  15 U.S.C. § 77b(a)(11).  The Fifth Circuit has noted that "[t]he longer the period of retention by the owner before his sale, the more persuasive would be the argument that the resale is not at variance with an original non-distributive intent" and that a document in which the distributor "records his own assertion of what was in his mind when he took the securities, may be probative."  *Vohs v. Dickson*, 495 F.2d 607, 620 (5th Cir. 1974).

By offering SPRK Tokens through his pool, Balina acted as an underwriter, purchasing SPRK Tokens from Sparkster for his own distribution, and thus the exemption of Section 4(a)(1)

was unavailable.  According to Balina's testimony, at the time of his purchase: "[T]here were other people in the group who … also wanted to purchase Sparkster tokens."  App. 21.  The same day that he signed the SAFT, Balina announced he was forming the pool, reflecting his state of mind.  App. 4.  His pool then received payments from investors before he made the payment to Sparkster.  App. 6.  Using a smart contract, Balina distributed SPRK tokens to members of his investing pool as soon as he received them from Sparkster, also reflecting his intent to distribute.  App. 7.

Alternatively, even if the Court agrees with Balina's argument that he did not purchase all of the SPRK Tokens in his allocation because he never possessed the full amount of tokens as a result of how the smart contract worked, Balina still acted as an underwriter because he offered or sold securities "for an issuer *in connection with* [a] distribution."  15 U.S.C. § 77b(a)(11) (emphasis added).  "[T]he prohibition on the sale or attempted sale of securities has broad reach" and is not limited to the person or entity who ultimately passes title to the security.  *SEC v. Blackburn*, 431 F.Supp.3d 774, 802 (E.D. La. 2019) (*citing SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013)), *aff'd*, 15 F.4th 676 (5th Cir. 2021).  The statute "extends to significant 'participants' in the sale, those who were both necessary for a transaction and a 'significant factor' in bringing it about." *Id.* (citations omitted).  Either way, the exemption does not apply.

## II.   Balina Violated the Touting Provision of the Securities Act by Not Disclosing the Consideration He Received for Promoting SPRK Tokens

### a.   Elements of a Claim Under Section 17(b) of the Securities Act

The Securities Act of 1933 prohibits promoting securities in exchange for compensation without disclosing the nature *and* amount of that compensation. Section 17(b) of the Act provides:

> **It shall be unlawful for any person**, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, **to** publish, **give publicity to**, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, **or communication which**, though not purporting to offer a security for sale, **describes such security for** a **consideration received or to be received, directly or indirectly, from an issuer**,

underwriter, or dealer, **without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.**

15 U.S.C. § 77q(b) (emphasis added).

Balina argues that he did not receive compensation for his promotion of SPRK Tokens. Mot. at 3-5.  The evidence demonstrates that he did.

### b.  Balina Received Consideration for His Promotion of SPRK Tokens

On May 18, 2018, Sparkster posted on its public Telegram channel: "Bonus tokens would be eliminated to deter anyone from dumping." App. 3.  Two days later, Balina and Sparkster executed the SAFT.  *Id*.  Under the SAFT, Balina received more favorable terms than were available to the general public.  First, he was allowed to purchase $5 million worth of tokens, whereas others' purchases were capped at $25,000, App. 3-4. Second, he received a 30% bonus of 10 million SPRK Tokens.  *Id*.[3]  Sparkster's CEO shared this information with Balina, who responded that he (Balina) was *required to disclose it* to comply with SEC regulations:

[5/21/18, 11:24:47 AM] Saj Daya: You have received a 30% bonus, it's specified on your SAFT. But because we've limited everyone else's contribution to the minimum so more people can participate, there's no bonus for them. I held an AMA in our telegram group on Thursday 17th at 4pm GMT. It was decided by the community that we would eliminate bonuses. We held a vote.
[5/21/18, 11:27:40 AM] Saj Daya: You're the only one that's been allowed to invest more than the min. Our bonus structure is: $25k to $50k 0%. 50k to 100k 5%, 100k to 250k 10%, 250k to 500k 15%, 500k to 1m 20%, 1m to 2.5m 25%, 2.5m+ 30%.
[5/21/18, 11:28:40 AM] Saj Daya: The community felt that eliminating bonuses would mean people would not dump on exchanges. It's documented in the AMA.
[5/21/18, 11:49:04 AM] Saj Daya: We've also mentioned that the max discount offered to anyone is 30%. It's listed on our token metrics page https://sparkster.me/tokensale. Our answers are clear that strategic partners have received discounts.
[5/21/18, 11:49:32 AM] Saj Daya: *bonus not discount
[5/22/18, 6:26:09 AM] Trust the Process: I think it should be changed to document that the highest bonus given out was 30%. I have to publicly disclose it to my audience due to SEC regulations. So I suggest to do this.

*Id*.

After Balina executed the SAFT, he began promoting the Sparkster ICO.  On May 20, 2018, Balina publicly posted that he had named Sparkster as his "hall of fame" top ICO and stated:

---

[3] Balina claims he received a "volume discount," but the SAFT is explicit that it was a 30% bonus.

"After Sparkster won my Amsterdam Crypto World Tour ICO pitch event, word is getting out that attending my Crypto World Tour was more fruitful than attending #Consensus2018.  I respect their hustle to fly all the way to London … to pitch.  The crowd voted and I agree"; as well as, "Here are the new spreadsheet rankings.  Sparkster takes the number one spot.  The Sparkster team showed my team two demos of their product, and we think it's the real deal. #NotInvestmentAdvice #DYOR.  Ian Balina."  App. 8-9.  Sparkster's CEO immediately thanked Balina for awarding Sparkster the "hall of fame" distinction.  App. 8.  Balina continued to promote SPRK Tokens as his "favorite" or "top" ICO until at least July 2018.  App. 9-10.

Balina asserts that there was no *quid pro quo*, but the facts show that Balina was given special consideration, and he promptly and repeatedly promoted SPRK Tokens.  A document showing an agreement to promote securities is not required "when the facts show that, in substance, there was a *quid pro quo." SEC v. Liberty Capital Group, Inc.*, 75 F.Supp.2d 1160, 1162 (W.D. Wash. 1999) *(citing SEC v. Wall Street Pub. Institute,* 851 F.2d 365, 376 (D.C. Cir. 1988)).  "[A] jury may infer the existence of a *quid pro quo* when the evidence shows that a favorable communication about a security was made and an otherwise unexplained payment was received." *Id.* (*citing United States v. Amick,* 439 F.2d 351, 364–65 (7th Cir. 1971)).  Balina has not acknowledged, let alone explained, why he received preferential terms, including 10 million bonus tokens (a $1.5 million value given the purchase price of $.15/token).  There is, at a minimum, an issue of material fact regarding the existence of a *quid pro quo* between Balina and Sparkster.

III.    **SPRK Tokens Were Offered and Sold as Securities**

a. **The Supreme Court's Test in *Howey* Governs Whether an Offering Involves an Investment Contract and, Therefore, a Security**

Under Section 2(a)(l) of the Securities Act, the term "security" includes any "investment contract."  In *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), the Supreme Court defined an

"investment contract" as "a contract, transaction, or scheme whereby a person invests his or her money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. . . ."  *Id.* at 298-99.  The *Howey* "test requires three distinct elements: (1) an investment of money; (2) in a common enterprise; and (3) on an expectation of profits to be derived solely from the efforts of individuals other than the investor."[4]  *Williamson v. Tucker*, 645 F.2d 404, 417-18 (5th Cir. 1981) (*citing SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478 (5th Cir. 1974)).  The "touchstone" of an investment contract "is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."  *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975).

The *Howey* test embodies a "flexible rather than static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *Howey*, 328 U.S. at 299.  In analyzing whether something is a security, "form should be disregarded for substance," *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), and the emphasis should be on "the economic realities underlying a transaction, and not on the name appended thereto."  *Forman*, 421 U.S. at 849.  Schemes and contracts involving a range of tangible and intangible assets, including crypto assets, have been deemed securities.  *SEC v. Telegram Grp. Inc.*, 448 F.Supp.3d 352, 365 (S.D.N.Y. 2020) (*citing Glen-Arden Commodities, Inc. v. Constantino*, 493 F.2d 1027 (2d. Cir. 1974) (whiskey casks)); *Miller v. Cent. Chinchilla Grp., Inc.*, 494 F.2d 414 (8th Cir. 1974) (chinchillas); *Balestra v.*

---

[4]  "[T]he word 'solely' in the third prong of *Howey* has not been construed literally."  *Long v. Shultz Cattle Co., Inc.*, 881 F.2d 129, 133 (5th Cir. 1989).  Instead, courts apply "a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Williamson,* 645 F.2d at 418 (*quoting SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973)).

*ATBCOIN LLC*, 380 F.Supp.3d 340 (S.D.N.Y. 2019) (digital tokens)).   Whether an offering is a

security is a matter of law that should be decided by the court.   *See United States v. Johnson*, 718

F.2d 1317, 1332 (5th Cir. 1983) (observing that "[t]here has been a steady line of cases, civil and

criminal, under the Securities Acts upholding a finding of a 'security' as a matter of law").

> **b.   Balina Cannot Carry His Burden to Demonstrate, as a Matter of Law, That as Offered and Sold by Sparkster and Balina, SPRK Tokens Did Not Qualify as Securities Under the *Howey* Test**

Balina argues that, as a matter of law, the *Howey* test is not satisfied because the SPRK

Tokens were marketed as a "finished product" and therefore the second and third elements of the

*Howey* test are not satisfied.   Mot. at 11-16.   That argument is factually and legally wrong.

> ### i.   SPRK Tokens Were Not Marketed as a Finished Product

> #### 1.   Sparkster Did Not Claim SPRK Tokens Could Be Used With a Finished Product

Balina places significant weight on his assertion that Sparkster claimed to have a

"'finished' product that was usable with a SPRK Token." Mot. at 11.   That premise is incorrect.

At the time of the ICO, SPRK Tokens were not usable with a finished product, and they were not

marketed to investors for their possible consumptive use.

Sparkster claimed to have a finished product (a no-code software platform), but not one

that could be used with SPRK Tokens.   App. 13-14.   Sparkster also claimed it was in the process

of developing two additional products (a "decentralized cloud" and a marketplace) on which SPRK

Tokens could be earned or used by users in the future.   App. 14-15.   Those products did not launch

until six months and one year, respectively, *after* the ICO.   App. 15 .

None of the quotations from Sparkster's CEO that appear in Balina's motion say that SPRK

Tokens could be used with Sparkster's allegedly finished product, the no-code software platform.

Instead, Sparkster's CEO acknowledged that the "decentralized cloud" was a work in progress:

"What we're building today is a blockchain to run the software that you build." *See* Mot. at 11.  It was on this "decentralized cloud," which did not yet exist, that users would "earn tokens for running GE software or different [software]." App. 14.  Courts have rejected this very argument that a future use of a digital asset, which "would materialize only if the enterprise advertised by [the issuer] turned out to be successful," indicates that the digital asset was not offered and sold as an investment contract. *SEC v. Kik Interactive Inc.*, 492 F.Supp.3d 169, 180 (S.D.N.Y. 2020).

### 2. Sparkster Marketed SPRK Tokens to Potential Investors, Not Potential Users of Its Current or Planned Products

Sparkster did not market SPRK Tokens to potential customers or users of its product, but to investors looking to profit from a rise in the market price.  Sparkster described its customer base as large technology companies.  In its Whitepaper, Sparkster stated: "Our product has garnered interest from many enterprise companies, which are some of the largest technology companies in the world.  So far, we have signed official partnerships with ARM and Libelium." App. 18.  Similarly, during a May 25, 2018, interview and demonstration with Balina, posted to Balina's YouTube channel, Sparkster's CEO was asked who its target client was, and he responded: "[W]ho is the ideal customer, well, we already have interest in our platform from Cisco, Huawei, Nestle.  We already have a partnership today with, with ARM (phonetic), with Labelium (sic)." *Id*.

During Balina's pitch contest and in subsequent interviews with Balina, however, Sparkster marketed SPRK Tokens not to major corporations but to Balina's followers, an audience of potential crypto investors.  Balina's introductory remarks at the contest where Sparkster competed demonstrate that his audience was one of crypto investors, not corporate customers:

> Who is Ian Balina? I'm a blockchain angel investor. I do this full-time for a living. I travel around the world trying to find the next big ICO. I'm also part of an angel investor group that invests up to $10 million in ICOs.

*** 

11

> So what is my goal? My goal – I mean, I've achieved my goal. I'm now financially independent, … all thanks to cryptocurrency investing to a point where … I'm still blessed to still be a crypto millionaire and not have to go back to working in the corporate world, because cryptocurrency has just changed my life. I'm just trying to evangelize and just share that with other people out there who have their own dreams and goals of having financial freedom, whether it's to quit your corporate job to have more time with your family and kids, to launch that business you've been dying to start, to launch that foundation you want to start or charity, or to just retire and just go on the beach and have fun, right, whatever your goal is.

App. 12, 352.  Sparkster may have boasted that it had a finished product, but it was not selling that product to Balina's followers.  It was trying to raise investor money, and highlighting the potential value of its product was just part of the pitch.  That is the difference between "Shark Tank" and QVC – participants, like Sparkster, are seeking investors, not customers.

Courts have also held that digital assets that have an actual consumptive use (which SPRK Tokens did not) can be offered and sold as part of an investment contract if marketed to potential purchasers who were not the expected users of the product.  For example, in *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020), *Grams*, a digital asset, may have had consumptive uses, but "Telegram's offering materials targeted buyers who possessed investment intent."  *Id.* at 373.  Because the consumptive uses of Grams "were not features that could reasonably be expected to appeal," *id.* at 174, to the venture capital firms from whom Telegram sought to raise funds, the court held that the SEC had shown a substantial likelihood of success on the merits and granted the SEC's application for a preliminary injunction. *Id.* at 381.  *See also SEC v. LBRY, Inc.*, 639 F.Supp.3d 211, 220 (D.N.H. 2022) ("Nothing in the case law suggests that a token with both consumptive and speculative uses cannot be sold as an investment contract.").

Balina's own statements at the time about why he purchased SPRK Tokens belie the notion that investors were merely purchasing a product they intended to use.  In his July 1, 2018, YouTube session, for example, Balina said he was attracted to Sparkster *not* because of its product but

because he expected to profit from an increase in the value of SPRK Tokens: "I mean, you guys

know me, I'm straight up an investor.  I'm here for an ROI."  App. 21.   He elaborated:

> Now, that's not to say that they have better technology than X, Y, Z project, it just
> means a better investment, right? ... I mean, some project could have the best
> technology in the world but be a horrible investment ….  [D]on't confuse a good
> investment with a – with great technology, all right.

*Id*.

### 3. The Sparkster Token Sale Agreement Has Limited Probative Value Regarding How SPRK Tokens Were Marketed

The Sparkster Token Sale Agreement ("TSA"), which Balina quotes at length in his

motion, does not further his argument that SPRK Tokens were being sold as a "finished product."

First, the word "finished" does not appear in the TSA.  Second, the TSA is—*at best*—unclear on

the question of whether SPRK Tokens are being offered and sold as securities:

> NOTHING IN THIS AGREEMENT CONSTITUTES AN OFFER OF
> SECURITIES FOR SALE IN THE USA, OTHER COUNTRIES AND IN ANY
> OTHER JURISDICTIONS WHERE IT IS UNLAWFUL TO DO SO. **THE
> SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED
> UNDER THE U.S. SECURITIES ACT** OR THE SECURITIES LAWS OF ANY
> STATE OF THE UNITED STATES OR OTHER JURISDICTIONS AND **THE
> SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED
> STATES** OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS
> (AS DEFINED IN REGULATIONS UNDER THE SECURITIES ACT) EXCEPT
> PURSUANT TO AN EXEMPTION ….

Mot., Exh. 4 at 2 (emphasis added).   Balina quotes the first sentence of this passage but

misleadingly omits the second, Mot. at 13, which repeatedly refers to "the securities" being offered

and sold.

Third, courts regularly look past disclaimers that are "contrary to the apparent economic

reality of a transaction" when analyzing whether an investment contract exists*.  Telegram Grp.

Inc.*, 448 at 365.  In *Telegram*, the defendant pointed to statements "emphasizing the consumptive

use of Grams and rejecting any expectation of profit."  *Id.* at 374 (*quoting*, among other statements,

"Grams are intended to act as a medium of exchange between users in the TON ecosystem. Grams are NOT investment products and there should be NO expectation of future profit or gain from the purchase, sale or holding of Grams.").  The court held that the disclaimers did not outweigh "the substantial evidence that a reasonable purchaser expected to profit from Grams upon their launch. *Id.* at 374-75.  *See also LBRY, Inc.*, 639 F. Supp. 3d at 219 ("a disclaimer cannot undo the objective economic realities of a transaction.").  The economic reality was that purchasers of SPRK Tokens expected to earn profits from Sparkster's development of its various products, which would increase the market price of SPRK Tokens.

### ii.   SPRK Token Purchasers Invested in a Common Enterprise

The Fifth Circuit defined a common enterprise under the second prong of *Howey* as "'one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties.'"  *Koscot*, 497 F.2d at 478 (*quoting SEC v. Glenn W. Turner Enters.*, 474 F.2d 476, 482 n.7 (9th Cir. 1973)).  "The critical factor is not the similitude or coincidence of investor input, but rather the uniformity of impact of the promoter's efforts."  *Id.*, *see also Long*, 881 F.2d at 140 (holding that "the critical inquiry is confined to whether the fortuity of the investments collectively is essentially dependent upon promoter expertise") (*quoting SEC v. Continental Commodities Corp.*, 497 F.2d 516, 522 (5th Cir. 1974)).  Moreover, a common enterprise exists where "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."  *Long,* 881 F.2d at 133 (citations omitted).

The fortunes of the SPRK investors were dependent upon Sparkster's efforts and expertise establishing a common enterprise, and Sparkster told investors it would use the proceeds from the sale of SPRK Tokens to develop its platform.  For example, Sparkster stated in its Whitepaper that

"[t]he development and launch of the Sparkster Platform by Sparkster Enterprise Ltd will be funded by the Company using the proceeds of the sale of the Tokens," and that "[w]e are developing targeted solutions for specific vertical markets based on our assessment of the potential for growth …."  App. 17.  In a June 1, 2018, YouTube presentation, in response to the question "*What are you going to do with all the money*?", Sparkster's CEO stated: "Vast majority of money we've raised will be used to promote Sparkster and tell the world about Sparkster." App. 18.

Courts have regularly looked to this common use of investor proceeds to conclude that a common enterprise existed.  For example, in *SEC v. Kik Interactive Inc.*, 492 F.Supp.3d 169 (S.D.N.Y. 2020), the court noted that "Kik established a common enterprise…. Kik used the funds for its operations, including the construction of the digital ecosystem it promoted. This ecosystem was crucial. The success of the ecosystem drove demand for Kin and thus dictated investors' profits." *Id.* at 178.  Similarly, in *SEC v. Telegram Grp. Inc.*, 448 F.Supp.3d 352 (S.D.N.Y. 2020), the court found that a common enterprise existed because "Telegram pooled the money received from the Initial Purchasers and used it to develop the TON Blockchain as well as to maintain and expand Messenger. The ability of each Initial Purchaser to profit was entirely dependent on the successful launch of the TON Blockchain." *Id.* at 369.  Without Sparkster's development and marketing, its investors were not going to make any profit.

### c. Sparkster Created in Potential SPRK Token Purchasers an Expectation of Profits from Sparkster's Efforts

Sparkster promoted the ICO as a way for investors—not customers—to make money off Sparkster's success.  In a Telegram comment posted on or about July 4, 2018, a few days before the "crowdsale" phase of the ICO, Sparkster's CEO bragged about expected profits: "Stick with us, and we'll deliver 300x.  Our platform is truly life changing."  App. 19.  Representations of this nature have been held to satisfy the third prong of the *Howey* test.  *See LBRY, Inc.*, 639 F. Supp.

3d at 217-18; *Kik Interactive, Inc.*, 492 F.Supp.3d at 173-175. 179; *Telegram Group, Inc.*, 448 F. Supp. 3d 352 at 360, 362; *SEC v. Terraform Labs, Pte. Ltd.*, No. 23-CV-1346 (JSR), 2023 WL 4858299, at *2 (S.D.N.Y. July 31, 2023).

Both in its Whitepaper and on social media, Sparkster stated that it planned to list SPRK Tokens on crypto asset trading platforms.  *See* App. 19 (SPRK tokens "may be placed on third-party exchanges"; in the future, users would have to buy and sell SPRK tokens on those platforms; and 2% of SPRK tokens would be retained to "facilitate liquidity for an exchange listing"); *see also* App. 20 ("Market makers are critical to securing an major exchange listing, without them we won't be able to get an exchange listing. We are working on this now."); *Id.* ("When is Sparkster going to hit exchanges? I'm not able to comment on exchanges as you might appreciate, but it is something we are actively working on.").  These representations created an expectation in investors that they would be able to profit from their investment in SPRK Tokens by re-selling them to third parties.  *See Balestra*, 380 F.Supp.3d at 356 n.14 ("purchasers' ability to resell [crypto assets] on other exchanges also supports the conclusion that the coins are securities"); *SEC v. NAC Foundation LLC*, 512 F.Supp.3d 988, 997 (N.D. Cal. 2021) (denying motion to dismiss where purchasers were led to expect that tokens "would be tradeable on stock-market-like exchanges").

Sparkster even delayed the planned "crowdsale" phase of the offering, citing unfavorable market conditions.  *See* App. 18-19 ("Hey guys, I have been listening to your concerns, and from seeing the deteriorating market conditions, I have decided to postpone the crowdsale.").  Then, Sparkster distributed all SPRK tokens during July 2018 in locked format, prohibiting their use and transfer, and did not list them on crypto asset trading platforms for almost a year.  App. 19-20. Sparkster's CEO repeatedly stated, during and after the ICO, that Sparkster took those actions

because it did not want SPRK tokens to decrease in value due to a general decline in the ICO market. *Id*.

Similar to the facts of the crypto asset cases discussed above, Sparkster also communicated to investors, both during and after the ICO, that it was responsible for growing the company and marketing and developing the platform, and it discussed Sparkster's efforts in this regard.  App.17-18, 20.  These representations also created an expectation of profits based on Sparkster's efforts.  *See LBRY*, 639 F.Supp.3d at 217-21; *Kik Interactive*, 492 F.Supp.3d at 176; *Telegram*, 44 F.Supp.3d at 360, 362. *See also Balestra*, 380 F.Supp.3d at 357 (holding that the dependence of token purchasers on management to develop and launch the underlying blockchain platform is sufficient to show their expectation of profits was dependent on management's efforts).

The opinion in *SEC v. Ripple Labs, Inc.*, No. 20 CIV. 10832 (AT), 2023 WL 4507900 (S.D.N.Y. July 13, 2023), is of no help to Balina.  In *Ripple*, the court held that investors who purchased XRP on crypto trading platforms, as opposed to buying from Ripple, had no reasonable expectation of profits from Ripple's managerial efforts because they did not know that their money would go to Ripple.  *Id.* at *11–12. Here, participants in Balina's investment pool understood that their investment was going to Sparkster.   Before Balina transferred the pool's payment to Sparkster, he posted on Telegram: "Sending funds soon.  Those that want to pull out please do so asap.  We won't wait long," and later, "Sending funds now," and, "Funds sent." App. 6. Moreover, at least one court has already rejected this holding: "That a purchaser bought the coins directly from the [issuer] or, instead, in a secondary resale transaction has no impact on whether a reasonable individual would objectively view the [issuer's] actions and statements as evincing a promise of profits based on their efforts. *Terraform Labs Pte. Ltd.*, 2023 WL 4858299 at *15.

### IV.     U.S. Securities Laws Apply to Balina's Conduct Because He Promoted, Offered, and Sold SPRK Tokens to U.S. Investors

Balina contends that the relevant provisions of the Securities Act do not apply to his conduct because he was physically abroad during the relevant period.  Mot. at 7-10.  He is incorrect.  Under *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), U.S. statutes are presumed not to apply extraterritorially.  *Id.* at 255.  But Balina's violative conduct was domestic: He used U.S. channels to target U.S. investors with his promotions, offers, and sales of SPRK Tokens.  Applying the Securities Act to that conduct does not run afoul of *Morrison*.

To determine whether a violation is "domestic," a court "must look to a statute's 'focus,'" and the "focus of a statute is 'the object of its solicitude,' which can include the conduct it 'seeks to regulate,' as well as the parties and interests it 'seeks to protect' or vindicate."  *In re Picard*, 917 F.3d 85, 96 (2d Cir. 2019) (citation omitted). A court must assess whether "the conduct relevant to the statute's focus occurred inside the United States," and if so, the case involves a permissible domestic application even if other conduct occurred abroad.  *Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 913 (D.C. Cir. 2018) (quotation omitted).

Section 5 of the Securities Act prohibits the unregistered offers and sales of securities that "make use of any means or instruments of transportation or communication in interstate commerce or of the mail."  15 U.S.C. §§ 77e(a), (c).  It was drafted "to assure full and fair disclosure in connection with the public distribution of securities." *Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 126 (2d Cir. 1998) (citations omitted).

> [T]he registration provisions [of the Securities Act] are designed to prevent the offer of securities *in the United States securities market* without accompanying standardized disclosures to aid investors, a course of conduct. This conduct, in turn, has the effect of creating interest in and demand for unregistered securities. To avoid this result, in keeping with Congress's purpose, the registration provisions should apply to those offers of unregistered securities

that tend to have the effect of creating a market for unregistered securities *in the United States*.

*Id.* (emphasis added).[5]  Securities Act Section 5 thus seeks to regulate not purchase and sales transactions, but rather the creation of a domestic market for unregistered securities when instrumentalities of commerce are used to offer, sell or deliver securities.  And "the parties and interests it 'seeks to protect' or vindicate" are investors in the United States market entitled to the information required by registration before they commit their money—"the heart of the [Securities] Act." *Pinter v. Dahl*, 486 U.S. 622, 638 (1988).  Securities Act Section 5 does not have a transactional focus; indeed, the prohibition against using domestic instrumentalities to make an unregistered offer of securities requires no completed transaction at all, and the SEC is authorized to enjoin illegal offerings before there is any sale.[6]

Balina promoted and offered SPRK Tokens using YouTube, Telegram, and his own blog site, all of which were available to investors in the U.S.  App. 8-10, 12.  YouTube and his blog site are both U.S. platforms.  He also offered and sold SPRK Tokens using a Google Form, another domestic means of communication. App. 4, 11.  In so doing, he helped create a market for SPRK Tokens in the United States, as evidenced by the fact that U.S. investors contributed to his pool. App. 11.  Requiring registration of offers and sales and disclosure of compensated promotions that use domestic instrumentalities to target and solicit U.S. investors regulates only domestic conduct and does not implicate concerns of the extraterritorial reach of U.S. law.  *Cf.  United States v.*

---

[5] *Banque Paribas* was decided before *Morrison*, but *Morrison* did not overrule this case.  *Morrison* involved the extraterritorial application of the Exchange Act, which has a different, transactional focus.  *Morrison*, 561 U.S. at 266.  The SEC is unaware of any case in which a court has ruled that *Morrison*'s transactional test applies to an SEC action brought under Section 5 or Section 17(b).

[6] Section 17(b) has a similar focus: It is meant to ensure U.S. investors have information to which they are entitled regarding promotions of securities that reach them through domestic channels of communication, i.e., that the promoter was not an indifferent third party but rather a paid shill.

*Elbaz*, 52 F.4th 593, 599-600 (4th Cir. 2022) ("While the wire-fraud statute does not apply extraterritorially, the focus of the statute is on misuse of American wires.  As her conduct misused American wires, she was properly prosecuted for a domestic offense.").

Alternatively, if the Court does apply the *Morrison* transactional test, there is at least a genuine issue of fact as to whether Balina's sales were domestic transactions.  Where, as here, a securities transaction does not occur on a national securities exchange, courts look to where the parties were located when they committed themselves to the transaction. *United States v. Vilar*, 729 F.3d 62, 77 n.11 (2d. Cir. 2013) ("territoriality under *Morrison* concerns where, physically, the purchaser or seller committed him or herself, not where, as a matter of law, a contract is said to have been executed").  *See also SEC v. Traffic Monsoon, LLC*, 245 F.Supp.3d 1275, 1295 (D. Utah 2017) ("Either a domestic purchaser or a domestic seller of a security may bring a transaction within the purview of" the U.S. securities laws), *aff'd sub nom. SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019).[7]  Contrary to Balina's assertion (Mot. at 8), it is disputed that he was abroad at *all* times during the relevant period because PrimaBlock data shows Balina's registration with the investment pool from an IP address *in* the United States.  App. 10-11.  Moreover, about nine participants in Balina's investment pool likely purchased SPRK Tokens from the United States, and therefore those sales constitute domestic transactions under *Morrison*.  App. 11.

## CONCLUSION

For the foregoing reasons, the Court should deny Balina's motion in its entirety.

---

[7] *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014), is wholly inapposite. The securities in that case involved securities-based swap agreements where the underlying securities traded on a German exchange. The Second Circuit was careful to cabin its holding, explaining that it "depends in some part on the particular character of the unusual security at issue." *Id.* at 201-202.  SPRK Tokens have no relationship to securities that trade on a foreign exchange, so the key issue of *Parkcentral* is not implicated here.

Dated: October 12, 2023              Respectfully submitted,


                                     */s/ Melissa Armstrong*_____
                                     Melissa Armstrong, State Bar No. 24050234
                                     Fernando Campoamor-Sánchez*
                                     Ivan J. Snyder*
                                     U.S. Securities and Exchange Commission
                                     100 F Street, N.E.
                                     Washington, DC  20549
                                     (202) 551-8523 (Campoamor Sánchez)
                                     Email:  campoamorsanchezf@sec.gov
                                     *Counsel for Plaintiff Securities and Exchange Commission*

Of Counsel:
Carolyn M. Welshhans
David Frohlich

*Admitted pro hac vice*

**Certificate of Service**

I certify that on October 12, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas, Austin Division, using the electronic case filing system of the court. I hereby certify that I have served all counsel according to Fed. R. Civ. P. 5(b)(2).

/s/ Melissa Armstrong
Melissa Armstrong

22